William R. Baldiga, Esq.
May Orenstein, Esq.
BROWN RUDNICK LLP
7 Times Square
New York, NY 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801

*Counsel for Aman Resorts Group*
*Limited, by Carpentaria Management*
*Services Limited*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| AMAN RESORTS GROUP LIMITED, | : | Case No. 16-10517 (SCC) |
| | : | |
| Debtor. | : | |

-----------------------------------------------------------------X

## ANSWER TO INVOLUNTARY PETITION
## AND CONSENT TO ENTRY OF ORDER FOR RELIEF

Aman Resorts Group Limited ("ARGL"), based on the authorization attached hereto as

Exhibit 1, hereby (i) files this *Answer to Involuntary Petition and Consent to Entry of Order for*

*Relief*, (ii) consents to the Involuntary Petition, and (iii) respectfully requests that this Court enter

an order for relief under Section 303(h) of title 11 of the United States Code as soon as

practicable against ARGL.

Dated: March 7, 2016
New York, New York

BROWN RUDNICK LLP

By: */s/ William R. Baldiga*
William R. Baldiga, Esq.
7 Times Square
New York, NY 10036
(212) 209-4800

*Counsel for Aman Resorts Group Limited, by*
*Carpentaria Management Services Limited*

**<u>EXHIBIT 1</u>**

### DIRECTION AND AUTHORIZATION OF CARPENTARIA MANAGEMENT SERVICES LIMITED TO AMAN RESORT GROUP LIMITED TO FILE ANSWER AND CONSENT TO INVOLUNTARY PETITION

Carpentaria Management Services Limited ("Carpentaria"), pursuant to and in accordance with the BVI Court Order (defined below) and the BVI Companies Act 2004 (the "BVI Act"), hereby certifies, for and on behalf of Aman Resorts Group Limited ("ARGL"), that the following resolution was duly adopted in accordance with applicable law and that such resolution has not been amended, modified or rescinded and is in full force and effect as of the date hereof:

**WHEREAS**, attached hereto as Annex A is a true and correct copy of an Order of the Eastern Caribbean Supreme Court, in the High Court of Justice, Virgin Islands, Commercial Division, made on October 2, 2015 and entered on October 15, 2015 (the "BVI Court Order"), in the case captioned *In the Matter of Peak Hotels and Resorts Group Limited and In the Matter of Aman Resort Group Limited and in the Matter of the BVI Business Companies Act 2004, between: Peak Hotels and Resorts Limited and (1) Peak Hotels and Resorts Group Limited, (2) Aman Resorts Group Limited*, Claim No. BVIHC (Com) 0116 of 2015;

**WHEREAS**, pursuant to the BVI Court Order, on October 16, 2015, that certain Irrevocable Appointment and Assignment of Interest (the "Assignment"), attached hereto as Annex B, was entered into by and among Carpentaria, on the one hand, and Peak Hotels and Resorts Limited, on the other;

**WHEREAS**, on March 4, 2016, an involuntary chapter 11 bankruptcy petition was filed against ARGL in the United States Bankruptcy Court for the Southern District of New York (the "Court"); and

**WHEREAS**, on March 7, 2016, an amended involuntary chapter 11 bankruptcy petition was filed against ARGL in the Court (as amended, the "Involuntary Petition").

**NOW, THEREFORE, BE IT RESOLVED**, that, pursuant to and in accordance with the BVI Court Order, the BVI Act, and the Assignment, Carpentaria has determined that it is desirable and in the best interests of ARGL that ARGL shall be and hereby is authorized to file or cause to be filed an answer and consent to the Involuntary Petition and to consent to entry of an order for relief against ARGL pursuant to Section 303(h) of title 11 of the United States Code.

AMAN RESORTS GROUP LIMITED, by
Carpentaria Management Services Limited

By: _____
   Name: Sean Sullivan
   Title:  Authorized Signatory of
          Carpentaria Management Services Limited

**<u>Annex A</u>**



**THE EASTERN CARIBBEAN SUPREME COURT**
**IN THE HIGH COURT OF JUSTICE**
**VIRGIN ISLANDS**
**COMMERCIAL DIVISION**
Claim No. BVIHC (Com) 0116 of 2015

IN THE MATTER OF PEAK HOTELS AND RESORTS GROUP LIMITED

AND IN THE MATTER OF AMAN RESORTS GROUP LIMITED

AND IN THE MATTER OF THE BVI BUSINESS COMPANIES ACT 2004

B E T W E E N:

PEAK HOTELS AND RESORTS LIMITED

<u>Claimant / Applicant</u>

-and-

(1) PEAK HOTELS AND RESORTS GROUP LIMITED

(2) AMAN RESORTS GROUP LIMITED

<u>Defendants / Respondents</u>

---

## ORDER

---

BEFORE:              The Honourable Justice Barry Leon (Ag)

MADE:                Friday, the 2nd day of October 2015

ENTERED:             15th day of October 2015

**UPON THE CLAIM / APPLICATION** by Peak Hotels and Resorts Limited ("PHRL") dated 28 September 2015 for Orders in respect of each of the above Defendants / Respondents under section 184C of the BVI Business Companies Act 2004 ("**the Application**")

**AND UPON READING** the evidence recorded upon the Court File as having been read, namely the First Affidavit of Andrew Dunn dated 28 September 2015, and the exhibits thereto

**AND UPON HEARING** John Brisby QC, Rosalind Nicholson and Alexander Cook, Counsel for PHRL, the Defendants/Respondents having been given short notice of this Application by delivery of the documents relating to the Application to their respective registered offices this morning

**IT IS HEREBY ORDERED THAT:**

1.      PHRL has leave pursuant to section 184C of the BVI Business Companies Act, 2004 ("**the Act**"), and in accordance with section 184D and 184F of the Act (collectively, "**BVI Derivative Actions Provisions**"), to make, in the name of and on behalf of the First Defendant/Respondent, Peak Hotels and Resorts Group Limited ("**the JVC**"), an application

against the Second Defendant/Respondent, Aman Resorts Group Limited ("ARGL"), for leave pursuant to the BVI Derivative Actions Provisions to make an application in the name of and on behalf of ARGL before the English High Court of Justice (Chancery Division) ("English Court") seeking the relief to be pursued on behalf of ARGL set out in paragraphs 2 and 3 below.

2.      PHRL has leave pursuant to the BVI Derivative Actions Provisions, to make, in the name of and on behalf of ARGL, an application to seek leave from the English Court to amend its Amended Consolidated Particulars of Claim in Claim HC-2014-000497 (which is currently proceeding before the English Court) in the form of the draft Re-Amended Particulars of Claim (as amended in green, annexed hereto) (with any such minor amendments as may appear necessary and not alter the essence of the claims set out); and, if such leave is granted, to prosecute such claims in ARGL's name and on its behalf, until judgment and the conclusion of any appeal(s).

3.      PHRL has leave pursuant to the BVI Derivative Actions Provisions:

3.1.    to institute, and thereafter prosecute through to a conclusion (including any appeal(s)), proceedings under Chapter 11 of the United States Bankruptcy Code in the name of, and on behalf of, ARGL in respect of that company before the United States Bankruptcy Court for the Southern District of New York; and for that purpose

3.2.    to take such actions, file such papers, give such testimony, and (either by itself or by Carpentaria Management Services Limited, with full powers and authority under the Act and all other applicable law) to execute any necessary or appropriate agreements and commitments and all related corporate resolution(s) (none of which shall require any other signature to render the same fully valid) for ARGL and on ARGL's behalf, in connection with such proceedings as set out at paragraph 3.1 above.

4.      The period of notice set down in section 184C(4) of the Act is abridged accordingly.

5.      There be liberty to the Defendants/Respondents to apply to set aside or vary this Order upon 7 days' written notice to the Claimant/Applicant's attorneys, Messrs Conyers Dill & Pearman, of Commerce House, Wickhams Cay 1, PO Box 3140, Road Town, Tortola, British Virgin Islands VG1110 for the attention of Miss Rosalind Nicholson and Mr Luke Petith, with a copy to rosalind.nicholson@conyersdill.com and luke.petith@conyersdill.com.

BY THE COURT

~Benjamin~
~pp~ REGISTRAR

Amended Particulars of Claim by Order of [          ] J dated [          ] 2015

**Amended Particulars of Claim by Order of Warren J dated 20 August 2015**

**Claim No. HC-2014-000497**

IN THE HIGH COURT OF JUSTICE
CHANCERY DIVISION

B E T W E E N:

**PEAK HOTELS AND RESORTS LIMITED**
(bringing this claim on its own behalf and in a double derivative capacity on behalf of the
Eighth Defendant, Aman Resorts Group Limited)

**Claimant**

-and-

**(1) TAREK INVESTMENTS LIMITED**
**(2) PEAK HOTELS AND RESORTS GROUP LIMITED**
**(3) SHERWAY GROUP LIMITED**
**(4) CARL JOHAN ELIASCH**
(5) PONTWELLY HOLDING COMPANY LIMITED
(6) VLADISLAV DORONIN
(7) AH OVERSEAS LIMITED
(8) AMAN RESORTS GROUP LIMITED

**Defendants**

-and-

**(1) PHRL HOLDINGS LIMITED**

**First Named Third Party**

**(2) OMAR SHARIF AMANAT**

**Second Named Third Party**

**(3) LALIT MODI**

**Third Named Third Party**

---

**RE- AMENDED CONSOLIDATED
PARTICULARS OF CLAIM**

---

### I.    Introduction

1.    These claims arise out of the acquisition by a group of investors of Aman Resorts, a collection of 26 small luxury resorts and hotels in Asia, Europe and the Americas (**"Aman Resorts"**), through a joint venture company they formed for that purpose, Peak Hotels and Resorts Group Limited (**"the JVC"**).

2.    In these Particulars of Claim, claim number HC14D02543 will be referred to as **"the TIL Claim"** and claim number HC14B02770 will be referred to as **"the Sherway Claim"**.

### II.    Dramatis Personae

3.    The principal human characters which feature in these claims are as follows:

3.1.   Mr Omar Sharif Amanat (**"Mr Amanat"**), an entrepreneur and venture capitalist;

3.2.   Mr Adriaan Zecha ("**Mr Zecha**"), the founder of Aman Resorts, and a leading visionary of the hotel industry;

3.3.   the Second Defendant in the Sherway Claim, Mr Carl Johan Eliasch (**"Mr Eliasch"**), the Chairman of Head N.V. the well known sports manufacturer, and a former Special Representative of the Prime Minister of the United Kingdom; and

3.4.   the Sixth Defendant, Mr Vladislav Doronin (**"Mr Doronin"**), a Russian businessman, whose primary business interest is real estate.

4.   The Claimant, Peak Hotels and Resorts Limited (**"PHRL"**), is a company incorporated and registered in the British Virgin Islands under company number 1808196, whose registered office is at Nemours Chambers, Road Town, Tortola, British Virgin Islands. PHRL was incorporated on 14 January 2014.

5.   PHRL's majority shareholder is Peak Investments Limited ("**PIL**"). PIL is owned by Mr Amanat's family trust. Mr Zecha and (arguably) Jingpeng ~~Jinpeng~~ Group Limited (**"Jinpeng"**), a company incorporated and registered in the British Virgin Islands, and Beijing Tourism Group Co Limited (**"BTG"**), a State Owned Enterprise of the Government of the People's Republic of China, are also ordinary, non-voting shareholders in PHRL. Whether or not Jinpeng and/or BTG are shareholders is currently the subject of a separate dispute.   Mr Amanat was, until September 2014 ~~recently~~, the sole director of PHRL. Its present director is Ms Carolyn Turnbull (**"Ms Turnbull"**), who, until recently, acted as Aman Resorts' Executive Director of Global Sales.

6.   The First Defendant in the TIL Claim, Tarek Investments Limited (**"TIL"**), is a company owned and controlled by Mr Doronin. TIL was incorporated on 3 September 2013 and is registered in the British Virgin Islands under company number 1789421. Its registered office is at 3076 Sir Francis Drake's Highway, PO Box 3463, Road Town, Tortola, British Virgin Islands.

7.   The JVC (the Second Defendant in the TIL Claim) was incorporated on 17 January 2014 as a joint-venture investment vehicle through which PHRL and TIL were to acquire an interest in Aman Resorts. The JVC is registered in the British Virgin Islands under company number 1808788 and its registered office is at Nemours Chambers, Road Town, Tortola, British Virgin Islands.

8.   The current shareholders of the JVC are as follows:

8.1.  PHRL holds 12,339 Class "A" shares, which amount to an overall interest of 35.2% in the JVC.

8.2.  TIL holds 22,704 Class "B" shares, which amount to an overall interest of 64.8% in the JVC.

(Each of the "A" and "B" shares has the same value.)

9.  Although the shareholdings in the JVC are unequal, the Shareholders Agreement dated 31 January 2014, which governs the relationship between PHRL and TIL as regards the JVC's affairs (**"the JVC SHA"**), provides for equal control at Board level. PHRL and TIL are both entitled under the JVC SHA to nominate two directors to the Board of the JVC, being "A" and "B" directors respectively. In short, the JVC SHA ensures that the JVC is a "deadlock company", with no one shareholder (through its nominated directors) being able to push through proposals without the agreement of the other shareholder.

10.  As at the date of these Particulars of Claim, the following are directors of the JVC nominated by PHRL and TIL respectively:

"A" Directors
- Carpentaria Management Services Limited (**"Carpentaria"**)
- Mr Eliasch

"B" Directors
- Mr Doronin
- Mr Alan Djanogly, the Co-Founder and Chief Executive Officer of International Asset Management Limited (**"Mr Djanogly"**)

11.  The Third Defendant in the TIL Claim and the First Defendant in the Sherway Claim, Sherway Group Limited (**"Sherway"**), is a company owned and controlled by Mr Eliasch. Sherway was incorporated on 4 July 2011 and is registered in the British Virgin Islands under company number 1652716. Its registered office is at Vanterpool Plaza, 2nd Floor, Wickhams Cay I, Road Town, Tortola, British Virgin Islands.

12.  In circumstances pleaded to in further detail below, PHRL Holdings Limited (**"Holdings"**) was incorporated on 27 March 2014. As at the date of these Particulars of Claim, PHRL is the sole shareholder of Holdings. Holdings was incorporated as a vehicle through which Sherway and Mr Eliasch could gain an indirect equity interest in the JVC by: (i) the transfer of PHRL's shares in the JVC to Holdings; and (ii) the transfer of a proportion of PHRL's shares in

Holdings to Sherway. Sherway and PHRL would then be the sole shareholders in Holdings. Holdings is registered in the British Virgin Islands under company number 1817883 and its registered office is at Nemours Chambers, Road Town, Tortola, British Virgin Islands.

13. The Fifth Defendant, Pontwelly Holding Company Limited ("**Pontwelly**") is, it is averred, a company owned and controlled by Mr Doronin ~~and an unnamed business associate~~. PHRL avers that, whatever the precise formal legal structure, Mr Doronin exercises *de facto* control over Pontwelly and it is (and can be considered to be) Mr Doronin's vehicle or nominee. In particular:

    13.1. TIL has alleged in its Defence that Pontwelly is owned and controlled by "*a family trust of Mr Doronin*".

    13.2. Pontwelly's registered address is identical to the registered address of TIL and PHRL has seen a document which indicates that TIL and Pontwelly are under the control of a common entity.

    13.3. Mr Doronin has referred to the loan provided by Pontwelly to ARGL (see paragraph 13A below) as being "*my loan*" (including in particular at the 22 April Meeting (defined below)).

13A. Pontwelly is incorporated in the British Virgin Islands and its registered office is at 3076 Sir Francis Drake's Highway, PO Box 3463, Road Town, Tortola, British Virgin Islands. By an agreement dated 31 January 2014, Pontwelly provided a loan facility of US$ 168 million to the Eighth Defendant, Aman Resorts Group Limited ("**ARGL**") (one of the JVC's wholly owned subsidiaries, and the immediate holding company of Silverlink (defined below)) ("**Financing Agreement**"), in the circumstances pleaded more particularly below. In order to secure its indebtedness to Pontwelly, ARGL *inter alia* pledged the shares which it held in Silverlink (defined below) to Pontwelly pursuant to a pledge agreement dated 13 February 2014 ("**the Pontwelly Pledge Agreement**").

14. Corporate structure charts, which summarise the entities and individuals set out above and in Section IV below, and which reflect the corporate structure both before and after the proposed interposition of Holdings, are attached to these Particulars of Claim at Appendix 1 and Appendix 2 respectively.

### III.   Executive Summary

15. In summary, PHRL's position in this claim is as follows:

15.1.    In broad terms, this claim arises out of the conduct of Mr Doronin (through his vehicle, TIL), in concert with Mr Eliasch, which appears to be designed to force PHRL (and parties connected therewith, including Mr Amanat and Mr Zecha) out of the JVC, to dilute their shareholdings therein, and to assume ultimate control of Aman Resorts.

15.2.    Despite having been appointed as PHRL's nominated "A" director in the JVC, Mr Eliasch appears to have adopted a course of action as director which is materially adverse to PHRL's interests, the interests of Sherway and the interests of the JVC, and comprises a breach of Sherway's own contractual obligations. It has since emerged that (unbeknown to, and undisclosed by, either Mr Doronin or Mr Eliasch to PHRL) Mr Eliasch and Mr Doronin are well known to each other, having been close friends for a number of years. It is legitimately to be inferred that Mr Doronin and Mr Eliasch have resolved to work together for the sole purpose of gaining an unfair advantage in relation to the management and conduct of the JVC, and that Mr Eliasch (as pleaded in further detail below) is acting to the detriment of PHRL's (and indeed Sherway's) interests in the JVC, and to the detriment of the JVC's own interests, at the behest of, or in cooperation with, Mr Doronin.

15.3.    Mr Doronin (through TIL), with the assistance or acquiescence of Mr Eliasch and his *de facto* control of the JVC's Board, appears to be putting these objectives into effect by, among other things:

15.3.1.    Unlawfully procuring that the JVC's Board pass various purported resolutions authorising the directors to make capital calls on the shareholders, including one purported "capital call" for US$ 150 million at a price of US$ 0.01 per share – a purported price which was not a genuine or accurate valuation of shares in the JVC, but rather was made in bad faith in an effort to leverage the purported capital call's dilutive effect on PHRL. These purported capital calls were not made for a legitimate commercial purpose but instead were made with the intention of diluting PHRL's shareholding in the JVC.

15.3.2.    Unlawfully purporting to terminate unilaterally various incentive arrangements which were agreed between TIL, the JVC and PHRL and several of PHRL's affiliates and third parties and/or failing or refusing to negotiate and execute an asset management agreement with such parties.

15.3.3.    Unlawfully purporting to force out and/or remove Mr Zecha from his position as CEO of the JVC, despite the fact that (i) PHRL and TIL had agreed to Mr Zecha acting as CEO for at least 6 months following completion on 7 February 2014; (ii) PHRL and TIL have expressly agreed that, even if Mr

Zecha stepped down as CEO of the JVC, he would remain Chairman of the "*Resorts Business*" (within the meaning of the JVC SHA) or CEO of Aman Resorts Management B.V. ("**AMBV**"), a company incorporated for the management of the resorts; and (iii) Mr Zecha did not propose to resign with immediate effect. Notwithstanding this, TIL purported to unlawfully have Mr Doronin himself appointed as CEO, in breach of various provisions of the JVC SHA. Since Mr Zecha has in fact stepped down as CEO of the JVC, TIL and the JVC have, in breach of the JVC SHA, failed or refused to procure that Mr Zecha be appointed as Chairman of the "*Resorts Business*" or CEO of AMBV.

15.3.4. In seeking to achieve the above and other aims (including in particular purportedly making capital calls for US$ 50 million and US$ 10 million by notices dated 17 June 2014), generally ignoring or flouting the procedural protections set out in the JVC SHA, including in respect of the proper procedure for the summoning and conduct of Board meetings. TIL's nominated directors, together with Mr Eliasch, have persistently ignored the request of Carpentaria (one of PHRL's nominated directors) to adjourn board meetings and have held invalid meetings, whose resolutions have had to be restrained by the Court.

15.3.5. Keeping PHRL in the dark about plans hatched by Mr Doronin, Mr Eliasch and/or Mr Djanogly by ensuring that documents and information circulated among these individuals regarding the JVC do not reach Carpentaria.

15.4. Mr Doronin (through TIL) has also procured, again with the assistance or acquiescence of Mr Eliasch, that no progress be made on refinancing the US$ 168 million loan from Pontwelly to ARGL, thereby continuing to line his own pocket through the punishing interest rate charged by Pontwelly to the joint venture. Mr Doronin (together and dishonestly conspiring with Pontwelly, Mr Eliasch, Mr Djanogly and Mr Jolivet) has attempted to engineer a situation (involving breaches of duty and by means of an unlawful means conspiracy) in which ARGL is alleged to have defaulted on its obligations under the Financing Agreement, thereby purportedly enabling Pontwelly to seize ARGL's shares in Silverlink.

15.5. In what is legitimately to be inferred to be a pincer movement, PHRL also has had served upon it a purported "*Enforcement Notice*" by Sherway, alleging that PHRL is in breach of the Facility Agreement (defined below), on the basis that a consent required for the transfer of certain shares has been correctly obtained from Pontwelly, and that, as a result, Sherway is entitled to acquire PHRL's shares in the JVC at 80% of fair value. In fact, the purported consent obtained from Pontwelly, which is owned and

controlled by Mr Doronin and a business associate was not for various reasons a valid "*Share Transfer Consent*". It is legitimately to be inferred that Sherway's service of the purported "*Enforcement Notice*", which it is assumed has been taken by Mr Eliasch (through Sherway) at the behest of Mr Doronin, it a yet further tactic designed to enable Mr Doronin to take control of Aman Resorts.

15.6.   In the premises, PHRL seeks declaratory and injunctive relief to protect it ~~and ARGL~~ from the unlawful actions of the Defendants ~~(which expression shall hereafter, unless the context otherwise requires, exclude ARGL)~~ TIL, the JVC, Sherway and Mr Eliasch. PHRL also seeks damages, and damages and restitutionary relief in a double derivative capacity on behalf of ARGL. The claims pleaded herein arise in tort or under agreements which are governed by English law and subject to the jurisdiction (and in some cases exclusive jurisdiction) of the English courts.

## IV.    Factual Background

16.    Aman Resorts was founded by Mr Zecha in 1988, with the opening of its first hotel, the Amanpuri, in Thailand. In the years that followed, Aman Resorts established 25 other luxury hotels and resorts in Europe, Asia and the Americas.

### (a)    The acquisition of Aman Resorts

17.    On 27 November 2007, DLF Global Hospitality Limited, India's largest real estate company ("**DLF**"), acquired a controlling stake in Silverlink Resorts Limited ("**Silverlink**"), the holding and operating company of Aman Resorts. DLF acquired its controlling interest in Silverlink for US$ 400 million, including debt of US$ 150 million.

18.    On 20 July 2013, DLF signed a non-binding letter of intent with Peak Venture Partners LLC ("**Peak LLC**"), which later formed PHRL in connection with the proposed sale by DLF of its controlling interest in Silverlink to Peak LLC.

19.    A negotiation period followed, during which it became apparent that DLF were in talks with a number of potential bidders. On 15 November 2013, Peak LLC incorporated ARGL, a company incorporated and registered in the British Virgin Islands under company number 1799232. ARGL's registered office is at Nemours Chambers, Road Town, Tortola, British Virgin Islands. ARGL was incorporated as a vehicle for the potential acquisition of Silverlink.

20.    In or around December 2013, Peak LLC was made aware that it was the preferred bidder for the acquisition of Silverlink.

21.    On 11 December 2013, Mr Amanat was introduced to Mr Doronin through an acquaintance of his, Mr Nader Tavakoli (**"Mr Tavakoli"**), who knew one of Mr Doronin's close business associates, Mr Djanogly. Mr Amanat met Mr Doronin at his apartment in the Mandarin Oriental hotel in New York.

22.    During discussions between Mr Doronin and Mr Amanat, among other things:

22.1.    Mr Doronin proposed to match the debt terms offered by one of Mr Amanat's other potential investor partners;

22.2.    it was discussed that Mr Doronin would be a "silent passive investor" in the Aman Resorts deal;

22.3.    Mr Doronin said that he understood that he would have veto on major decisions but not day to day control or management responsibilities;

22.4.    Mr Doronin attempted to dissuade Mr Amanat from progressing negotiations with other potential investors on the basis that (by implication, in contrast to him) those investors wanted control of the ultimate joint venture company – Mr Doronin said to Mr Amanat "*I thought [y]ou want to control [the joint venture company] or at least have [a] partner with whom you feel comfortable*".

23.    Induced by Mr Doronin's representations as pleaded above, and in the light of the comparatively favourable terms which Mr Doronin appeared to be offering, on 25 December 2013, a binding letter agreement was entered into between Peak LLC and Mr Doronin (**"December Letter Agreement"**). The December Letter Agreement contemplated:

23.1.    The formation of a joint venture company between Peak LLC and Mr Doronin, as a vehicle for holding the shares in ARGL (in the event, this was the JVC).

23.2.    Consistently with the representations pleaded above, that Peak LLC would be the "*Managing Member*" for the purposes of the on-going management of Aman Resorts. In return for providing such management services, and the work it had undertaken to procure the acquisition of Silverlink, it was agreed that Peak LLC would receive certain payments and related incentives. These payments and incentives included an annual asset management fee and a carried interest equal to 25% of all distributions after the equity investors in the JVC received a 10% internal rate of return.

24.     On 2 January 2014, a binding share purchase agreement was entered into between DLF and ARGL (**"the SPA"**). Under the terms of the SPA, ARGL would, subject to the satisfaction of various conditions, acquire 100% of issued share capital of Silverlink.

25.     During January 2014, the relationship between Mr Amanat and Mr Doronin began to deteriorate. As a result of the tension between Mr Amanat and Mr Doronin, about a week before the deal was due to close, Mr Amanat offered to buy Mr Doronin out, and asked him to name his price. Mr Doronin instead threatened to apply for an injunction restraining completion of the SPA with DLF, and contacted the CEO of DLF directly to arrange a meeting, contrary to Mr Doronin's agreed role as a passive investor. It was in these circumstances, and under this pressure, that Mr Amanat felt that he had no option but to complete the deal with Mr Doronin, as DLF had threatened to re-open the bidding if ARGL was not able to complete the acquisition by the due date for closing.

26.     On 31 January 2014:

    26.1.    The JVC SHA was entered into between PHRL and TIL in respect of the affairs of the JVC. The JVC was also a party to this agreement.

    26.2.    ARGL entered into the Financing Agreement with Pontwelly.

27.     In the event, completion of the acquisition contemplated by the SPA occurred on 7 February 2014, funding having been provided pursuant to the terms of the JVC SHA.

**(b)    The introduction of Mr Amanat to Mr Eliasch**

28.     Mr Sam Gullotta (**"Mr Gullotta"**) of Churchill Securities had been retained by Mr Amanat in around November 2013 to look for suitable investors with which to partner in the proposed acquisition of Aman Resorts.

29.     Mr Gullotta was contacted by Mr Djanogly, through a mutual friend, asking for more information about the Aman Resorts deal. At this point, Mr Gullotta did not know that Mr Djanogly was already involved in the deal (on Mr Doronin's side), but was subsequently informed of this by Mr Amanat.

30.     On 19 February 2014, Mr Gullotta met with Mr Djanogly. During this meeting:

    30.1.    Mr Djanogly explained that there was a dispute between Mr Doronin and Mr Amanat.

30.2.   Mr Gullotta asked Mr Djanogly whether Mr Doronin might be interested in purchasing Mr Amanat's stake in Aman Resorts.

30.3.   Mr Djanogly suggested that Mr Doronin did not need, nor was interested in doing so, because Mr Doronin was intent on unleashing a "*scorched earth*" policy on Mr Amanat which would result in Mr Amanat being "*diluted into oblivion*" by the making of large capital calls which he suspected Mr Amanat could not meet.

31.   Although Mr Djanogly suggested at the 19 February meeting that Mr Doronin would not be interested in acquiring Mr Amanat's shares, Mr Djaongly sent Mr Gullotta an email the following day saying "*if you have any more detail on [Mr Amanat]'s sale of shares please let me know as we may have some interested parties*".

32.   A few days later, Churchill received an unsolicited contact from a Monaco-based lawyer, who wished to introduce a wealthy client of his, Mr Eliasch, with a view to discussing potential investments. Mr Eliasch spoke with Mr Gullotta, who offered him a number of investment opportunities. Mr Eliasch was, however, very keen on the Aman Resorts deal and made it clear that he wanted further information. During this conversation or one subsequent to the London Meeting (defined below) Mr Gullotta asked Mr Eliasch whether he knew Mr Djanogly. Mr Eliasch denied knowing him.

33.   In around late February 2014, Mr Amanat spoke to Mr Gullotta. During this telephone call, Mr Gullotta told Mr Amanat that:

33.1.   he had a potential investor who, despite having been presented with a number of different investment opportunities by Mr Gullotta, was very interested in Aman Resorts;

33.2.   the potential investor was Mr Eliasch, who was said to be a serious investor who lived in London and who was "independent"; and

33.3.   (when asked by Mr Amanat whether Mr Eliasch knew Mr Doronin or Mr Djanogly) he did not think that Mr Eliasch knew either of them.

34.   Shortly thereafter, Mr Amanat met with Mr Gullotta and Mr Eliasch at the offices of Head NV in London (**"the London Meeting"**). At the London Meeting and/or during telephone discussions thereafter during February/March 2014, Mr Amanat (acting on behalf of PHRL) explained to Mr Eliasch (acting on his own behalf and on behalf of Sherway) that:

34.1.  Mr Amanat was looking to raise money for working capital for PHRL and that he needed someone with the financial strength to assist PHRL with meeting the funding requirements of the JVC.

34.2.  There was tension between Mr Amanat and his co-shareholder in the JVC and that he needed a partner who would reinforce and support PHRL's interests. As an example of the difficulties which PHRL was facing, Mr Amanat explained that PHRL's co-shareholder was not respecting PHRL's rights under Schedule 7 of the JVC SHA.

35.  Mr Eliasch said that he would be able to provide finance to PHRL and that he wanted to have a Board seat on the JVC as he was very experienced on boards and knew a lot about corporate governance. Mr Eliasch also said, or said words to the effect of, the following:

35.1.  "*I don't breach agreements*";

35.2.  that he could be "*a very good advocate*" for PHRL; and

35.3.  that PHRL "*[didn't] need to worry about me not supporting*" PHRL's rights under Schedule 7 of the JVC SHA.

36.  After the initial London Meeting, Mr Amanat and Mr Eliasch liaised with the intention of arranging a further meeting. Mr Amanat told Mr Eliasch that he would be in Courchevel in the French Alps in late March 2014. Mr Eliasch said that he would meet Mr Amanat there.

37.  While Mr Amanat was in Courchevel:

37.1.  Mr Amanat met with Mr Doronin in order to attempt to resolve the differences between the two of them. In the event, Mr Amanat ended up having a heated discussion with Mr Doronin about the JVC. During this conversation, Mr Doronin said to Mr Amanat: "*if I feel that you tried to screw me I will hunt you down and shoot you*".

37.2.  Mr Amanat met with Mr Eliasch. During his meeting Mr Eliasch said, or said words to the effect of, the following:

37.2.1.  (when asked by Mr Amanat if he knew the other shareholder in the JVC, Mr Doronin (via his vehicle, TIL)) that he knew Mr Doronin only through Mr Doronin's former girlfriend, Naomi Campbell ("**Ms Campbell**"), and that his wife and Ms Campbell were close friends (thereby giving PHRL the impression, given the nature of Mr Doronin's and Ms Campbell's parting and

the fact that they had been involved in legal disputes with one another, that Mr Eliasch was on Ms Campbell's "side" and not Mr Doronin's);

37.2.2.  (when asked by Mr Amanat whether he and Mr Doronin were good friends) that he and Mr Doronin were not good friends; and

37.2.3.  that he (Mr Eliasch) wanted to partner with Mr Amanat and Mr Zecha and help them in dealing with the other shareholder (Mr Doronin, through TIL) and help PHRL turn Aman Resorts into an even more thriving company;

37.2.4.  that he understood (when told by Mr Amanat) that the matters discussed were confidential and confirmed that Mr Amanat could trust him; and

37.2.5.  that "*I don't like to be involved with people who breach agreements so if [Mr Doronin, via his vehicle, TIL] has breached agreements then I will come out strongly on your side. I don't want to be in the middle of any history between you but as the agreement is clear then I will support you*".

38.  In or around early April 2014, during a conversation between Mr Amanat and Ms Carol Ascher (**"Ms Ascher"**), the owner of a villa at the Amanpuri, Mr Amanat mentioned that he was thinking of bringing Mr Eliasch in on the Aman Resorts deal. Ms Ascher told Mr Amanat that Mr Eliasch and Mr Doronin were good friends and that Mr Doronin and Ms Campbell had gone on vacation on Mr Eliasch's yacht with Mr Eliasch and his wife.

39.  Mr Amanat, concerned about this revelation, telephoned Mr Eliasch to ask him specifically about what he had been told by Ms Ascher. Mr Eliasch said, or said words to the effect of: "*no I didn't, I may have rented it [the yacht] to him [Mr Doronin] but I can't recall, I'm not friends with him and have never done business with him*". Mr Amanat believed Mr Eliasch and thought that it was possible that Ms Ascher had misunderstood the arrangement as it was some time ago, when Mr Doronin and Ms Campbell were still together.

40.  At a subsequent meeting between Mr Gullotta and Mr Djanogly, Mr Djanogly denied knowing Mr Eliasch. This was incorrect. Mr Djanogly and Mr Eliasch are well-acquainted. In addition, following the London Meeting, Mr Gullotta asked Mr Eliasch on several occasions whether he wanted Mr Gullotta to assist by arranging a meeting with the other shareholder, Mr Doronin. Mr Eliasch declined this suggestion on ~~aeahe~~ each occasions.

41.  Furthermore, (PHRL assumes in an effort to convince Mr Amanat that Mr Eliasch was "on his side") on 21 March 2014, Mr Eliasch telephoned Mr Amanat to inform him that  Mr Doronin had just telephoned him and had: (i) offered Mr Eliasch US$ 1 million to walk away from the

deal with Mr Amanat/PHRL; (ii) said that he (Mr Doronin/TIL) had the right to buy out PHRL at a 20% discount and that, as Mr Amanat/PHRL had "*a lot of unpaid debts*", Mr Eliasch should not do a deal with PHRL; and (iii) said that he did not want Mr Eliasch to buy any of PHRL's shares in the JVC as he (Mr Doronin) wanted to buy them. Mr Eliasch told Mr Amanat that Mr Doronin was very angry on the call and that he had sought to inform Mr Amanat straight away.

42.    Finally, it was an implied representation, arising from the tenor and context of the express representations pleaded above, that:

42.1.    Sherway/Mr Eliasch would act in good faith in the interests of PHRL and/or the JVC and/or any joint venture vehicle established by PHRL and Sherway/Mr Eliasch; and

42.2.    any funds that Sherway/Mr Eliasch would be providing (through his corporate vehicle) by way of loan to PHRL, would come from his own funds (and certainly not from the funds of Mr Doronin or anyone associated with him) and/or that he would have the ultimate beneficial interest in the proposed investment in PHRL

   ("the Implied Representations").

43.    The representations pleaded at paragraphs 35.1-35.3, 37.2 and 39-42 above will hereafter be referred to as "the Representations".

44.    The Representations, which were made to Mr Amanat on behalf of PHRL (including through the medium of Mr Gullotta) both by Mr Eliasch on his own behalf and on behalf of Sherway, continued until the agreements pleaded at paragraph 46 below were entered into, and were at all material times false (or alternatively: (i) became false prior to the entry into the agreements pleaded at paragraph 46 below and neither Sherway nor Mr Eliasch corrected the relevant representation; and/or (ii) were adopted by Sherway prior to entry into these agreements). In particular, in relation to the Representations:

44.1.    PHRL now knows that, contrary to the Representations, Mr Eliasch and Mr Doronin are very good friends.

44.2.    As will be apparent from the facts and matters pleaded below, Mr Eliasch did not want (and had no intention of):

44.2.1.    partnering with Mr Amanat (or PHRL) in helping him deal with Mr Doronin (or TIL);

44.2.2. acting as an advocate for PHRL (or indeed any joint venture vehicle established by PHRL and Mr Eliasch);

44.2.3. safeguarding PHRL's rights and interests under the JVC SHA or generally (or the rights and interests of any joint venture vehicle established by PHRL and Mr Eliasch); and/or

44.2.4. safeguarding Holdings' prospective rights and interests pursuant to the Holdings SHA (defined below).

44.3.    Rather, (either at the time of the Representations or subsequently, but before the agreements pleaded at paragraph 46 below were entered into) Mr Eliasch had decided to partner and/or act in concert with Mr Doronin (or TIL) in his attempt to force Mr Amanat out of the Aman Resorts group of companies.

44.4.    PHRL infers that, due to the manner in which Mr Eliasch has subsequently acted, as pleaded in further detail below, the Implied Representation pleaded at paragraph 42.2 above is and was false and that Mr Eliasch was in fact provided with the US$ 50 million which Sherway ultimately loaned to PHRL by Mr Doronin or one of his vehicles.

45.    Mr Amanat (both on his own behalf and on behalf of PHRL) believed, and relied upon, the Representations, when entering into the agreements pleaded at paragraph 46 below.

(c)    **The Sherway Agreements**

46.    On 2 April 2014, Sherway and PHRL entered into a suite of agreements pursuant to which, in broad terms, Sherway was to acquire a 13.62% indirect interest in the JVC (through approximately 38.71% of the shares in Holdings), in return for providing a convertible loan of US$ 50 million to PHRL. (It was originally intended that Mr Eliasch (through a corporate vehicle) would become a shareholder directly in PHRL and that a shareholders' agreement would be entered into to govern the relationship between the PHRL shareholders. This intention was, in the event, replaced with the insertion of Holdings into the structure instead, so that PHRL and Sherway would each hold shareholdings in Holdings instead.) The agreements entered into by PHRL were as follows:

46.1.    a Shareholders' Agreement between PHRL and Sherway in respect of the affairs of Holdings (**"the Holdings SHA"**) (Holdings was also a party to this agreement);

46.2.   a Facility Agreement between PHRL as borrower and Sherway as lender in respect of a loan of US$ 50 million, convertible on the basis specified more particularly below (**"the Facility Agreement"**);

46.3.   two Pledge Agreements between PHRL and Sherway, pursuant to which PHRL pledged certain assets as security for the monies advanced (**"the Pledge Agreements"**) (the Pledge Agreements are governed by New York law and are subject to New York jurisdiction clauses);

46.4.   a Call Option Agreement granted by PHRL in favour of Sherway over certain shares held by PHRL in the JVC (**"the Call Option"**); and

46.5.   a Personal Guarantee pursuant to which Mr Amanat guaranteed, in favour of Sherway, certain of PHRL's obligations to Sherway (**"the Personal Guarantee"**).

(The agreements set out in this paragraph will hereafter be collectively referred to as **"the Sherway Agreements"**. It is averred that these agreements should be viewed collectively as essentially one over-arching agreement.)

47.   Prior to the entry into the Sherway Agreements, it was agreed and understood between Mr Amanat (acting for and on behalf of PHRL) and Mr Eliasch (both on his own behalf and on behalf of Sherway) that Mr Eliasch would occupy one of the positions of "A Director" nominated by PHRL as the "A" Shareholder in the JVC. As Mr Eliasch (and Sherway) well knew, Mr Amanat (and PHRL) was proceeding on the basis of what he believed was an agreement or common understanding between them that:

47.1.   the Representations were true and correct and that (insofar as they concerned Mr Eliasch's proposed role on the Board of the JVC) Mr Eliasch would act in accordance with them;

47.2.   as PHRL's nominated "A" director on the Board of the JVC, Mr Eliasch would:

47.2.1.   at all times act in accordance with the JVC SHA, the JVC's Memorandum of Association (**"JVC Memorandum"**) and Articles of Association (**"JVC Articles"**) in discharging his duties as a director of the JVC;

47.2.2.   at all times act in accordance with those terms of the Holdings SHA which applied to his conduct as a director of the JVC and Holdings, in particular, clauses 4, 7.4-7.7, 8.3-8.4, 10.1 and 12, and each of them;

47.2.3. act in accordance with PHRL's instructions in relation to the affairs of the JVC (save where those instructions conflicted with his fiduciary duty to the JVC);

47.2.4. consult with PHRL prior to casting his vote at any meeting of the Board of directors and/or signing any document in his capacity as an "A" Director of the JVC;

47.2.5. pass on to PHRL, and/or consult with PHRL in connection with, all documentation and information obtained by him in his capacity as an "A" Director of the JVC;

47.2.6. act at all material times to safeguard PHRL's (and/or PHRL's and Sherway's) investment in the Aman Resorts group of companies, particularly the JVC; and

47.2.7. act at all material times in good faith in the interests of the JVC.

47.3. Upon "*Completion*" within the meaning of the Holdings SHA, as Holdings' nominated "A" director on the Board of the JVC, Mr Eliasch would:

47.3.1. at all times act in accordance with the JVC SHA, the JVC Memorandum and the JVC Articles in discharging his duties as a director of the JVC;

47.3.2. act (through Sherway) in partnership with PHRL (through Holdings) in relation to the JVC and its affairs;

47.3.3. act in accordance with Holdings' instructions in relation to the affairs of the JVC (save where those instructions conflicted with his fiduciary duty to the JVC);

47.3.4. consult with Holdings prior to casting his vote at any meeting of the Board of directors or sign any document in his capacity as an "A" Director;

47.3.5. pass on to Holdings, and/or consult with Holdings in connection with, all documentation and information obtained by him in his capacity as an "A" Director of the JVC;

47.3.6. act at all material times to safeguard the investment of PHRL (or alternatively PHRL's and Sherway's investment) or alternatively Holdings in the Aman Resorts group of companies, particularly the JVC; and

47.3.7.  act at all material times in good faith in the interests of the JVC.

(The facts and matters set out in this paragraph above will hereafter be referred to as **"the Agreement"**.)

48.  In the premises, PHRL avers that (Mr Eliasch being the controlling mind and will of Sherway and having made the Agreement on behalf of Sherway as well as on behalf of himself):

48.1.  the Sherway Agreements (and each of them) were entered into: (i) in reliance on the truth of the Representations; and (ii) on the basis of the Agreement;

48.2.  the Agreement forms an implied term of the Sherway Agreements and in particular the Holdings SHA or, alternatively, the Sherway Agreements (in particular clause 3.3 of the Holdings SHA) should be construed in accordance with the Agreement; and

48.3.  the Agreement in any event forms a collateral contract between PHRL and Mr Eliasch and/or Sherway.

49.  In addition to the entry by PHRL into the Sherway Agreements, on 2 April 2014, PHRL drew down the US$ 50 million loan from Sherway, pursuant to a notice of the same date. On the same day, as required under the Holdings SHA, PHRL sent a "*Share Transfer Consent*" (within the meaning of the Holdings SHA) to Pontwelly. The Financing Agreement provides, among other things, that changes in the shareholding in PHRL and the JVC will constitute an "*Event of Default*" under the Financing Agreement, in the absence of Pontwelly's consent to any such change(s).

50.  On 9 April 2014, Mr Eliasch replaced Mr Amanat, and Carpentaria Management Services Limited (**"Carpentaria"**) replaced Mr Tavakoli, as "A" directors of the JVC nominated by PHRL.

**V.    JVC "A" and "B" shareholders and directors**

51.  The JVC SHA contains various provisions relating to the nomination of directors by the "A" and "B" shareholders in the JVC and the rights and obligations of the shareholders of the JVC in this regard:

"*4.5 Shareholder obligations*
*...*
*(b) Each Shareholder agrees to exercise its respective rights under this agreement so as to ensure that the business of the JVC Group consists exclusively of the Business and that the Business shall be conducted on commercial principles with a view to optimising overall*

*returns in accordance with the Resorts Business Plan, the Development Business Plan and the terms of this agreement.*
*(c) Each Shareholder shall procure that the Directors appointed by it shall act in good faith in discharging their duties as directors of the JVC (and ARGL and ARDL, as applicable).*

...

### 6.1 Appointment of Directors

*(a) The appointment, removal, dismissal and conduct of the Directors shall be regulated in accordance with this agreement and the Memorandum and Articles.*
*(b) There shall be a maximum of six Directors on the Board comprising three A Directors and three B Directors. The initial number of Directors shall be four comprising two A Directors and two B Directors. The Shareholders will use consider an expansion of the number of Directors from four to six during the first two years from the Completion Date. In accordance with clause 3.3(b), [Mr Amanat] and [Mr Tavakoli] shall be the first A Directors and [Mr Doronin] and [Mr Djanogly] shall be the first B Directors. Each Shareholder may also appoint one observer to the Board who shall be entitled to attend all meetings and to receive all information otherwise provided to the Directors, but will have no vote. An observer will be reimbursed for reasonable costs and expenses in attending meetings and will enjoy the same resort benefits referenced under the compensation letter for directors as "Other." The observer for the A Shareholder will be Bhavin Shah.*
*(c) The A Shareholder may nominate up to a maximum of two A Directors (unless the Board has been expanded in which event the A Shareholder may nominate three A Directors), and may request the removal of any of the A Directors which it nominated, by giving notice to the JVC and the other Shareholder. The B Shareholder may nominate up to a maximum of two B Directors (unless the Board has been expanded in which event the B Shareholder may nominate three B Directors), and request the removal of any of the B Directors which it nominated, by giving notice to the JVC and the other Shareholder. In advance of such nomination(s) a Shareholder will consult with the other Shareholder on the identity of the individual proposed as a new Director. Upon receipt of any such nomination or request for removal, the Shareholders shall procure the passing of such resolutions as may be necessary to appoint or remove the relevant Director.*

...

## 10. ACCOUNTING AND OTHER INFORMATION

...

### 10.3 Right of access

Each Director, Shareholder and its authorised representatives shall be allowed access at all reasonable times to examine the books and records of the JVC and each Subsidiary.

### 10.4 Provision of information to Shareholders

*(a) The JVC shall supply each Director and each Shareholder with the financial and other information necessary to keep it informed about how effectively the Business of the JVC and each Subsidiary is performing and in particular shall supply each Director and each Shareholder with:*
*(i) a copy of the consolidated audited accounts of the JVC Group prepared in accordance with the JVC's accounting principles and policies and otherwise with all applicable laws and IFRS (or other appropriate accounting standard as determined by the Board) within 120 days of the end of the Financial Year to which such audited accounts relate; and*
*(ii) unaudited monthly management accounts of each of the Resorts Business and the Development Business which shall he supplied within 30 days of the end of the month to which they relate which shall include a profit and loss account, a balance sheet, a cash flow statement, a comparison of the actual revenue and expenditure against the forecast for the corresponding period in the approved Resorts Business Plan or Development Business Plan (as applicable) and an explanation of any material difference between the two and of any factors or circumstances known to the JVC which may lead the JVC to consider that the results of the Resorts Business or the Development Business for forthcoming months may differ materially from the*

*approved Resorts Business Plan or Development Business Plan (as the case may be).*

*12. **ONGOING OBLIGATIONS***

*...*

*12.2 **Audit and inspection***

*...*

*(b) Subject to the other provisions of this agreement, including clause 24:*
*(i) either Shareholder shall be entitled to examine the books and accounts of the JVC and each Subsidiary and shall be supplied with all information, including copies of all published accounts, Directors' reports and notices of meetings of the JVC and each Subsidiary and all other circulars and notices issued or given to members of, or those dealing with, the JVC and each Subsidiary relating to the Business or otherwise to the affairs and financial or other position of the JVC and each Subsidiary; and*
*(ii) the Shareholders agree (and shall procure that the JVC agrees) that, for this purpose, the Directors shall be entitled to pass any information relating to the JVC and each Subsidiary, the Business and the JVC's and each Subsidiary's affairs to either Shareholder, and neither the Shareholder nor the JVC shall raise any objection to nor allege any breach of any duty of confidence to the JVC or any Subsidiary as a result of such passing of information.*

*...*

*23. **STATUS OF AGREEMENT***
*23.1 Each party shall, to the extent that it is able to do so, exercise all its voting rights and other powers in relation to the JVC to procure that the provisions of this agreement are properly and promptly observed and given full force and effect according to the spirit and intention of the agreement.*
*23.2 If there is an inconsistency between any of the provisions of this agreement and the provisions of the Memorandum and Articles, the provisions of this agreement shall prevail as between the parties..."*

52.    The JVC's Memorandum of Association provides, so far as is material on this point, as follows:

**"12 SHAREHOLDERS' AGREEMENT AND SPECIFIC RIGHTS**

*12.1 The [JVC] shall, and the Shareholders and the directors shall procure that the [JVC] and each of the Subsidiaries shall, act in accordance with and observe the terms of the [JVC SHA] and the directors and Shareholders shall procure that the [JVC], the Subsidiaries, its and their businesses and any transactions in its or their shares or securities and any dealings between the Shareholders in relation to the [JVC] or any Subsidiary shall be at all times be operated, managed, administered, dealt with and otherwise subject to the rights and obligations set forth in the [JVC SHA].*

*12.2 As between the parties to the [JVC SHA], each of the provisions of this Memorandum and the Articles shall be read subject to the applicable provisions of the [JVC SHA] (irrespective of whether or not any particular provision is expressly said to be subject to the [JVC SHA])."*

53.    The JVC's Articles of Association provides, so far as is material on this point, as follows:

**"8 DIRECTORS**

*8.3 The maximum number of directors shall be four, comprising two A Directors and two B Directors.*

*...*

*8.6 The A Shareholder and the B Shareholder may each nominate up to a maximum of two persons to be directors or request the removal of any director so nominated by that Shareholder by notice in writing to the [JVC], and the Shareholders shall then procure the appointment or removal of such person or director provided that in any advance of any such appointment or request the nominating or requesting Shareholder shall consult with the other Shareholder on the identity of such person. Any director nominated by the A Shareholder shall be an* **A Director** *for the purpose of the Memorandum and these Articles and any director nominated by the B Shareholder shall be a* **B Director** *for the purpose of the Memorandum and these Articles.*
...

**9 POWERS OF DIRECTORS AND SHAREHOLDER RESERVED MATTERS**

*9.1 Subject to the Memorandum and these Articles, the business and affairs of the [JVC] shall be managed by, or under the direction or supervision of, the directors of the [JVC], and the directors of the [JVC] shall have all the powers necessary for managing, and for directing and supervising, the business and affairs of the [JVC] PROVIDED THAT at all times the directors shall manage the business and affairs of the [JVC] in accordance with the [JVC SHA]...*

*9.4 If the [JVC] is carrying out a joint venture between shareholders, a director of the [JVC] may, when exercising powers or performing duties as a director, act in a manner which he believes is in the best interests of the holding company even though it may not be in the best interests of the [JVC].*

*9.5 Each director shall exercise his powers for a proper purpose and shall not act or agree to the [JVC] acting in a manner that contravenes the Memorandum, the Articles or the Act or the [JVC SHA]. Each director, in exercising his powers or performing his duties, shall act honestly and in good faith in what the director believes to be the best interests of the [JVC]."*

54.    The effect of these provisions can be summarised as follows:

54.1.    Both PHRL (as an "A" shareholder) and TIL (as a "B" shareholder) have the right to nominate an equal number of directors to the Board of the JVC.

54.2.    Directors nominated by the shareholders are permitted, among other things, to pass on information relating to the JVC's business and affairs (and the business and affairs of the JVC's subsidiaries) to its nominated shareholder.

54.3.    In contrast to the position in ordinary companies, the shareholders are entitled to request and be supplied with extensive information in relation to the JVC, including its books and records and the financial and other information necessary to keep it informed about how effectively the business of the JVC and each of its subsidiaries is performing.

54.4.    The JVC SHA is to be given primacy. Both the shareholders under the JVC SHA and the directors under the JVC Memorandum and the JVC Articles are to adhere to, and manage the business of the JVC in accordance with, the provisions of the JVC SHA.

54.5.    In circumstances where (as here) the JVC is carrying out a joint venture between shareholders, a director may, when exercising his powers or performing his duties as

a director, act in a manner which he believes is in the best interests of the holding company even thought it may not be in the best interests of the JVC.

**VI.**   **The Holdings SHA: shareholders and directors**

55.   The Holdings SHA provides *inter alia*, as regards shareholders and directors of Holdings, as follows:

"**BACKGROUND**
...
(B) Sherway wishes to become a Shareholder in [Holdings] with [PHRL], and, through [Holdings] obtain an indirect interest in the [the JVC] Group.

(D) The parties agree to participate in and make provision for the management and administration of the affairs of [Holdings] Group on the terms and conditions set out in this agreement.
...
**3. COMPLETION**

3.1 Completion shall take place within 2 Business Days of satisfaction of the Completion Condition following execution of this agreement at:
    (a) the offices of [PHRL]'s Solicitors; or
    (b) any other place agreed in writing by the parties.

3.2 Completion Date means the date of Completion.

3.3 At Completion (or as otherwise provided), [PHRL] and [Holdings] shall:
    (a) procure that such shareholder and board resolutions of [Holdings] are passed as may be necessary to:
        (i) adopt the Memorandum and Articles in agreed form;
        (ii) (with effect from or before the date hereof) effect the Share redesignations described at clauses 3.4, and 3.5 below; and
        (iii) (with effect from or before the date hereof) appoint or designate, as the case may be, [Mr Amanat], as the A Director and [Mr Eliasch] as the B Director, and, in accordance with clause 7.2(k), [Mr Amanat] as Chairman of the Board; and
    (b) procure that such steps are taken (including, if required, the passing of shareholder and relevant board resolutions of [Holdings], [the JVC], ARGL, Silverlink and ARDL (once ARDL has been incorporated)) as may be necessary with effect from the date hereof (or as soon as reasonably practicable thereafter) to appoint [Mr Eliasch] as a director nominated by [Holdings] pursuant to all of the boards in respect of which [Holdings] has the right to appoint two directors pursuant to the [the JVC] SHA (including, without limitation, the [the JVC] Board, the ARGL Board, the Silverlink Board and the ARDL Board (once ARDL has been incorporated)) and that [Mr Eliasch] receives compensation and indemnification arrangements at an equivalent level to those which have been granted to the other Board members of [the JVC]. Provided that in the event that, for reasons beyond the control of [PHRL] or [Holdings], it is not possible to appoint [Mr Eliasch] to such board positions at Completion:
        (i) [PHRL] shall procure that [Mr Amanat] shall not exercise any of his rights as a director on any such boards without first having obtained the prior consent of [Mr Eliasch]; and

(ii) [Holdings] hereby irrevocably and by way of security for its obligations under this clause appoints Sherway as its attorney for the purpose of (i) exercising all of [Holdings]'s rights in connection with appointment of one of the directors to the [the JVC] Board, the ARGL Board, the Silverlink Board and the ARDL Board. Sherway's ability to use such power shall be limited to the appointment of one representative of Sherway on the aforementioned Boards; and (ii) procuring satisfaction of the Completion Condition in the event that PHRL has not provided a written notice to Pontwelly requesting such consent within 2 Business Days of the date hereof.

3.4 Prior to Completion the Board shall resolve, upon the Memorandum and Articles becoming effective, to re-designate the Retained Shares [i.e. 6,129 shares in PHRL Holdings] as A Shares in the register of members of [Holdings] and issue a share certificate to [PHRL] in respect of all such A Shares.

3.5 Prior to Completion the Board shall resolve, upon the Memorandum and Articles becoming effective, to re-designate all of the Sale Shares [i.e. 3,871 shares in Holdings] as B Shares in the register of members of [Holdings] and issue a share certificate to [Sherway] in respect of all such B Shares.

3.6 At Completion the Sale Shares will be transferred to Sherway in accordance with the terms of the [Facility Agreement].

3.7 The parties waive, or agree to procure the waiver of, any rights or restrictions which may exist in the current Memorandum and Articles of [Holdings] or otherwise which may prevent the transfer of the Sale Shares to Sherway or the re-designation of such Shares as B Shares pursuant to this agreement.

3.8 Completion shall be conditional only upon Pontwelly having provided is consent to the transfer of the 12,339 A shares held by [PHRL] in [the JVC] to [Holdings] and the completion of such transfer of shares and deliver to Sherway a copy of an updated register of members of [the JVC] reflecting [Holdings] as the owner of such shares in [the JVC] (the **"Completion Condition"**).

3.9 For the avoidance of doubt the provisions of clause 3.3 and clause 6 shall apply from the date hereof notwithstanding the fact that Sherway will not become a Shareholder of [Holdings] until Completion.

3.10 Without prejudice to foregoing, within 1 Business Day of the date hereof, PHRL shall provide a notice to [the JVC] requesting the removal of [Mr Tavakoli] or [Mr Amanat] from the board of [the JVC], ARGL and Silverlink and the appointment of [Mr Eliasch] in their place.

## 4. BUSINESS AND FINANCIAL PLAN

4.1 Business of [Holdings]
(a) The business of [Holdings] shall be the exercise of its rights as a shareholder in [the JVC] in accordance with the terms of the [the JVC] SHA in connection with the management of the [the JVC's] business (the **"Business"**).
...

4.2 Shareholder obligations
(a) Each Shareholder shall use reasonable endeavours to ensure that the Business is carried on in accordance with this agreement.
(b) Each Shareholder agrees to exercise its respective rights under this agreement so as to ensure that the business of [Holdings] consists exclusively of the Business and that the Business shall be conducted on commercial principles with a view to optimising overall returns in accordance the terms of this agreement.
(c) Each Shareholder shall procure that the Director[s] appointed by it shall act in good faith in discharging their duties as directors of [Holdings] (as well as [the JVC], ARGL, Silverlink and ARDL (once incorporated) as applicable).

...
## 8. ACCOUNTING AND OTHER INFORMATION

...
### 8.3 Right of access
Each Director, Shareholder and its authorised representatives shall be allowed access at all reasonable times to examine the books and records of [Holdings] and each member of the [Holdings] Group.

### 8.4 Provision of information to Shareholders
(a) Provided at all times that such information has been supplied to [Holdings], [Holdings] shall supply each Director and each Shareholder with any and all information supplied to it pursuant to the [JVC] SHA (including drafts of any business plans to be agreed pursuant to the [JVC] SHA, any notices served under the [JVC] SHA and such financial and other information as is necessary to keep each Director and each Shareholder informed about how effectively the Business of [Holdings] and [JVC] Business is performing) and in particular, shall supply each Director and each Shareholder with:

(i) a copy of the audited accounts of [Holdings];

(ii) a copy of the consolidated audited accounts of the [JVC] Group prepared in accordance the [JVC] SHA; and

(iii) unaudited monthly management accounts of [Holdings] and the [JVC] Business which shall be supplied within 30 days of the end of the month to which they relate which shall include a profit and loss account, a balance sheet, a cash flow statement, a comparison of the actual revenue and expenditure against the forecast for the corresponding period in any approved business plan pursuant to the [JVC] SHA and an explanation of any material difference between the two and of any factors or circumstances known to [Holdings] which may lead [Holdings] to consider that the results of the [JVC] Business for forthcoming months may differ materially from the approved business plan pursuant to the [JVC] SHA.

...
## 10. ONGOING OBLIGATIONS

...
### 10.1 Audit and inspection
(a) Either Shareholder may from time to time require that (at such Shareholder's own cost) [Holdings] procures that an audit or review of the Business and any other affairs of [Holdings]or any other member of the [Holdings] Group is carried out, and shall in such case be entitled to designate a person to carry out such audit or review on its behalf. Such person (which may, but need not, be the Shareholder itself or an adviser, consultant or contractor of the Shareholder) shall be entitled to visit and inspect any premises of [Holdings] or any other member of the [Holdings] Group and to discuss the affairs, finances and accounts of [Holdings] and the [JVC] Group with its officers and employees, and [Holdings] and each member of the [Holdings] Group shall provide reasonable access and co-operation to facilitate the carrying out of such audit or review.

(b) Subject to the other provisions of this agreement, including clause 21:

(i) either Shareholder shall be entitled to examine the books and accounts of [Holdings] and each other member of the [Holdings] Group and shall be supplied with all information, including copies of all published accounts, Directors' reports and notices of meetings of [Holdings]and each member of the [Holdings] Group and all other circulars and notices issued or given to the members of, or those dealing with, [Holdings]and each member of the [Holdings] Group relating to the Business or otherwise to the affairs and financial or other position of [Holdings]and each member of the [Holdings] Group; and

(ii) the Shareholders agree (and shall procure that [Holdings]agrees) that, for this purpose, the Directors shall be entitled to pass any information relating to [Holdings] and each other member of the [Holdings] Group, the Business, the [JVC] Business and the affairs of any member of [Holdings'] Group to either Shareholder, and neither the Shareholder nor [Holdings] shall raise any

*objection to nor allege any breach of any duty of confidence to [Holdings] or
any other member of the [Holdings] Group as a result of such passing of
information.*

*...*

**12. DEADLOCK**

*12.1 Occurrence of deadlock
(a) There is a deadlock if a resolution of the Board is proposed and such resolution does not
receive approval of the Board or the Shareholders or a majority of the Directors are unable to
agree on any matter that relates to [the JVC] or the business of [the JVC].
(b) Either Shareholder may give notice in writing to the other Shareholder no earlier than 5
Business Days after the occurrence of an event set out in clause 12.1(a) ("Deadlock
Notice") that in its opinion there is a deadlock and identifying the matter over which the
parties are deadlocked.*

*12.2 Artificial deadlock
(a) In no circumstances shall either Shareholder create an artificial deadlock for the purposes
of this clause 12. An artificial deadlock is a management deadlock caused by either
Shareholder or its respective representatives failing to attend (or appoint a proxy or
representative to attend in its place) a duly convened general meeting or Board meeting
which is necessary to enable the [Holdings] to carry on the Business properly and efficiently in
accordance with this agreement.
(b) The Shareholders shall use their reasonable endeavours to reach agreement on matters
relating to [the JVC] or the business of [the JVC].*

*...*

**20. STATUS OF AGREEMENT**

*20.1 Each party shall, to the extent that it is able to do so, exercise all its voting rights and
other powers in relation to [Holdings] to procure that the provisions of this agreement are
properly and promptly observed and given full force and effect according to the spirit and
intention of the agreement.*

*20.4 The parties shall, when necessary, exercise their powers of voting and any other rights
and powers they have to amend, waive or suspend a conflicting provision in the Memorandum
and Articles to the extent necessary to permit [Holdings] and its Business to be administered
as provided in this agreement.*

*...*

**25. ASSIGNMENT AND OTHER DEALINGS**

*...*

*25.2 Each party confirms that it is acting on its own behalf and not for the benefit of any other
person."*

56.    The effect of these provisions may be summarised as follows:

56.1.    "Completion" within the meaning of the Holdings SHA will take place when (i)
Pontwelly has provided its consent to the transfer of 12,339 "A" shares held by PHRL
in the JVC to Holdings; and (ii) PHRL has provided to Sherway a copy of an updated
register of members of the JVC reflecting Holdings as the owner of such shares in the
JVC (**"Holdings Completion"**).

56.2.    At or upon Holdings Completion:

56.2.1.  6,129 shares and 3,817 shares in Holdings will be re-designated as "A" and
"B" shares in Holdings respectively;

56.2.2. the 3,817 "B" shares in Holdings will be transferred to Sherway in accordance with the provisions of the Facility Agreement;

56.2.3. PHRL and Holdings shall procure that such steps are taken as may be necessary from 2 April 2014 (or as soon as reasonably practicable thereafter) to appoint Mr Eliasch as a director nominated by Holdings pursuant to all of the Boards in respect of which Holdings has the right to appoint two directors pursuant to the JVC SHA;

56.2.4. If upon Holdings Completion (for reasons beyond the control of PHRL), Holdings is not able to appoint Mr Eliasch to the above appointments, PHRL shall procure that Mr Amanat shall not exercise any of his rights as a director on any such boards without first having obtained the prior consent of Mr Eliasch.

(PHRL avers that Holdings Completion has not yet occurred because, among other things, neither of the requirements pleaded at paragraph 56.1 above have been met.)

56.3.    Holdings' business will be the exercise of its rights as shareholders in the JVC in accordance with the terms of the JVC SHA in connection with the management of the JVC's business. Both PHRL and Sherway shall procure that each of the directors appointed by it in (among other entities) Holdings and the JVC shall act in good faith in discharging their duties as directors of Holdings. In very short form, it is averred that the ultimate effect of these provisions is to require Sherway to procure that, at all material times while he is a director of the JVC, Mr Eliasch acts in accordance with the terms of the JVC SHA.

56.4.    PHRL and Sherway are required to use their reasonable endeavours to reach agreement "*on matters relating to [the JVC] or the business of [the JVC]*". In default of agreement upon "*any matter that relates to [the JVC] or the business of [the JVC]*", the deadlock provisions of the agreement are triggered.

56.5.    Both PHRL and Sherway were to be given equal access to documents and information relating both to the business of Holdings and the JVC. Specifically, the effect of these provisions was that Mr Eliasch would not be entitled to withhold information and documents from PHRL which had been received by him as a director of the JVC nominated by Holdings.

56.6.    Both PHRL and Sherway confirmed that they were acting on their own behalf and not for the benefit of any other person (which would include specifically acting for the benefit of TIL and/or Mr Doronin).

57.    It is averred that, on a true construction of the Holdings SHA (or alternatively, it was an implied term of the Holdings SHA that), in the event that Mr Eliasch was in fact appointed to the Board of the JVC before Holdings Completion occurred, whether pursuant to clause 3.10 of the Holdings SHA or otherwise, Mr Eliasch would abide by those terms of the Holdings SHA which applied to his conduct as a director of the JVC and Holdings, in particular, clauses 4, 7.4-7.7, 8.3-8.4, 10.1 and 12, and each of them.

58.    After entry into the Sherway Agreements, Mr Eliasch (acting on his own behalf and on behalf of Sherway) has acted in flagrant breach of the JVC SHA (and assisted TIL in acting in breach of this agreement), the Agreement and the Sherway Agreements, as more particularly described below.

## VII.    Purported "Capital Calls" by the JVC

### (a)    Relevant provisions of the JVC SHA

59.    Clause 5 of the JVC SHA provides, as far as is material, as follows:

"*5. FINANCING THE BUSINESS*

*5.1 Initial finance*

*The JVC and the Business shall be financed initially by the proceeds of the Share subscriptions referred to in clause 3 and by the lenders pursuant to the terms of the Facility Agreements.*

*....*

*5.3 Allotment*

*Subject to clause 5.4, no Shares shall be allotted except with the prior written agreement of each Shareholder.*

*5.4 Additional capital funding*

(a) *The Shareholders wish to fund a capital reserve to address capital expenditures and working capital requirements of the JVC Group (the "**Capital Reserve**") to the extent such expenditures and requirements are not covered by cash flows. The amount of the Capital Reserve will be specified in the Initial Reserts Business Plan and in no event shall the total Capital Reserve exceed US$60,000,000. Each Shareholder agrees with the other to make available to the JVC its Respective Proportion of the amount of any Capital Reserve as determined under clause 5.4(c) below in consideration of the pro-rata issuance to it of further Shares in the JVC in accordance with this agreement and the Memorandum and Articles.*

(b) In addition to its Respective Proportion of the Capital Reserve, each Shareholder agrees with the other to make available to the JVC its Respective Proportion of the amount of any further funding required under any Resorts Business Plan (other than the Initial Resorts Business Plan) or under the Development Business Plan (other than the Initial Development Business Plan), in each case as determined under clause 5.4(c) below in consideration of the pro-rata issuance to it of further Shares in the JVC in accordance with this agreement and the Memorandum and Articles. For the avoidance of doubt, the Initial Resorts Business Plan and the Initial Development Business Plan cannot require further funding beyond the Capital Reserve in the first 12 months following Completion.

(c) The Board, or any Director following receipt by the JVC of a notice from the lender under a Facility Agreement, will give notice in writing to each Shareholder of (i) the date ("**Due Date**") on which each Shareholder shall be required to pay to the JVC all or a portion of its Respective Proportion of the Capital Reserve (its "**Additional Capital Amount**") or its Respective Proportion of the amount of any further funding provided for in the Resorts Business Plan or the Development Business Plan to the extent provided under clause 5.4(b) (its "**Further Capital Amount**"), by way of subscription for Shares, (ii) the subscription price per Share and (iii) the number of Shares to be allotted ("**Additional Shares**"). The Due Date for an Additional Capital Amount will be not less than 60 days from the date of such written notice and the Due Date for a Further Capital Amount will be not less than 20 Business Days from the date of such written notice. The parties acknowledge and agree that the Board shall be required to give notice to each Shareholder in accordance with this clause 5.4(c) in the event that the lender under a Facility Agreement serves notice on the borrower under such agreement requiring that funding of the Capital Reserve be made. In each case, each Shareholder undertakes to the other to provide such Additional Capital Amount to the JVC on the Due Date and to procure that the JVC undertakes to allot the Additional Shares and issues a share certificate in respect of the Additional Shares following receipt of such Additional Capital Amount or Further Capital Amount (as applicable).

(d) Notwithstanding clause 5.4(c), the Board shall give notice immediately after Completion that US$50,000,000 of the Capital Reserve is being called and that the Due Date for each Shareholder is 60 days from Completion. The Shareholders agree that they shall instruct their nominated directors to comply with this clause.

(e) If either of the Shareholders ("**Non-payer**") fails for any reason to pay to the JVC its Additional Capital Amount or its Further Capital Amount on the Due Date ("**Deficit Capital Amount**"), the other Shareholder ("**Paying Shareholder**") may serve notice on the Non-payer in accordance with clause 5.4(e) and the following provisions of this clause 5.4 will apply.

(f) The Paying Shareholder, provided that it has paid to the JVC 100% of its Additional Capital Amount or Further Capital Amount (as applicable) in accordance with clause 5.4(c), shall be entitled to give notice to the Non-payer and such notice shall:

(i) require the Non-payer to pay the Deficit Capital Amount to the JVC within 10 Business Days of service of such notice;

(ii) notify the Non-payer that, if it does not make such payment in accordance with 5.4(f)(i):

(A) the Paying Shareholder may (at its sole discretion) provide all or a portion of the Deficit Capital Amount to the JVC in the form of a loan due and owing from the Non-payer and bearing interest at 18% per annum (or, if less, the maximum rate permitted under applicable law) compounded quarterly, such loan to be repaid by the Non-payer to the Paying Shareholder within 120 days of the date the loan was funded; and

(B)  if any Deficit Capital Amount loan provided by the Paying Shareholder pursuant to clause 5.4(f)(ii)(A) is not repaid by the Non-payer within the required 120 day period, the JVC shall allot to the Paying Shareholder,

(I)  if the Deficit Capital Amount comprises a Further Capital Amount, the number of Additional Shares (being additional A Shares if the Paying Shareholder is PHRL, and additional B Shares if the Paying Shareholder is TIL) which the Non-payer would have received had it provided the Further Capital Amount pursuant to clause 5.4(c), or

(II)  if the Deficit Capital Amount comprises an Additional Capital Amount, twice the number of Additional Shares (being additional A Shares if the Paying Shareholder is PHRL, and additional B Shares if the Paying Shareholder is TIL) which the Non-payer would have received had it provided the Additional Capital Amount pursuant to clause 5.4(c),

### 5.5 No further contributions

Except as provided in clause 5.4, neither Shareholder shall be obliged to contribute further funds or subscribe for additional securities (including Shares) for the benefit of any member of the JVC Group. Except as provided in clause 5.4, if at any time following Completion, additional funding is required by any member of the JVC Group for any purpose, the Shareholders shall have the right of first refusal to provide such funding in the form of either equity or debt securities in their Respective Proportions..."

60.    Clause 7 of the JVC SHA provides, as far as is material, as follows:

### "7. RESERVED MATTERS

#### 7.1    Reserved Matters

(a)  The Board shall procure that, unless otherwise approved by the Board, the CEO does not take any decision in relation to the JVC Group (i) which is not in accordance with the Resorts Business Plan or the Development Business Plan (subject to an ability of the CEO to authorize deviations from the operating budget or working capital budget in either the Resorts Business Plan or the Development Business Plan of up to 5% in the aggregate); (ii) which comprises a Board Reserved Matter; or (iii) which does not constitute a matter arising in the ordinary course of the Resort Business or the Development Business. The CEO shall be removed if he violates the terms of this clause 7.1(a) unless all of the Directors otherwise agree.

(b)  The Shareholders shall procure that neither the JVC nor the Subsidiaries shall undertake any of the Shareholder Reserved Matters without the prior written approval of each of the Shareholders.

#### 7.2    Method of approval by Shareholders

The Shareholders shall give their approval to any of the Shareholder Reserved Matters either in writing by PHRL and TIL or by their authorised representatives for this purpose (which may include the A Directors and B Directors respectively) or by representatives of the Shareholders at a general meeting of the JVC.

#### 7.3    Meetings of Shareholders

*General meetings of Shareholders in the JVC shall take place in accordance with the applicable provisions of the Memorandum and Articles including on the basis that:*

(a)    *The quorum shall be one duly authorised representative of PHRL and one duly authorised representative of TIL;*

(b)    *the notice of the meeting shall set out an agenda identifying in reasonable detail the matters to be discussed;*

(c)    *the chairman of the meeting shall not have a casting vote; and*

(d)    *a decision to approve any of the Shareholder Reserved Matters shall require a unanimous vote of all the Shareholders.*

*Any matters requiring a general meeting of or approval by the Shareholders under applicable law, but not covered by the Shareholder Reserved Matters, shall be dealt with in accordance with the Memorandum and Articles."*

61.    Schedule 2 Part 1(b) ("*Board Reserved Matters (subject to clause 14 deadlock resolution mechanism)*") paragraph 3 provides that, among other things, the following will be a "*Board Reserved Matter*":

"*To the extent not contemplated by either the Resorts Business Plan or the Development Business Plan, making a demand on the Shareholders to provide further funding to the JVC by way of equity contribution (other than in respect of the Capital Reserve)*".

62.    Schedule 2 Part 2 ("*Shareholder Reserved Matters (subject to clause 14 deadlock resolution mechanism and 3 year Lock-up Period)*") paragraph 2 provides that, among other things, the following will be a "*Shareholder Reserved Matter*":

"*Creating, allotting or issuing any Shares or other securities by the JVC or granting any option or other right to require the allotment or issue of any Shares or other securities, save in each case for the creating, allotting or issuing of any Shares or other securities pursuant to this agreement*".

63.    The effect of these provisions may be summarised as follows:

63.1.    The JVC's business is and was to be funded initially by the proceeds of share subscriptions. Thereafter, (only) "*to the extent such expenditures and requirements are not covered by cash flows*", by the Shareholders contributing to the "*Capital Reserve*" in accordance with the provisions of the JVC SHA.

63.2.    Clause 5.4(d) makes provision for the Board to give notice of an immediate "capital call" in respect of the "*Capital Reserve*" in the sum of US\$ 50 million. However, clause 5.4(a) provides that in no event shall the "*Capital Reserve*" exceed US\$ 60 million. Further, no further funding can be required by the "*Initial Resorts Business Plan*" or the "*Initial Resorts Development Plan*" beyond the US\$ 60 million of the "*Capital Reserve*" within the first 12 months following Completion (clause 5.4(b)).

63.3.   After the first 12 months following Completion:

    63.3.1.   Further funding may be required as set out in any *"Resorts Business Plan"* and/or *"Development Business Plan"* pursuant to the mechanism provided for at clause 5.4(b) and the due date for any such *"Further Capital Amount"* will be 20 Business Days from the date of any notice (clause 5.4(c)).

    63.3.2.   Clause 5.5 makes it clear that shareholders will only be obliged to provide capital pursuant to the machinery in clause 5.4. Shareholders have a right of first refusal in respect of any further funding which is actually required by the JVC beyond the amounts in clause 5.4. Paragraph 3 of Schedule 2 Part 1(b), however, makes it clear that the Board (but not the JVC's CEO) has the power to make such a request for further funding, if so required.

63.4.   To the extent that the Board is capable of exercising its power to request further funding beyond the *"Capital Reserve"* (i.e. pursuant to clause 5.5 and paragraph 3 of Schedule 2 Part 1(b)), both clause 5.3 and paragraph 2 of Schedule 2 Part 2 make it clear that the Board cannot purport to issue or allot any additional shares in the JVC pursuant to any such request for further funding, unless both of the "A" and "B" shareholders consent.

64.   By a written resolution dated 11 April 2014, the Board of the JVC (**"the Board"**) (comprising of Mr Amanat (on behalf of Carpentaria), Mr Eliasch, Mr Doronin and Mr Djanogly) resolved, among other things, that the JVC's shareholders *"shall make a capital contribution of US$50,000,000 in accordance with the terms of the [SHA]"*. Although this resolution is expressed as being *"in accordance with the terms of the [SHA]"*, in fact the 11 April 2014 meeting was itself more than 60 days after Completion, so did not strictly follow the terms of clause 5.4(d). Furthermore, no price per share, or due date for payment, was set by these written resolutions. By the mutual agreement of the directors, other matters to be discussed by the Board were adjourned to be dealt with at a meeting on 22 April 2014.

**(b)**   **Board Meeting on 22 April 2014**

65.   On 20 April 2014, Mr Robert Ivanhoe (**"Mr Ivanhoe"**) of Greenberg Traurig LLP (**"GT"**), sent an agenda for a further meeting of the Board, proposed to be convened on 22 April 2014 (**"the Original Agenda"**). Mr Ivanhoe, who had previously acted for TIL on the negotiation of, and entry into the JVC SHA, appeared to be acting as the JVC's "interim General Counsel".

66.    As an aside, PHRL objected and objects to Mr Ivanhoe and/or GT acting on behalf of the JVC given that he/it has a clear conflict of interest. Indeed, despite PHRL having objected on several occasions to GT's involvement in the JVC's affairs, GT (or at least its London office, Greenberg Traurig Maher LLP) appears to still be involved to date, having drafted, for example, both sets of purported minutes relating to the purported meetings on 23 July 2014 and 25 July 2014 and the minutes of meetings on 18 August 2014 and 10 September 2014. Pending disclosure, it is unclear who has been funding GT and why it appears still to be involved in the JVC's affairs, especially given the fact that the JVC appears to have retained the services of Macfarlanes to act for it. PHRL's case is that this is a further indicator of Mr Doronin's tight *de facto* control over the JVC, contrary to the regime envisaged by the JVA SHA.)

67.    This Original Agenda contained so far as is relevant for present purposes, the following item:

"E. Capital calls:
a.    $50 mln to be funded immediately
b.    Propose to increase capital funding by additional $150 mln, additional $140 million needs Board approval".

68.    The Board met at the offices of GT in Miami, United States of America, on 22 April 2014 (**"the 22 April Meeting"**). The 22 April Meeting was lengthy, starting at approximately 9.30 a.m. and finishing at approximately 8.00 p.m.

69.    The following individuals attended the 22 April Meeting in its entirety:

69.1.    Mr Eliasch (as PHRL's nominated "A" Director);

69.2.    Mr Tavakoli, as Carpentaria's representative (as PHRL's nominated "A" Director);

69.3.    Mr Doronin (as TIL's nominated "B" Director);

69.4.    Mr Djanogly (as TIL's nominated "B" Director); and

69.5.    Mr Ivanhoe (as an "Observer", but presumably appointed to this position by TIL).

70.    Mr Amanat (as an "Observer" on behalf of PHRL) attended part of the 22 April Meeting by telephone and subsequently in person. Mr Bhavin Shah attended in person for portions of the 22 April Meeting. Mr Zecha attended most of the 22 April Meeting, but only participated to the extent pleaded at paragraphs 128-139 below.

71.    During the 22 April Meeting, various documents were circulated which had not been seen by PHRL's nominated "A" directors before the 22 April Meeting, or, at any rate, had not been

seen by Carpentaria. Indeed, when Mr Amanat raised the fact that these documents had not been seen, he was sent a copy of the documents by email, but never received a hard copy. These included the following documents:

71.1.   A printout from a PowerPoint presentation entitled "*Protecting the Brand and Legacy while Building a Global Hotel and Real Estate Group*" ("**the Brand Presentation**") – The Brand Presentation, comprising of 18 slides, contained at Section 7 ("*Capital Requirements of the New Aman*") two slides containing only generalised information and which purported to require "*an immediate capital call from shareholders*" of US$ 200 million to commence all of the proposed steps "*at short notice*". In contrast to the apparent urgency conveyed, the same slide appeared to acknowledge that "*detailed investment proposals with detailed investment analysis and cash flows will be prepared*" for each of the proposed initiatives.

71.2.   A printout from a PowerPoint presentation entitled "*Development Business Plan*" ("**the Development Presentation**") – The Development Presentation, comprising of 10 slides, contained ambitious proposals for expansionist real estate development, but did not contain any information in relation to proposed funding or the need for any capital call.

71.3.   A printout from a PowerPoint presentation comprising of 6 slides entitled "*3 years [sic.] business plan*" – This document contained various colourful figures and charts but did not contain any information in relation to proposed funding, or the need for any capital call.

71.4.   A printout from a PowerPoint presentation comprising of 68 slides entitled "*3 years [sic.] business plan*" – This document also contained various colourful figures and charts in relation to each of Aman Resorts' hotels and resorts. The budget for Silverlink (the immediate holding and operating company for Aman Resorts) for 2014 does not appear to reflect (or include any provision for) the aggressive expansion proposed in the Brand or Development Presentations, nor the need for funding of the order of US$ 200 million. Indeed, the Profit & Loss account for Silverlink shows a company whose revenues and profit have increased on 2013.

72.     At the 22 April Meeting, consultants who had been engaged to produce the documents pleaded at paragraph 71 above ran through the presentations. The Board was provided with no information on the issue of "capital calls" beyond some generalised remarks by Mr Doronin and the two slides in the Brand Presentation pleaded above.

73.   Mr Amanat objected to the proposed "capital call" of US$ 200 million. However, Mr Eliasch indicated his support for the proposed "capital call", indicating that he agreed that this ought to involve the issuance of further shares in the JVC to the contributing shareholder. Mr Eliasch did this despite having received specific instructions from PHRL not to vote in favour of any call which might result in the issuance of further shares, and have the effect of diluting PHRL's shareholding in the JVC (and indeed Sherway's prospective shareholding via Holdings). This demonstrated to PHRL that it had lost control of its nominated director and that Mr Eliasch was essentially acting as a "rogue director" in Mr Doronin's interests and/or (PHRL assumes pursuant to some form of arrangement or agreement between Mr Doronin and Mr Eliasch) Mr Eliasch's personal interests, but contrary to the interests of PHRL, the prospective interests of Sherway (via Holdings) and the interests of the JVC. Although Mr Eliasch has subsequently contended in a letter from his solicitors dated 27 July 2014 (**"the 27 July Letter"**) that he "*explained to Mr Amanat ... at a breakout session during the [22 April Meeting] that any resolution authorising such a [capital] call required unanimous shareholder approval ... and that further board approval would be required for the projects that it was intended to fund*", this is untrue, as is very apparent from Mr Eliasch's subsequent conduct.

74.   By an email dated 23 April 2014, Mr Ivanhoe circulated what were described by him as "*resolutions prepared to reflect yesterday's Board meeting*", which he asked to be signed and returned by the Board (**"the Original Minutes"**). The Original Minutes recorded, in relation to the purported "capital call" that:

"*5. In addition to the capital call of $50 million that was approved by the Board on 11 April 2014, an additional capital call of US$150 million shall be called from the shareholders of the Company.*

*6. The US$50 million capital call approved by the Board on 11 April 2014 shall be payable within 10 business days of the date of the Board meeting at a price of US$5,000 per share. Any director is authorized to send a notice to the shareholders of the Company in respect of this Capital Call.*"

75.   By a letter to the Board dated 29 April 2014, PHRL objected to the US$ 150 million purported "capital call" as being in contravention of the provisions in the JVC SHA in respect of capital contributions by shareholders, as pleaded above.

76.   By a letter to the Board dated 2 May 2014 (**"TIL's 2 May letter"**), TIL purported to justify the US$ 150 million "capital call" on the basis that it was made not under the provisions of clause 5.4 of the JVC SHA, but pursuant to paragraph 3 of Schedule 2 Part 1(b). TIL's 2 May 2014 letter also enclosed two documents:

76.1.   a further copy of an agenda for the 22 April Meeting which differed in various respects from the Original Agenda (**"the Revised Agenda"**);

76.2.   a further written record of the 22 April Meeting, which differed in various respects from the Original Minutes (**"the Revised Minutes"**).

(Despite PHRL's repeated written requests for electronic copies of these documents, including all metadata, in order to enable it to ascertain by whom and when alterations to these documents were made, both TIL and the JVC have failed and/or refused to supply them.)

77.   As far as PHRL is aware, (unlike the Original Agenda) the Revised Agenda was not circulated in advance of the 22 April Meeting and was made available (at the very earliest) at the 22 April Meeting itself. As far as is relevant to the topic of purported "capital calls":

77.1.   the Revised Agenda stated at item I(E): "*Capital calls – propose increase capital funding by addition $200 mln*"; and

77.2.   the Revised Minutes added to the matters set out at paragraph 74 above the following additional words: "*This additional capital shall be used for future development projects which shall be subject to further approvals by the Board*".

78.   By a letter dated 22 May 2014 (**"22 May letter"**), PHRL set out in detail its objections to various of the acts purportedly taken by the Board at the 22 April Meeting, including the purported "capital call". The 22 May letter also requested provision of various documents and the recording of the 22 April Meeting, which, it is understood, was recorded by Mr Djanogly on his iPhone/iPad. Again, despite a copy of this recording having been promised in TIL's letter of 2 May 2014 and having been requested in PHRL's letters dated 9 May 2014, 22 May 2014, 3 June 2014 and 5 June 2014, TIL and/or the JVC has failed and/or refused to provide it, in breach of clauses 10.3-10.4 and/or 12.2 of the JVC SHA. Moreover, as "*the recording*" is mentioned in the First Witness Statement of Mr Eliasch dated 1 July 2014, PHRL hereby requests inspection of the recording pursuant to CPR r.31.14(b).

(c)   **The 4 June telephone call**

79.   By an email dated 28 May 2014 at 10.13 p.m. London time (5.13 p.m. New York time), Mr Djanogly circulated a purported notice in respect of a further proposed meeting of the Board by telephone on 4 June 2014 at 3.00 p.m. London time (10.00 a.m. New York time). Without prejudice to PHRL's case that this notice was invalid, it will hereafter be referred to for convenience as **"the First Notice"**. Clause 6.2 of the JVC SHA provides, as far as is material, as follows:

"6.2   *Meetings of Directors*

..."

(c) The parties shall ensure that at least five Business Days' notice of a meeting of the Board is given to all Directors entitled to receive notice accompanied by:

(i)     an agenda specifying in reasonable detail the matters to be raised at the meeting; and

(ii)    copies of any papers to be discussed and/or voted on at the meeting.

(d) A shorter period of notice of a meeting of the Board may be given if both an A Director and a B Director agree in writing but the notice provisions under clause 6.2(c)(i) and (ii) will still apply.

(e) Matters not on the agenda, or business conducted in relation to those matters, may not be raised at a meeting of directors unless an A Director and a B Director agree in writing.

(f) The quorum at any meeting of directors is at least one A Director and one B Director. No business shall be conducted at any meeting of directors unless a quorum is present at the beginning of the meeting and at the time when there is to be voting on any business. If a quorum is not present within 30 minutes after the time specified for a directors' meeting in the notice of the meeting then it shall be adjourned for five Business Days to the same time and place. If at least one A Director and one B Director are not present at such adjourned meeting, a quorum shall be the Directors so present.

(g) A meeting of directors shall be adjourned to another time or date at the written request of an A Director or a B Director. No business may be conducted at a meeting after such a request has been made.

(h) Meetings of directors shall make decisions by passing resolutions and save as provided by applicable law or as set out in clause 7, a resolution is passed if more votes are cast for it than against it.

(i) At a meeting of directors, each Director has one vote; provided that if an equal number of A Directors and B Directors is not present at any meeting of the Board, then the A Director(s) present shall (between them) at that meeting have two votes and the B Director(s) present shall (between them) at that meeting have two votes...".

80.     Clause 6.2(c) of the JVC SHA requires that "at least five Business Days' notice of a meeting" be provided to directors. The circulation by email of the First Notice on 28 May 2014 at 10.13 p.m. (London time) did not provide the directors with the requisite notice period, as there were only 4 business days between 28 May 2014 and 4 June 2014 (i.e. Thursday 29 May, Friday 30 May, Monday 2 June and Tuesday 3 June).

81.     Furthermore, clause 6.2(c) provides that any notice for a Board meeting be accompanied by an agenda "specifying in reasonable detail the matters to be raised" and "copies of any papers to be discussed and/or voted on at the meeting". The First Notice included an agenda containing the following items:

"A.     Funding requirements of the JVC and its subsidiaries
   1.   Capital Call of $50 million
        • Due date for payment
        • Price per share
   2.   Capital Call of $10 million
        • Due date for payment
        • Price per share
   3.   Additional Funding of $150 million

- Form of funding – capital call, convertible debt or debt
- Due date for payment
- Price per share if capital call or convertible debt

B.    Any other business".

82.    No documents were circulated to enable any informed or commercially sensible discussion of, among other things: (i) the need for the proposed capital calls; (ii) the proposed price per share (which, in respect of item A(1), had already been recorded as US$ 5,000 per share in the Original Minutes); (iii) (in respect of item A(3)) the form of funding.

83.    By a letter from Carpentaria to the JVC dated 3 June 2014, Carpentaria sought an adjournment of the proposed meeting pursuant to its right under clause 6.2(g) of the JVC SHA. In a letter of the same date from PHRL to the JVC (**"PHRL's 3 June letter"**), PHRL explained that it was seeking this adjournment on the basis that, in summary (i) inadequate notice of the proposed meeting had been given; (ii) the purported "capital call" for US$ 10 million (agenda item A(2)) was *ultra vires* as it contravened clauses 5.4(a) and 4.2 of SHA; (iii) the request for "*[a]dditional funding*" of US$ 150 million (agenda item A(3)) was *ultra vires* because it contravened clauses 5.4(a)-(b) and 5.5 of the JVC SHA, and any suggestion that further shares could be issued pursuant to it in any event contravened clauses 5.3 and 5.3 and Schedule 2 Part 2 paragraph 2 of the JVC SHA because it required PHRL's consent (which was refused); and (iv) the JVC had failed or refused to provide the documents sought in PHRL's 22 May letter. PHRL accordingly requested that the proposed meeting be adjourned until such time as these issues had been addressed.

84.    On 4 June 2014 at 10.00 a.m. New York time, Mr Bruce Wilson (**"Mr Wilson"**) of Covington & Burling, solicitors for Carpentaria, dialled in to the call for the proposed meeting (**"the 4 June call"**) in order to repeat (if necessary) Carpentaria's request for an adjournment of the proposed meeting. Mr Djanogly, Mr Doronin and Mr Ivanhoe were also present on the call. No "A" director was present. During the 4 June call, among other things:

84.1.    Mr Wilson made it clear that (i) Carpentaria required that the points in PHRL's 3 June 2014 letter be addressed before any such further meeting could take place; and (ii) any business purportedly transacted following Carpentaria's request for an adjournment would be invalid (clause 6.2(g) of the JVC SHA). Mr Wilson repeated the request for the recording of the 22 April Meeting, and the documents specified in PHRL's 3 June letter.

84.2.    Mr Doronin objected to the proposed adjournment (although he failed to state on what basis) and also objected to Mr Wilson's presence on the call, noting that he was neither a director nor an approved observer. Mr Doronin then demanded that Mr Wilson leave the call, which he did at 10.21 a.m. New York time.

85.    PHRL does not know what (if anything) else was discussed on the 4 June call.

**(d)    The 6 June Meeting**

86.    By an email dated 4 June 2014 timed at 8.11 p.m. London time (3.11 p.m. New York time), Mr Djanogly circulated a purported notice in respect of a yet further proposed meeting of the Board by telephone on 6 June 2014 at 3.00 p.m. London time (10.00 a.m. New York time). Without prejudice to PHRL's case that this notice was invalid, it will hereafter be referred to for convenience as **"the Second Notice"**.

87.    In the Second Notice, Mr Djanogly said "*[f]urther to the adjournment of today's Board Meeting I confirm, as agreed by all directors, that the Board Meeting scheduled for today is now scheduled to take place*" on 6 June 2014. The statement by Mr Djanogly, namely that all directors had agreed to an adjournment of just 48 hours, is and was untrue; Carpentaria did not agree. Indeed, Carpentaria wrote on 4 June 2014 to object to a 48 hour period and said that the earliest a meeting could be convened would be one week after provision of the documents and information sought in PHRL's 3 June letter. Moreover, the Second Notice included a further proposed agenda for discussion at the purported meeting, which tabled various topics proposed for discussion which had not featured in the First Notice (items B-E). At least insofar as those issues were concerned, Mr Djanogly had failed to give adequate notice of a meeting at which these items were to be considered, in contravention of clause 6.2(c).

88.    By a letter dated 5 June 2014 from TIL to the JVC (but marked for the attention of Mr Amanat) (**"TIL's 5 June letter"**), TIL provided a substantive response to PHRL's 22 May letter. As far as related to the purported "capital call" purportedly approved at the 22 April Meeting, the 5 June letter contended, in summary that:

88.1.    The purported "capital call" of US$ 150 million was within the Board's power pursuant to clauses 5.5 and Schedule 1 Part 1(b) paragraph 3 of the JVC SHA. However, TIL accepted that (unlike under clause 5.4) no shareholder is obliged to provide funding.

88.2.    The US$ 150 million "capital call" was "*validly approved by the Board*" at the 22 April Meeting, including by Mr Eliasch, an "A" director. (If, which PHRL does not accept, there was any such approval by Mr Eliasch, it could only be because Mr Eliasch was acting in breach of (i) his duty to consult with PHRL; and/or (ii) his duty to safeguard the interests of PHRL or alternatively the joint interests of PHRL and Sherway as "A" shareholder, as TIL well knew. Furthermore, any such approval is also wholly at odds

with the assertion made in the 27 July letter that Mr Eliasch recognised that such a call would require shareholder consent.)

88.3.   There were "*currently discussions on going*" with the auditors of Silverlink "*with regard to Silverlink's "going concern" status*" and that accordingly there was "*an urgent need to provide additional funding*". (This did not appear to be a reason articulated in the Brand Presentation put before the Board when purporting to consider the purported US$ 150 million "capital call".)

88.4.   Given that (TIL wrongly asserted) "*the need for the additional funding has been approved by the Board*" there was nothing that TIL, as a shareholder, could do and that, as a result, it was suggested that PHRL took up its concern with the Board. (This point wholly ignored TIL's obligations under clause 4.5(a)-(d) of the JVC SHA.)

89.   By a letter from Carpentaria to the JVC dated 5 June 2014, Carpentaria again sought an adjournment of the proposed meeting pursuant to its right under clause 6.2(g). In a letter of the same date from PHRL to the JVC ("**PHRL's 5 June letter**"), PHRL explained that (i) Carpentaria had not agreed to a 48-hour adjournment of the proposed meeting; and (ii) to press ahead with the proposed meeting in the absence of having given proper notice, and in the absence of any reply to the matters contained in PHRL's 3 June letter, constituted a display of bad faith. PHRL accordingly requested that the proposed meeting be adjourned until such time as these issues had been addressed.

90.   On 6 June 2014 at 10.00 a.m. New York time, Ms Louise Nash ("**Ms Nash**") of Covington & Burling, dialled in to the call for the proposed meeting in order to confirm that the JVC had received Carpentaria's further request for an adjournment. Mr Djanogly, Mr Doronin, Mr Eliasch and Ms Fiona Adams ("**Ms Adams**") of GT were also present on the call. It is not clear in what capacity Ms Adams attended, but the 6 June Minutes (pleaded to at paragraphs 92-93 below) record her as being an Observer, presumably appointed by TIL.

91.   During the call, Ms Adams said that, although the JVC had received a request for an adjournment from Carpentaria, the request was "*defective*" because "*no alternative time or date was specified*" as alleged to be required by clause 6.2(g). Mr Doronin said that PHRL could not repeatedly cause the meeting to be adjourned and that Mr Amanat had agreed by email to proceed with the meeting in 48 hours. This was untrue. According to the 6 June Minutes (pleaded to at paragraph 92 below), Mr Eliasch said that he had expressly agreed the adjourned meeting time with Mr Amanat. This was also untrue. In any event, Ms Nash reiterated that any email correspondence was irrelevant in the light of Carpentaria's request to adjourn pursuant to clause 6.2(g). Although the Board agreed to note her objections, Ms Nash was told to leave the call, which she did at 3.15 p.m. New York time. The call then continued,

purportedly as a meeting of the Board. Without prejudice to PHRL's position that this purported Board meeting was *ultra vires*, it will hereafter be referred to for convenience as **"the 6 June Meeting"**).

92.    By an email dated 9 June 2014, a set of purported minutes were circulated by Ms Adams (**"the 6 June Minutes"**), which recorded what happened after Ms Nash left the call. The 6 June Minutes stated that:

> "[n]otwithstanding the objection raised by Ms Nash, the directors present decided to commence the meeting on the basis that a valid notice of adjournment to another time or date had not been received, that the meeting had already been adjourned once at the request of the Carpentaria and on the basis that it was in the best interests of the Company to hold the meeting".

93.    The 6 June Minutes went on to record that the Board had, among other things, purportedly:

93.1.    agreed that the price per share for a US$ 50 million capital call would be US$ 3,343 per share (which, without explanation, was contrary to the US$ 5,000 per share which was recorded in the Original Minutes and which appeared to be an attempt to increase the dilutive effect in the event that PHRL fails and/or refuses to contribute pursuant to the call) and that such payment would be due 10 business days from the date on which the call notice was sent to the shareholders by any of the JVC's directors;

93.2.    agreed that the funding requirements of the JVC and its subsidiaries set out in the business plans were in excess of the US$ 60 million "Capital Reserve" specified in the JVC SHA and that such funding requirements could not be met out of internal cash flows and that a further capital call of US$ 10 million was necessary on the same terms as to price and due date as the US$ 50 million call; and

93.3.    agreed that there was "a genuine business need" for funding in the sum of US$ 150 million and that "a further capital call" in this amount was permitted by the JVC SHA and, although it appears to have been acknowledged that no shareholder was obliged to provide this funding, that this "capital" call would be approved "at a price of $0.01 per share" with payment being due within 20 business days from the date on which the call was sent by a member of the Board to shareholders.

94.    The 6 June Minutes were signed off by Mr Eliasch as "Chairman" of the Board. Mr Eliasch's signature of this document (which included a purported resolution authorising "any director ... to issue a notice to the shareholders requesting they fund the capital call") makes it abundantly clear that Mr Eliasch did not hold the view professed in the 27 July letter. In its

clumsy attempt to justify Mr Eliasch's actions in this regard, the 27 July letter effectively admits that what the Board attempted to do at the 6 June Meeting was wrongful.

95.    By a letter dated 6 June 2014 from TIL to the JVC (but marked for the attention of Mr Amanat), TIL purported to justify the resolutions set out in the 6 June Minutes above. This letter noted (but did not deal with) PHRL's refusal of consent for the issuance of any further shares in the JVC.

96.    In the event, PHRL was forced to apply for an injunction in respect of the purported capital calls passed at the 22 April Meeting and the 6 June Meeting. On the day of the hearing, TIL provided undertakings which held the ring. These undertakings have since been continued through to trial.

(e)    **The 25 July Meeting**

97.    By an email dated 17 July 2014, Mr Djanogly circulated a notice for a meeting on 25 July 2014, to discuss the making of a US$ 50 million "capital call". By a letter dated 21 July 2014, Carpentaria exercised its right pursuant to clause 6.2(g) of the JVC SHA to adjourn the meeting scheduled for 25 July 2014.

98.    Despite Carpentaria's adjournment request, and in breach of clause 6.2(g) of the JVC SHA, TIL and Mr Eliasch chose to press ahead with the proposed meeting on 25 July 2014, alleging (wrongly) that Carpentaria had exercised its right to adjourn in bad faith. Without prejudice to PHRL's contention that the purported meeting on 25 July 2014 was invalid, this meeting will be referred to for convenience as **"the 25 July Meeting"**.

99.    At the 25 July Meeting, the Board purported to pass a resolution again pressing the US$ 50 million "capital call", purportedly resolving:

"*4.3. With regard to the price per share it was acknowledged that, as the shareholders had already committed under the [JVC] SHA to provide this funding, the price per share should not be an issue. $5,000 per share was the price used at the time the shareholders subscribed for their existing shareholdings and it should therefore be an uncontroversial price.*

*4.4. It was resolved that the due date for payment of the Capital Call shall be 8 August 2014 and the price per share for the Capital Call shall be $5,000. Any director is hereby authorised to take all actions as may be necessary to implement and conclude the Capital Call on these terms.*"

100.    PHRL was forced to apply for an injunction in respect of the resolutions purportedly passed at the 25 July Meeting. At a hearing before Mrs Justice Rose on 31 July 2014 (**"the 31 July hearing"**), the JVC was enjoined from acting upon the resolutions purportedly passed at the 25 July Meeting.

**(f)        Conclusions and relief sought**

101.    In the premises, the actions taken by the Board at the 22 April Meeting and/or the 6 June
Meeting (as the case may be) were unlawful and invalid for the following reasons:

101.1.    The 6 June Meeting took place notwithstanding that Carpentaria had requested an
adjournment of that meeting pursuant to clause 6.2(g) of the JVC SHA. This clause
does not require the director to specify another time and place for the proposed
meeting in its written request for an adjournment. Further, even if it did, PHRL
(through Carpentaria) sought to adjourn the proposed meeting until such time as the
matters in PHRL's 3 June letter were addressed, which included the provision of
certain important documents. Accordingly, the Board's apparent view that the request
for an adjournment of the 6 June Meeting was defective is incorrect. Further, clause
6.2(g) provides that, upon an adjournment request being made, no business may be
conducted at a meeting. This is mandatory in terms – the Board's apparent view in
the 6 June Minutes that: (i) the meeting had already been adjourned once at
Carpentaria's request; and (ii) it was in the best interests of the JVC to hold the 6
June Meeting, was irrelevant. Accordingly, even though clause 5.4(d) requires the
Board to give notice *"immediately"* after Completion that US$ 50 million of the *"Capital
Reserve"* is being called, and that the due date is 60 days from Completion, it was not
competent for the Board to make such a call in respect of this US$ 50 million, and/or
set a due date and/or price per share, at the 6 June Meeting.

101.2.    If, which is denied, the Board was able to consider any matters at the 6 June Meeting
at all (including in particular the call for US$ 50 million), it was not in any event able to
pass resolutions in relation to (i) any due date for the US$ 50 million "capital call"
which was less than 60 days as provided for by clause 5.4(d) of the JVC SHA (for the
reasons pleaded at paragraph 101.3.1 below); (ii) the purported US$ 10 million
"capital call"; or (iii) the purported US$ 150 million "capital call", whether at the 22
April Meeting or the 6 June Meeting.

101.3.    As to the purported US$ 50 million "capital call":

101.3.1.PHRL avers that, on a true construction of clause 5.4(d) (or it was an implied
term to the effect that), the shareholder would have 60 days from the date
on which the notice was issued by a director of the JVC. Any other reading
of this clause would be absurd, as it would enable, for example, a director to

issue a notice after expiry of the 60 day period and demand a contribution of US$ 50 million immediately. The reason why clause 5.4(d) provides that the shareholder will have 60 days "*from Completion*" was because the agreement also envisaged that the Board would give notice "*immediately*" i.e. on Completion.

101.3.2. Further, the fact that the Board did not issue any such notice within 60 days of 31 January 2014 cannot be a reason for abridging the 60 day period provided to the shareholders for payment. Indeed, the fact that the Board did not do so demonstrates that the need for this funding was, and is, not urgent.

101.3.3. Accordingly, the resolution purporting to require payment within "*10 Business Days from the date on which the call notice is sent to the shareholders*" was unlawful.

101.4.   As to the purported US$ 10 million "capital call":

101.4.1. While a capital call over and above US$ 50 million is permitted up to US$ 60 million within the first 12 months following Completion, clause 5.4(a) SHA provides that: "*[t]he amount of the Capital Reserve will be specified in the Initial Resorts Business Plan and in no event shall the total Capital Reserve exceed US$60,000,000*" (emphasis added).

101.4.2. For the reasons pleaded at paragraphs 108-112 below, the Brand Presentation did not constitute the "*Initial Resorts Business Plan*" within the meaning of clause 4.2 of the JVC SHA.

101.4.3. If, contrary to the above, the Brand Presentation did constitute the "*Initial Resorts Business Plan*", section 7 ("*Capital Requirements of the New Aman*") made no mention of the "*Capital Reserve*" at all, still less proposed that the "*Capital Reserve*" be increased from US$ 50 million to US$ 60 million, as required by clause 5.4(a) of the JVC SHA.

101.4.4. If, contrary to the above, the US$ 10 million "capital call" could be lawfully called (i.e. by virtue of the fact that, contrary to PHRL's case, it was provided for in the "*Initial Resorts Business Plan*") this would constitute an "*Additional Capital Amount*" within the meaning of clause 5.4(c) of the JVC SHA, for which the due date for payment must be "*not less than 20 Business Days from the date of such written notice*". By resolving that the

US$ 10 million "capital call" would be payable within "*10 Business Days from the date of on which the call notice is sent to the shareholders*", the Board acted in breach of clause 5.4(c) of the JVC SHA, and the US$ 10 million "capital call" call was unlawful for this additional reason.

101.5.  As to the purported US$ 150 million "capital call":

101.5.1. Clause 5 of the JVC SHA ("*Financing the Business*") contains a detailed and comprehensive scheme for the injection of capital into the JVC. The JVC's business is and was to be funded initially by the proceeds of share subscriptions and thereafter, (only) "*to the extent such expenditures and requirements are not covered by cash flows*", by the Shareholders contributing to the "*Capital Reserve*". Clauses 5.4(a) and 5.4(b), read together, provide that no further funding can be called beyond the US$ 60 million of the "*Capital Reserve*" within the first 12 months following Completion (i.e. before 7 February 2015). On a true construction of the JVC SHA, these provisions envisage that the JVC's shareholders should have to contribute no more than US$ 60 million during the first 12 months following Completion. Clauses 5.5 and paragraph 3 of Schedule 2 Part 1(b) (which envisage the raising of "*additional funding*" beyond that set out in the "*Resorts Business Plan*" or the "*Development Business Plan*") ought to be construed as applying only after the first 12 months following Completion.

101.5.2. The correctness of this analysis is supported by the fact that, in a belated effort to remedy Mr Eliasch's obvious breaches of the JVC SHA (and Holdings SHA), the 27 July letter confirms that Mr Eliasch "*will not support and will not vote for any [capital] call to be made in the first 12 months following Completion which is over and above ... $60 million*".

101.5.3. If, contrary to the above, the Board did have the power to request additional funding from the JVC's shareholders beyond the US$ 60 million of the Capital Reserve in the first 12 months following Completion, this power could only have been invoked if there existed, at the time of the 22 April Meeting or the 6 June Meeting, a real business requirement for these additional funds (see clause 5.5). There was no such requirement. Alternatively, the Board cannot reasonably have believed that there was such a requirement. In particular:

101.5.3.1. the 22 April Meeting contained little discussion of this topic and did not contain the type of in-depth analysis one would expect when seeking funding of the order of US$ 150 million;

101.5.3.2. the Development Presentation contains no details at all in respect of the proposed funding; and

101.5.3.3. the Brand Presentation contains only a series of generalised proposals and, tellingly, acknowledged that *"detailed investment proposals with detailed investment analysis and cash flows"* will be prepared for each proposal in due course. It is clear that no such detail had been enquired into as at the date of the 22 April Meeting. The Brand Presentation also appeared to suggest that very large sums were required for the development of various hotels and resorts, without any research or investigation having been undertaken in relation to the true cost and/or viability of any of the projects.

101.5.4. Further, and in any event, if, contrary to the above, the Board was capable of exercising any power to request any additional funding from the JVC's shareholders, such funding could not take the form of a "capital call" (or indeed any other mechanism pursuant to which shares are issued in return for funding) without PHRL's consent because (i) clause 5.5 does not provide for any such mechanism; and/or (ii) clause 5.3 and paragraph 2 of Schedule 2 Part 2 of the JVC SHA provide that the consent of both shareholders is required before any further shares or securities in the JVC can be created, allotted or issued. PHRL's 3 June letter made it clear that it did not consent to issuance of any further shares.

101.5.5. Finally, even if, contrary to the above: (i) the Board was capable of exercising any power to request any additional funding from the JVC's shareholders; and (ii) the Board was somehow able to issue shares as a result of such a request, the selection of a purported price per share of US$ 0.01 was plainly an act of bad faith, and for the obvious purpose of seeking to dilute PHRL's shareholding in the JVC. To date, no explanation has been provided for this bogus price and why, most strikingly, this price is so different from the other two prices per share (US$ 5,000 and US$ 3,343) considered at the 22 April Meeting and the 6 June Meeting respectively. Leaving to one side the fact that the JVC is not authorised under clause 5.1 of its Memorandum of Association to issue 150 billion shares, should such a call have been taken

up, it is quite clear that the US$ 0.01 value was arrived at in order to substantially leverage the dilutive effect of any call on PHRL, in the event that TIL contributed its share of US$ 150 million, but PHRL did not.

102.    Notwithstanding the foregoing, and in breach of the JVC SHA:

102.1.    the Board purported to pass the purported resolutions pleaded at paragraph 93 above; and

102.2.    on 17 June 2014, PHRL received two letters from Mr Djanogly (in his capacity as a director of the JVC) purporting to issue a capital call of US$ 50 million and US$ 10 million, at a price per share of US$ 3,343 per share, payable by 3 July 2014, allegedly pursuant to the resolutions passed at the 6 June Meeting (**"the JVC Calls"**).

103.    It is averred that these actions were not carried out for legitimate commercial purposes, but were carried out for the purpose of attempting to dilute PHRL's shareholding in the JVC. Indeed, the reduction of the price per share proposed from US$ 5,000 per share at the 22 April Meeting to US$ 3,343 per share (in the case of the US$ 50 million and US$ 10 million calls) and US$ 0.01 (in the case of the US$ 150 million call) at the 6 June Meeting represents, it is to be inferred, an attempt to dilute PHRL further in the event that it failed or refused to meet the purported calls. As the Defendants well knew, PHRL is unwilling to inject further sums of this magnitude into the JVC within the first year following Completion without, at least, detailed plans and projections justifying the immediate need for further capital.

104.    As to the 25 July Meeting, for the same reasons as pleaded 96.1 above, this meeting was invalidly convened, so could not have passed any valid resolutions. However, even if, contrary to this, the 25 July Meeting had been validly convened, the resolution(s) purportedly passed were unlawful:

104.1.    TIL's nominated directors did not give any genuine or serious consideration to the correct price per share, instead concluding that US$ 5,000 per share was appropriate because this *"was the price used at the time the shareholders subscribed for their existing shareholdings"* and that it was *"uncontroversial"*. TIL procured that these steps were taken despite PHRL having asked for the relevant financial information (which the attendees of the 25 July Meeting had access to in any event, but PHRL did not) to enable (all of) the Board to arrive at a correct valuation. This constituted a breach of clause 4.5 of the JVC SHA.

104.2. Further, or alternatively, in requiring the US$ 50 million "capital call" to be paid by 8 August 2014, the JVC (as procured by TIL) breached clause 5.4(d) of the JVC SHA, for the same reasons as pleaded at paragraph 101.3 above.

105.   Mr Eliasch was a willing participant with Mr Doronin in the above pleaded acts, despite the fact that (i) PHRL had instructed him not to do so; (ii) this course of conduct was in breach of the JVC SHA and the Holdings SHA; (iii) this course of conduct was not for a legitimate commercial purpose and/or was contrary to PHRL's, Sherway's and/or the JVC's best interests. In particular, and in addition to the breaches of the JVC SHA identified above, Mr Eliasch (and, by reason of Mr Eliasch's conduct, Sherway) acted in breach of the Agreement and/or the Sherway Agreements (in particular those clauses set out and summarised at paragraphs 55-57 above) with regard to the matters pleaded above *inter alia* by reason of the following:

105.1. casting his vote in favour of a purported call for further capital of some US$ 210 million at the 22 April Meeting, despite PHRL's instructions to the contrary;

105.2. despite PHRL's and Carpentaria's written objections to the 6 June Meeting going ahead, and Carpentaria's request for an adjournment of the 6 June Meeting, Mr Eliasch:

105.2.1. falsely claimed that Mr Amanat had agreed to the 6 June Meeting going ahead;

105.2.2. agreed to, and participated in, the 6 June Meeting as if it were a valid meeting of the JVC's Board, purportedly fulfilling the quorum requirement of one "A" director;

105.2.3. purportedly voted in favour of a price per share of US$ 3,343 per share for the US$ 50 million capital call, without: (i) any sensible commercial basis for deciding on a price for each share; and/or (ii) any apparent reason for departing from the US$ 5,000 per share price adopted at the 22 April Meeting;

105.2.4. purportedly voted in favour of a US$ 10 million capital call, despite PHRL's written objections, as set out in PHRL's 22 May letter and PHRL's 3 June letter, at the same price as for the US$ 50 million call (in respect of which the same objections as set out at paragraph 105.2.3 above apply *mutatis mutandis*);

105.2.5. purported to agree that there was "*a genuine business need*" for funding for the JVC in the sum of US$ 150 million and purportedly voted in favour of "*a further capital call*" in this amount "*at a price of $0.01 per share*", with payment being due within 20 business days from the date on which the call was sent by a member of the Board to shareholders, despite (i) PHRL's written objections as set out in PHRL's 22 May letter and PHRL's 3 June letter; and (ii) this being a clear breach of the JVC SHA, as pleaded at paragraph 101 above; and

105.3.   Mr Eliasch planned and/or acquiesced in the sending of a notice calling the 25 July Meeting, and subsequently attending, purporting to vote at, and signing off the minutes of, the 25 July Meeting, despite this being a clear breach of the JVC SHA as pleaded at paragraphs 101.1 and 104 above.

105.4.   Mr Eliasch and Sherway ignored and repudiated the obligation upon them to use their reasonable endeavours to reach agreement with their venture partner on matters relating to the JVC (and indeed sought without agreement to act in a manner that was contrary to the interests of their partner and their joint venture).

105.5.   The actions pleaded in this paragraph were not being carried out for legitimate commercial purposes, but were being carried out for the purpose of attempting to dilute PHRL's shareholding in the JVC.

106.   For the avoidance of doubt, not only did Mr Eliasch's actions as pleaded above constitute the assistance or acquiescence in TIL's and the JVC's breaches of the JVC SHA, but his actions (on his own behalf and on behalf of Sherway) gave rise to breaches of the Agreement and the Sherway Agreements (in particular, the Holdings SHA and the express and implied obligations within it pleaded at paragraphs 55-57 above).

107.   In the premises, and in addition to its other relief, including its remedies in respect of the repudiatory breaches by Sherway, PHRL seeks:

107.1.   A declaration that the resolutions purportedly passed at the 6 June Meeting (including the US$ 50 million call, for the reasons pleaded at paragraphs 101.1-101.3 and 103 above) and the 25 June Meeting are invalid and of no effect.

107.2.   Further or alternatively, a declaration that any resolutions purporting to seek a "capital call", beyond US$ 50 million, passed at the 22 April Meeting and/or the 6 June Meeting are invalid and of no effect.

107.3. Further or alternatively, a declaration that the JVC Calls (or either of them) are invalid and of no effect.

107.4. Further or alternatively, a declaration that the JVC and/or the Board has no power to issue any further shares pursuant to any request for further funding under clause 5.5 and/or paragraph 3 of Schedule 2 Part 1(b), absent PHRL's consent.

107.5. An injunction restraining the JVC and/or the Board from:

107.5.1. purporting to give effect to the resolutions (or any of them) purportedly passed at the 6 June Meeting insofar as they relate to "capital calls" or requests for further funding;

107.5.2. purporting to make a call for a capital contribution and/or give effect to the JVC Calls (or either of them);

107.5.3. purporting to create, issue and/or allot any further shares pursuant to the resolutions (or any of them) purportedly passed at the 22 April Meeting or 6 June Meeting, as the case may be; and/or

107.5.4. purporting to give effect to the resolutions (or any of them) purportedly passed at the 25 July Meeting,

and/or an order compelling TIL to procure that its nominated directors do not do any of the aforementioned acts.

## VIII.    Business Plans

108.    Clauses 4.2 and 4.3 of the JVC SHA make detailed provision for the preparation of, and agreement to, the "*Initial Resorts Business Plan*" and the "*Initial Development Business Plan*" respectively. In particular:

108.1. Clauses 4.2(a)-(d) and 4.3(a)-(d) make detailed provision for, among other things: (i) the circulation to the Board of copies of the "*Initial*" versions of each of these plans; (ii) the opportunity for the "A" and "B" Directors to consider them and require any further information; (iii) a preliminary meeting to discuss the draft plans; and (iv) the presentation to the Board of a revised plan, incorporating any amendments.

108.2. Clause 4.2(a)(iv) provides that the "*Initial Resorts Business Plan*" shall include the matters set out at Schedule 6 of the JVC SHA, which contains a detailed list of topics for inclusion.

109.    TIL and/or the JVC have failed to comply with any of these requirements. The first notification which the "A" directors had of the approval of any business plan was in the Original Agenda, circulated on 20 April 2014. This simply proposed for discussion at item IV(A): "*[a]pproval of Development Business Plan and update on current projects*". The Original Agenda made no mention of any "*Initial Resorts Business Plan*", nor did it enclose a copy of either an "*Initial Resorts Business Plan*" or an "*Initial Development Business Plan*".

110.    TIL has alleged in correspondence that the Brand Presentation and the Development Presentation are the "*Initial Resorts Business Plan*" and the "*Initial Development Business Plan*" respectively, and that these were validly approved by the Board at the 22 April Meeting.

111.    This contention is incorrect:

111.1.  The Board was not able to purportedly approve the Brand Presentation as the "*Initial Resorts Business Plan*" because: (i) the approval of the "*Initial Resorts Business Plan*" was not a matter listed on the Original Agenda (or indeed the Revised Agenda), contrary to clauses 6.2(c)(i) and 6.2(e) (and no written agreement was obtained from both an "A" and a "B" director or, if it was, the matters pleaded at paragraph 88.2 above are repeated *mutatis mutandis*); (ii) the Brand Presentation did not accompany the Original Agenda, contrary to clause 6.2(c)(ii); and/or (iii) the Brand Presentation did not in any event comply with the requirements set out in clause 4.2 and/or Schedule 6 of the JVC SHA.

111.2.  The Board was not able to purportedly approve the Development Presentation as the "*Initial Development Business Plan*" because: (i) the Development Presentation did not accompany the Original Agenda, contrary to clause 6.2(c)(ii); (iii) the Development Presentation did not in any event comply with the requirements set out in clause 4.3 of the JVC SHA.

112.    In the premises, TIL and/or the JVC (with the assistance or acquiescence of Mr Eliasch) have breached the JVC SHA. For the avoidance of doubt, not only did Mr Eliasch's actions as pleaded above constitute the assistance or acquiescence in TIL's and the JVC's breaches of the JVC SHA, but his actions (on his own behalf and on behalf of Sherway) gave rise to breaches of the Agreement and the Sherway Agreements (in particular, the Holdings SHA and the express and implied obligations within it pleaded at paragraphs 55-57 above). In the premises, PHRL seeks a declaration that:

112.1.   the Brand Presentation does not constitute the *"Initial Resorts Business Plan"* and/or that the Board did not validly approve it as such at the 22 April Meeting; and/or

112.2.   the Development Presentation does not constitute the *"Initial Development Business Plan"* and/or that the Board did not validly approve it as such at the 22 April Meeting.


## IX.     Schedule 7 Incentive Arrangements

113.   The incentive arrangements set out in Schedule 7 of the JVC SHA (**"the Incentive Arrangements"**) represented the negotiated position of the parties as at the date of entry into the JVC SHA in respect of the rights to be granted to PHRL (and various third parties) as envisaged in the December Letter Agreement, as pleaded at paragraph 23 above.

114.   Although the details of the rights to be granted to Peak LLC (and subsequently PHRL) varied as the negotiations progressed, these rights represented a key economic benefit to PHRL (and various affiliated third parties) and were a material element of the consideration for the entire transaction.

115.   Clause 13.4 of the JVC SHA provides as follows:

> *"Incentive fees, if any, payable to PHRL Affiliates shall be set forth in Schedule 7, as such schedule may be modified by the Shareholders from time to time. There shall be no restriction on the ability of PHRL Affiliates to assign the benefit of any of the incentives set forth in Schedule 7 to any other Affiliate".*

116.   Schedule 7 of the JVC SHA provides, as far as is material, as follows:

> *"Unless and until other incentive arrangements are otherwise agreed by the Board, the following incentive agreements have been agreed with PHRL in consideration of the role of PHRL and its Affiliates in facilitating the transaction contemplated by the SPA and providing on-going management to ARGL and Silverlink. Payments made hereunder will be made to PHRL and PHRL will indemnify the JVC and TIL from any compensation claims from Nader Tavakoli, SURF Hotels Pte. Limited (**"SURF"**) and any other service provider. Such incentive arrangements will be incorporated into an asset management agreement between the JVC, PHRL and SURF entered into within 10 Business Days of Completion which will include usual and customary terms in the international private equity real estate investment industy [sic.] (including appropriate indemnification, reporting, standards of care and expense coverage provisions): ..."*

[The remainder of the schedule went on to set out various agreed terms, including an asset management fee of US$ 1 million per annum (with the potential to increase that amount to US$ 2 million per annum) in favour of SURF and a profit sharing agreement in respect of ARGL in favour of, among other entities, PHRL.]

117.   Paragraph 6 of Schedule 2 Part 2 of the JVC SHA provides that the following will be a *"shareholder reserved matter"*:

*"Entering into or terminating any material partnership, joint venture, profit-sharing agreement, technology licence or collaboration"*.

118.   A proposal to discuss the Incentive Arrangements did not feature on the Original Agenda prior to the 22 April Meeting, and could therefore not be raised at the 22 April Meeting in the absence of the written agreement of an "A" and a "B" director (clause 6.2(e) of the JVC SHA). No such written consent was sought or obtained (or, if it was, the matters pleaded at paragraph 88.2 above are repeated *mutatis mutandis*).

119.   Further, in the Amended Agenda (which was circulated to the Board, at the earliest, at the 22 April Meeting itself), item I(K) provided as follows: "*AM agreement and other incentive arrangements (as well as other outstanding payables)*". The Amended Agenda was not circulated 5 business days before the 22 April Meeting, and accordingly additional items on it could not be validly discussed absent the written agreement of an "A" and a "B" director (clause 6.2(e) of the JVC SHA). No such written consent was sought or obtained (or, if it was, the matters pleaded at paragraph 88.2 above are repeated *mutatis mutandis*). Furthermore, the description at item I(K) of the Amended Agenda was vague, non-specific and failed to comply with the requirements of clause 6.2(c). As articulated, it in no way suggested that the termination of the Incentive Arrangements was contemplated.

120.   At the 22 April Meeting itself, Ms Carol Osborne (**"Ms Osborne"**), of Bryan Cave LLP (solicitors then acting for PHRL), briefly attended by telephone at the request of Mr Amanat. Ms Osborne objected to discussion of the Incentive Arrangements, but was repeatedly interrupted by Mr Doronin and told to leave the 22 April Meeting.

121.   When Mr Eliasch indicated that he was going to abstain from the purported vote on the Incentive Arrangements, Mr Amanat called for a break in the meeting, during which he had a private conversation with Mr Eliasch, which Mr Tavakoli joined. Mr Amanat asked Mr Eliasch not to abstain but Mr Eliasch refused to do so. Although Mr Eliasch did not vote in favour of the termination of the Incentive Arrangements, the effect of his abstention was (as he must have well known) to hand this purported vote to the "B" directors, who both purported to vote in favour of the purported termination.

122.   Notwithstanding the foregoing, the Board purported to reduce the Incentive Arrangements to a value of US$ 3 at the 22 April Meeting. The Original Minutes stated as follows:

*"...It was pointed out that schedule 7 of the Shareholders Agreement provides that the incentive arrangements set out in schedule 7 shall apply until the Board agrees to a different approach than that set out in schedule 7. Following discussion it was agreed that the incentive*

*arrangements (including the asset management fee and the carried interest arrangements)
set out in schedule 7 to the Shareholders Agreement are inappropriate and as a result the
Board resolved to reduce such incentive arrangements to an aggregate total of $3. This
resolution is subject to confirmation by independent counsel to be appointed on behalf of the
Company that it is in accordance with the terms of schedule 7".*

123.     The Board's purported action in this regard was unlawful and invalid:

123.1.    Discussion of the Incentive Arrangements failed to comply with the requirements set
out in clauses 6.2(c) and/or 6.2(e) of the JVC SHA and was not capable of being
discussed, let alone acted upon, during the 22 April Meeting (absent the written
consent of an "A" and a "B" directors, which was not sought and/or obtained or, if it
was, the matters pleaded at paragraph 88.2 above are repeated *mutatis mutandis*).

123.2.    Further, and in any event, the reduction of the Incentive Arrangements from a multi-
million dollar economic value to an economic value of US$ 3 was, in effect, a
termination of these rights. The reduction of these rights to US$ 3 was a transparent
and clumsy attempt to circumvent the effect of paragraph 6 of Schedule 2 Part 2,
which provides that the termination of *"any material partnership, joint venture, profit-
sharing agreement"* is a *"shareholder reserved matter"*. There is no basis for the
suggestion by TIL in its 27 May 2014 letter that paragraph 6 does not apply to an
amendment to a provision in the JVC SHA itself. This is consistent with clause 13.4 of
the JVC SHA, which provides that the shareholders (not the Board) may modify the
Incentive Arrangements.

123.3.    The fact that Schedule 7 begins with the words *"[u]nless and until other incentive
arrangements are otherwise agreed by the Board..."* does not give the right to the
Board to amend unilaterally and/or terminate the arrangements which have already
been agreed with the relevant counterparties. Such a power would directly contradict
the express wording of clause 13.4. This wording is designed to deal with a situation
where, absent variation by the shareholders, the Board may negotiate a different set
of incentive arrangements with the beneficiaries of the arrangements identified in
Schedule 7.

124.     Indeed, Mr Ivanhoe did not himself appear sure that this was a matter which could lawfully be
carried out by the Board. In an email dated 22 April 2014, Mr Ivanhoe said: *"I acknowledge
that this is less than crystal clear but think the directors [sic.] can take this action pursuant to
schedule 7"*. For the reasons pleaded above, this assertion is incorrect.

125.     Despite PHRL's objections, both at the 22 April Meeting and in correspondence, TIL has
maintained that this action may lawfully be taken by the Board. It has, however, confirmed in
its 5 June 2014 letter that a *"third party law firm would be asked to review this decision"*.

PHRL does not consider that a review by a third party law firm is necessary or appropriate. Indeed, despite the fact that, as at the date of filing these Particulars of Claim, over five months have passed since PHRL's original objection to the unlawful termination of the Incentive Arrangements, no supportive opinion from a third party law firm (including Macfarlanes, who have been retained to advise the JVC) has been produced.

126.    Mr Eliasch has assisted and/or acquiesced in TIL's and the JVC's breaches of the JVC SHA in particular by (i) attending the 22 April Meeting but abstaining from the purported vote on the termination of the Incentive Arrangements, thereby effectively handing such a purported vote to the "B" directors; and (ii) failing to speak out in support of PHRL when its written objections to this conduct were made known to the Board. Not only did Mr Eliasch's actions as pleaded above constitute the assistance or acquiescence in TIL's and the JVC's breaches of the JVC SHA, but his actions (on his own behalf and on behalf of Sherway) gave rise to breaches of the Agreement and the Sherway Agreements (in particular, the Holdings SHA and the express and implied obligations within it pleaded at paragraphs 55-57 above).

127.    In the premises, PHRL avers that TIL and/or the JVC have acted in breach of the JVC SHA and PHRL seeks:

127.1.   a declaration that the resolution purportedly terminating and/or amending the Inventive Arrangements at the 22 April Meeting is invalid and of no effect;

127.2.   an order requiring TIL and/or the JVC to comply with its obligations under Schedule 7, in particular to procure that an asset management agreement is entered into between the JVC, PHRL and SURF, which will include (i) usual and customary terms in the international private equity real estate investment industry (including appropriate indemnification, reporting, standards of care and expense coverage provisions); and (ii) the matters set out in Schedule 7 of the JVC SHA.

X.    **Purported exclusion of Mr Zecha and appointment of Mr Doronin as CEO**

(a)    **Purported removal of Mr Zecha as CEO of the JVC**

128.    Clause 6.6(a) of the JVC SHA provides as follows:

"*The appointment and removal of the CEO will be made by the Board and is a Board Reserved Matter under Schedule 2 Part 1(b). Notwithstanding the foregoing, the initial CEO of the Company for the first six months following the Completion Date will be Adriaan Zecha and thereafter Adriaan Zecha will be the Chairman of the Resorts Business or CEO of AMBV, as determined by the Board following discussions with Adriaan Zecha*".

129.    Thus, the parties to the JVC SHA contractually agreed that:

129.1.  Mr Zecha would be the CEO of the JVC for at least the first six months following Completion; and

129.2.  in the event that Mr Zecha ceased to act as CEO, Mr Zecha would continue on as Chairman of the "*Resorts Business*" (which is defined as "*hotel and resort ownership, operation and management including (without limitation) the ownership and licensing of the Aman brand (including licensing in connection with the properties developed by the Development Business), but expressly excludes the Development Business*") or CEO of AMBV.

130.  Mr Zecha's knowledge of the business is and was unparalleled, and his remaining as CEO (and thereafter continuing with a role in the business) was considered by the contracting parties as important to provide the necessary continuity and ensure the continuing prestige of the Aman Resorts brand during the group's change of ownership. It was, however, envisaged that Mr Zecha would eventually wish to retire from his position as CEO of the JVC and that a replacement CEO would need to be appointed. Accordingly, the JVC had consulted Spencer Stuart in New York to search for suitable candidates.

131.  The fact that a replacement CEO would eventually be required is reflected by item II(D)(a) of the Original Agenda, which proposed discussion of "*[n]ew hires – CEO discussion and search, general counsel, other positions*". Despite originally maintaining that agenda item II(D)(a) constituted a reference to the appointment of Mr Doronin, TIL appeared to abandon this contention in its 5 June 2014 letter.

132.  During discussions between Mr Zecha and Mr Amanat, Mr Zecha had mentioned his wish to retire one day, provided that certain pre-conditions had been fulfilled, including requiring the repayment of a US$ 35 million loan by BTG to PHRL (of which he was a guarantor) and repayment of the US$ 10 million which he had contributed. Mr Zecha had mentioned that he would have no choice but to resign if there was a dispute between Mr Doronin and Mr Amanat, because such a dispute would be damaging to the Aman Resorts brand.

133.  According to TIL's 2 May 2014 letter, a meeting took place at Mr Doronin's home the night before the 22 April Meeting, which was attended by Mr Zecha, Mr Eliasch and Mr Doronin. PHRL understands that Mr Zecha said to Mr Doronin and Mr Eliasch that:

133.1.  Mr Zecha was aware that there were differences between the "A" and "B" shareholders in the JVC but that it was important for the image of Aman Resorts (and accordingly its business) that such disputes be resolved; and

133.2.  if they could not agree to resolve their differences, Mr Zecha would be compelled to resign from the JVC.

134.  However, PHRL understands that at no time did Mr Zecha inform Mr Doronin, Mr Eliasch or any other person that he would resign as CEO immediately, nor did he form any intention to do so, or in fact do so.

135.  Although PHRL accepts that Mr Zecha discussed the possibility of his resignation at the 22 April Meeting, it was in the terms as set out above. He also made it clear that, in the event that he was to resign, this would be conditional upon various matters, including making provision for the terms of his departure, and for his staff, being agreed upon.

136.  TIL has provided PHRL with what is said to be a transcript of that part of the 22 April Meeting, where it is said that Mr Zecha offered to resign with immediate effect. Despite requesting a copy of the entire recording of the 22 April Meeting made by Mr Djanogly as pleaded at paragraph 78 above, no such recording has been provided. Pending provision of this recording, PHRL does not accept the accuracy of the transcript supplied.

137.  The Original Minutes provided, among other things, as follows:

"1. Adrian Zecha has announced his resignation from the position of the CEO of the Company, chairman and managing director of Silverlink and all other posts currently held by him. A new arrangement is to be discussed with Adrian Zecha whereby he may assist the Company in the future in an advisory capacity.

2. Vladislav Doronin was appointed as the interim CEO of the Company with immediate effect, subject to confirmatory vote of Johan Eliasch".

138.  Neither of these items was on the Original Agenda (or indeed the Revised Agenda) in advance of the 22 April Meeting. Paragraph 123.1 above applies *mutatis mutandis* here. Furthermore, Mr Zecha's purported resignation and the purported appointment of Mr Doronin (who has no experience as a hotel executive) took place at the very end of the 22 April Meeting, after all of the other items on the agenda had been dealt with. It is to be inferred that this was a deliberate step, designed to ensure that it did not affect the voting of PHRL's nominated directors throughout the remainder of the 22 April Meeting.

139.  In any event, it is clear that Mr Zecha did not immediately resign from his position as CEO. In support of this, PHRL relies on the following facts and matters:

139.1.  Mr Ivanhoe presented Mr Zecha with a resignation letter at the 22 April Meeting and invited him to sign it; Mr Zecha did not do at the 22 April Meeting and has not done so since;

139.2.    Mr Zecha's letter dated 28 April 2014 and his solicitors' letters dated 6 May 2014 and 16 May 2014, in which he makes it clear that any suggestion that he resign was conditional upon reaching agreement about various matters which had not yet been agreed;

139.3.    when Mr Doronin circulated to Mr Zecha a draft internal announcement, which proposed to announce Mr Zecha's resignation and Mr Doronin's appointment, Mr Zecha immediately objected (and objected again subsequently, copying in the JVC's board), and reminded Mr Doronin of the conditional nature of his discussed resignation.

140.    Despite Mr Zecha's solicitors' letter dated 6 May 2014, demanding that Mr Zecha be confirmed as CEO, the JVC failed and/or refused to do so. In particular:

140.1.    despite Mr Zecha's objection to the draft internal announcement as being inaccurate, the JVC nevertheless circulated an announcement;

140.2.    despite Mr Zecha's objection to the draft internal announcement as being inaccurate, the JVC issued a public announcement respect of Mr Zecha's removal and Mr Doronin's appointment on or around 2 May 2014 (in breach of clause 25 of the JVC SHA, as pleaded at paragraphs 95-96 below);

140.3.    from Mr Zecha's solicitors' letter dated 6 May 2014, PHRL understands that Mr Zecha was prevented from entering his office on 30 April 2014 by a Mr Jim Mace (a lawyer instructed by, or acting on the instructions (whether directly or through Mr Ivanhoe) of, Mr Doronin) (**"Mr Mace"**);

140.4.    from Mr Zecha's solicitors' letter dated 16 May 2014, PHRL understands that Mr Zecha's assistants, Ms Trina Dingler Ebert and Ms Julia Walters were issued with letters of immediate termination;

140.5.    Mr Zecha received a letter dated 9 May 2014 from the JVC signed by Mr Djanogly, which asserted that the JVC had purportedly accepted Mr Zecha's resignation with immediate effect and (wrongly) accused Mr Zecha of having unlawfully interfered with the JVC's business interests (albeit with no proper particulars of that allegation); and

140.6.    according to Mr Zecha's solicitors' letter dated 16 May 2014 Mr Zecha received a letter dated 12 May 2014 from the JVC informing Mr Zecha (who is 81 years old) that he was required to vacate his current residence (where he has been living for the past 15 years) by 16 June 2014;

140.7.   in a letter dated 22 May 2014 from Maples and Calder, BVI solicitors on behalf of the JVC, the JVC asserted that Mr Zecha had resigned unconditionally and threateningly suggested that it was investigating Mr Zecha's *"conduct during his tenure as Chief Executive Officer"* (again, with no proper particulars of that allegation, and despite Mr Zecha having enjoyed 26 years of untarnished operating history and an unblemished reputation as one of the leading visionaries and entrepreneurs of the hospitality industry).

141.   Mr Eliasch assisted or acquiesced in TIL's and the JVC's breaches of the JVC SHA in this regard and also acted (on his own behalf and on behalf of Sherway) in breach of the Agreement and the Sherway Agreements (in particular, the Holdings SHA and the express and implied obligations within it pleaded at paragraphs 55-57 above).

**(b)     The purported appointment of Mr Doronin**

142.   As pleaded at paragraph 137 above, the Original Minutes purported to reflect Mr Doronin as having been appointed as CEO of the JVC. This purported resolution was is invalid. In particular:

142.1.   As pleaded at paragraph 87 above, the proposed appointment of Mr Doronin as CEO was not on the Original Agenda (or indeed the Revised Agenda) for the 22 April Meeting. The matters pleaded at paragraph 119 above are repeated.

142.2.   There was in fact no (or no valid) vote in respect of this matter at the 22 April Meeting. Mr Tavakoli expressed his opposition to this at the 22 April Meeting. TIL has asserted that Mr Eliasch later orally confirmed his vote in favour of Mr Doronin's appointment. Such an informal method of voting is not permitted under the JVC SHA and the JVC's Articles of Association (**"the Articles"**) (see clauses 6.2(f) and 6.2(h)-(i) articles 10.4-10.7 and 10.9 respectively), which contemplate the presence of a director at a meeting, at which he casts his vote in favour of a resolution.

143.   In the premises, PHRL avers that the purported appointment of Mr Doronin as CEO of the JVC is a breach of the provisions of the JVC SHA.

144.   Furthermore, clause 25.1 provides that:

*"...no party shall make, or permit any person to make, any public announcement, communication or circular (announcement) concerning this agreement without the prior written consent of the other parties (such consent not to be unreasonably withheld or delayed). The parties shall consult together on the timing, contents and manner of release of any announcement"*.

145.    On or around 2 May 2014, Mr Doronin / TIL caused a public announcement to be issued in respect of Mr Zecha's alleged resignation and Mr Doronin's purported appointment, without seeking PHRL's prior written consent. As the JVC SHA makes detailed provision for the appointment and removal of the CEO, it is averred that this constituted an announcement concerning the JVC SHA, and consequently a breach of clause 25.1 of the JVC SHA.

146.    Again, Mr Eliasch assisted or acquiesced in TIL's and the JVC's breaches of the JVC SHA in this regard and also acted (on his own behalf and on behalf of Sherway) in breach of the Agreement and the Sherway Agreements (in particular, the Holdings SHA and the express and implied obligations within it pleaded at paragraphs 55-57 above).

(c)    **Attempts to remove or neutralise Mr Zecha following commencement of the TIL Claim**

147.    The TIL Claim was commenced on 25 July 2014. It was accompanied by an application for interim injunctive relief, including in respect of the exclusion of Mr Zecha. This application was heard by Catherine Newman QC (sitting as a Deputy Judge of the Chancery Division) (**"Deputy Judge Newman"**) on 1 July 2014 (**"the 1 July hearing"**). Deputy Judge Newman reserved her judgment on the issue of the exclusion of Mr Zecha.

148.    Following the 1 July hearing, TIL procured witness statements from Mr Eliasch and Mr Ivanhoe, which were submitted to Deputy Judge Newman while she was considering her judgment and which were designed to support TIL's position in opposition to PHRL's application and to subvert the clear terms of clause 6.6(a) of the JVC SHA. As regards Mr Eliasch's witness statement, aside from the fact that matters in it were untrue or misleading, this witness statement was prepared solely: (i) to assist TIL's position in relation to the injunction application made by PHRL in relation to Mr Zecha; and (ii) to further TIL's interests in opposition to the position taken by PHRL at the 1 July hearing.

149.    The JVC had been represented by Stewarts Law LLP (**"Stewarts"**) at the 1 July hearing. Stewarts' appointment, which Mr Doronin, Mr Djanogly and Mr Eliasch had purported to authorise, had in fact been invalid, being in breach of clause 7.1 and paragraph 6 of Schedule 2 Part 1 of the JVC SHA, there having been no (or no valid) resolution of the JVC's board. Thereafter, TIL attempted to procure (with the assistance or acquiescence of Mr Eliasch) a situation in which Stewarts would take instructions only from Mr Doronin, Mr Djanogly and Mr Eliasch, to the exclusion of Carpentaria. (It is telling that, despite the proposed exclusion of Carpentaria, no effort was made to exclude Mr Eliasch from receiving advice or providing instructions to Stewarts, despite the fact that he would be entitled to communicate these matters to PHRL pursuant to clause 12.2(b)(ii) of the JVC SHA.) In any event, this constituted a transparent attempt by TIL (with the assistance or acquiescence of Mr Eliasch) to

manoeuvre itself into a position where it had access to a further set of legal representatives through which it could make submissions (for its own purposes) in these proceedings.

150.  This is evident from the fact that, despite Stewarts (purportedly on behalf of the JVC) having taken a neutral stance at the 1 July hearing on the question of Mr Zecha, TIL (with the assistance or acquiescence of Mr Eliasch) procured the writing by Stewarts of a letter to Deputy Judge Newman on 3 July 2014 (while she was considering her judgment) making submissions in support of TIL's position on the applications, again with the intention of subverting the clear terms of clause 6.6(a) of the JVC SHA. The Deputy Judge described this letter as "*irregular*" and containing submissions which "*could have been, but were not, made at the hearing*".

151.  It is not known (i) whether the JVC's funds were utilised for any or all of the above-pleaded improper purposes; and (ii) who of Mr Doronin, Mr Djanogly and/or Mr Eliasch gave instructions to Stewarts in respect of the above matters. Although PHRL has asked how Stewarts were paid, it has not been provided with an answer. PHRL reserves the right to supplement its pleading in this regard on disclosure.

152.  In the usual way, Deputy Judge Newman circulated her judgment in draft on 9 July 2014. The draft judgment made it clear that the Deputy Judge was minded to grant the injunctions sought by PHRL in respect of Mr Zecha. Following the circulation of the draft judgment, but before the judgment was due to be handed down on Monday 14 July 2014, TIL (with the assistance or acquiescence of Mr Eliasch) engaged in a series of desperate moves, in breach of the JVC SHA, to circumvent the effect of the Deputy Judge Newman's likely order. In particular:

152.1.  On the evening of Sunday 6 July 2014, Mr Djanogly had circulated a purported notice of an "*emergency board meeting*" of the JVC to be held at 3.00 p.m. on Monday 7 July 2014, to discuss the JVC's representation. Despite PHRL's objection, in its letter dated 4 July 2014, to Stewarts being appointed as solicitors to the JVC, Mr Eliasch agreed to and/or acquiesced in the sending by Mr Djanogly of this notice in order to, effectively, put into motion the proposal pleaded at paragraph 149 above. Although that the proposed resolution did not name the directors who were to give instructions to Stewarts, it is legitimately to be inferred that it was Mr Doronin's, Mr Djanogly's and Mr Eliasch's intention to vote themselves onto the committee who would provide instructions to Stewarts Law and to exclude Carpentaria/Mr Amanat. This notice was in breach of the notice provisions under clause 6.2 of the JVC SHA, so PHRL (through Carpentaria) exercised its right to adjourn this meeting to 3.00 p.m. on Friday 11 July 2014.

152.2.   On 10 July 2014 at 7.50 p.m., the evening before the adjourned meeting, Mr Djanogly circulated a purported notice of several additional "emergency" items (**"the Additional Items"**), which enclosed a large number of documents. TIL's anxiety to discuss (and pass resolutions in relation to) the Additional Items, together with a set of purported "*Corporate Governance Guidelines*" (**"the Proposed Guidelines"**), stemmed not from any genuine business need, but from TIL's desire to undermine Mr Zecha's position as CEO and to circumvent the effect of the Deputy Judge's order. The clear purpose of the Proposed Guidelines was: (i) to provide a purported basis for Mr Zecha's immediate removal upon him resuming his functions as CEO; and (ii) to prevent Mr Zecha from exercising the customary powers of the CEO, save with the approval of the Board This purported notice was accompanied by a purported consent to short notice and the addition of further items to the agenda under clause 6.2(d), signed by Mr Eliasch and Mr Doronin. These purported consents were invalid – they had not been given in order to enable the Board to discuss genuinely urgent matters, but rather had been given to assist TIL in attempting to circumvent the proposed order of Deputy Judge Newman. On Friday 11 July 2014, PHRL (through Carpentaria) exercised its right to adjourn this meeting to 21 July 2014.

152.3.   Evidently dissatisfied that the adjournment would not enable TIL to circumvent the effect of Deputy Judge Newman's judgment, which was due to be handed down on Monday 14 July 2014, and in an attempt to catch PHRL off-guard, at 6.55 p.m. on Friday 11 July 2014, Mr Djanogly circulated a further purported notice of an "emergency" meeting to be held at 8.00 p.m. that same evening (i.e. upon some 65 minutes' notice), which proposed (without explanation as to why they were so urgent that only 65 minutes' notice could be given) discussion of certain of the Additional Items, including in particular the Proposed Guidelines, which were objectionable for the reasons pleaded at paragraph 152.2 above..

152.4.   None of these board meetings concerned urgent matters or merited being called in contravention of the clear notice provisions under the JVC SHA.

152.5.   Not only did Mr Eliasch's actions, as pleaded above, constitute the assistance of or acquiescence in TIL's and the JVC's breaches of the JVC SHA, but his actions (on his own behalf and on behalf of Sherway) gave rise to breaches of the Agreement and the Sherway Agreements (in particular, the Holdings SHA and the express and implied obligations within it pleaded at paragraphs 55-57 above). PHRL avers that the signing by Mr Eliasch of the purported consent to short notice of the adjourned meeting, in the circumstances pleaded above, itself constituted a repudiatory breach of these agreements.

153.    On 14 July 2014, Deputy Judge Newman granted an interim injunction restraining the JVC from, among other things:

153.1.    taking any steps to remove and/or exclude Mr Zecha from his position as CEO of the JVC in reliance upon his alleged resignation on 22 April 2014 before 31 July 2013 or interfering with his functions as such, save as permitted by the JVC SHA or the JVC's Memorandum or Articles of Association;

153.2.    making any further internal and/or public announcements before 31 July 2014 to the effect that Mr Zecha has resigned and/or been removed from his position as CEO of the Second Defendant effective before midnight on 31 July 2014; and

153.3.    holding Mr Doronin as the CEO of the JVC (unless Mr Doronin is validly appointed as CEO of the JVC by the Board effective after 31 July 2014)

("the Zecha Injunction").

154.    Despite the Zecha Injunction having been granted, thereafter, efforts were made to thwart it. When Mr Zecha arrived at the offices of Silverlink in Singapore on 15 July 2014, he discovered that Mr Mace still had the keys to his office. Mr Zecha (reluctant to confront the man who had prevented him from entering his office before the Zecha Injunction was granted) sent Mr Amanat to speak to Mr Mace and to tell him to leave the premises. During this conversation:

154.1.    Mr Mace immediately retorted that Mr Zecha had no authority to make any demands, as he was not a director or officer of Aman International Pte Limited, a Singaporean company that holds the lease to Silverlink's premises, and scoffed that the judgement of the English Court has no jurisdiction in Singapore.

154.2.    When asked under whose authority he was acting, Mr Mace said that he was acting on behalf of "the board of the JVC" and was instructed by Mr Ivanhoe.

154.3.    Mr Amanat asked Mr Mace to leave so that Mr Zecha could get into his office and do his work without disruption. Mr Mace refused, and accused Mr Zecha of being disruptive.

155.    Mr Amanat then went to Mr Zecha and asked him to come to Mr Mace's room. When back in Mr Mace's room, Mr Zecha personally asked Mr Mace to leave the premises. Mr Amanat handed Mr Mace a copy of the judgment which had been handed down by Deputy Judge Newman but Mr Mace laughed and told Mr Amanat that it was entirely meaningless in

Singapore. He added that Mr Zecha's reinstatement was also meaningless and that Mr Doronin would be restored to being CEO in two weeks' time.

156.    By this time, it was approximately 4.00 p.m. and, unable to access his office, Mr Zecha and Mr Amanat left the premises.

157.    Mr Amanat informed PHRL's solicitors of what had happened in Singapore that day. PHRL's solicitors immediately wrote to GT, Herbert Smith Freehills (solicitors acting for TIL), the Court of Appeal (with whom TIL had filed an application for an urgent appeal against the Zecha Injunction) and to Deputy Judge Newman, informing them that Mr Mace was acting in contempt of court. The ultimate result of this letter was that Mr Zecha re-gained access to his office and was able to continue to act as CEO of the JVC, as provided for by the Zecha Injunction.

158.    Given that Mr Mace was employed by (or alternatively acted on the instructions of) GT (specifically Mr Ivanhoe), it is legitimately to be inferred that TIL/Mr Doronin had given him instructions to act in the way that he did. In addition to being a contempt of court, this conduct also constituted a breach (or alternatively a continuation of TIL's breach) of clause 6.6(a) of the JVC SHA.

(d)    **23 July Meeting and purported appointment of Mr Sirois as "Interim CEO"**

159.    Evidently keen to be rid of Mr Zecha as soon as possible, despite the terms of clause 6.6(a), which envisaged Mr Zecha having a continued role in Aman Resorts, by an email dated 15 July 2014, Mr Djanogly circulated a notice for a further meeting on 23 July 2014, to discuss: (i) the removal of Mr Zecha from midnight on 31 July 2014; (ii) the appointment of an "*Interim CEO*" from 1 August 2014; and (iii) the appointment of a "*Special Committee*" to progress discussion of the appointment of a permanent CEO.

160.    On Sunday 20 July 2014 at 10.06 p.m., Mr Djanogly circulated a wholly new document entitled the "*Code of Conduct*" which it was proposed would replace the Proposed Guidelines, just hours before the proposed meeting scheduled for the following day. The circulation of this new document (which, despite it obviously having been under preparation for some time prior to 20 July, PHRL had not seen or been asked to contribute to), and its inclusion in the proposed Agenda, was a breach of clause 6.2(c)(ii) of the JVC SHA. By a letter dated 21 July 2014, Carpentaria exercised its right pursuant to clause 6.2(g) of the JVC SHA to adjourn this proposed meeting, explaining its reasons for wishing to do so.

161.    Despite Carpentaria's adjournment request, and in breach of clause 6.2(g) of the JVC SHA, TIL and Mr Eliasch chose to press ahead with the proposed meeting on 23 July 2014, alleging

(wrongly) that Carpentaria had exercised its right to adjourn in bad faith. Without prejudice to PHRL's contention that the purported meeting on 23 July 2014 was invalid, this meeting will be referred to for convenience as **"the 23 July Meeting"**.

162.    At the 23 July Meeting, the Board purported to pass resolutions, among other things:

162.1.    removing Mr Zecha as CEO from 1 August 2014;

162.2.    appointing Mr Greg Sirios (**"Mr Sirios"**) as *"Interim CEO"*;

162.3.    establishing a "Special Committee" of the Board to *"oversee and exercise all rights of the Board in connection with negotiating the terms of employment"*, which was to consist of Mr Djanogly and Mr Eliasch.

163.    For the reasons pleaded above, the 23 July Meeting was invalidly convened, so could not have passed any valid resolutions. However, even if, contrary to the above, the 25 July Meeting had been validly convened, the resolution(s) purportedly passed were not passed in good faith and in the interests of the JVC, but were passed in order to further Mr Doronin's own interests:

163.1.    the resolution purporting to remove Mr Zecha was founded on baseless and unparticularised allegations of corruption against Mr Zecha which had been advanced by TIL as a device at the hearing before Deputy Judge Newman at the 1 July hearing in an attempt to avoid the Zecha Injunction;

163.2.    the resolution purporting to appoint Mr Sirios was passed on the footing that Mr Sirios, although he had been working at Aman Resorts for a number of years, is and was prepared to do what Mr Doronin told him to; and

163.3.    the resolution purporting to appoint a *"Special Committee"* of the Board was not passed because of any genuine desire to delegate the task of recruiting a permanent CEO to a sub-committee of the Board which would have the advantage of comprising fewer people (the whole Board only consists of four people) but was rather established in order to shut out Carpentaria, PHRL's only loyal director on the Board, from the process of appointing a permanent CEO.

164.    PHRL was forced to apply for an injunction in respect of the resolutions purportedly passed at the 23 July Meeting. At the 31 July hearing, Mrs Justice Rose granted PHRL an injunction restraining the JVC from acting upon the resolutions purportedly passed at the 23 July Meeting, save (on balance of convenience grounds) the resolution purporting to remove Mr

Zecha as of midnight on 31 July 2014. By the time of the 31 July hearing, PHRL had made it clear that it did not oppose the appointment of Mr Olivier Jolivet (**"Mr Jolivet"**) as Interim CEO. For the avoidance of doubt, PHRL maintained (and maintains) that the resolution purportedly removing Mr Zecha was invalid.

(e)     **Continued exclusion of Mr Zecha from any role as Chairman of the *"Resorts Business"* or CEO of AMBV**

165.     PHRL had hoped that Mr Jolivet was not in any of the shareholders' camps, and that his appointment would provide a measure of ring-holding pending the resolution of these proceedings. For the reasons pleaded below, PHRL appears to have been mistaken in this belief. Indeed, since his appointment, Mr Jolivet has chosen not to (or been unable to) maintain a line that is adequately independent from Mr Doronin, and has sought at every turn to exclude PHRL (through its representative on the Board, Carpentaria) from any say in the management of the Aman Resorts business.

166.     The day after the hearing, 1 August 2014, Mr Doronin caused to be issued an internal announcement to the entire Aman Resorts staff, which presented the result of the 31 July hearing as a victory for Mr Doronin, stating in particular that the Court had *"ratified"* the removal of Mr Zecha. This announcement also contained a purported quote from Mr Zecha, stating that *"[t]his is an exciting time for the Aman new management and I look forward to the global expansion of the brand, simple and elegant"*. Mr Zecha neither said these words, nor did he authorise Mr Doronin to attribute any quote to him. The inclusion of this quote was nothing more than an attempt to convince Aman Resorts staff (the majority of whom are fiercely loyal to Mr Zecha) that Mr Zecha had accepted the state of affairs and that there would be no role for him in the business in the future. This contravened clause 6.6(a) of the SHA.

167.     On 7 August 2014, Mr Jolivet sent a letter to the Board in which, among other things:

167.1.     Mr Jolivet incorrectly stated that he had been appointed *"as Interim CEO of all Aman Group Companies"* and that *"[Mr Zecha] has no formal role in the group pending the decision of the Board regarding his new role"*. This was incorrect. Mr Jolivet had only been appointed CEO of the JVC. Mr Zecha remained managing director of Silverlink, pursuant to his contract of employment dated 23 August 2008.

167.2.     Mr Jolivet also circulated a document entitled *"Summary of Findings"*, which was apparently produced by Allen & Gledhill (**"A&G"**), Silverlink's Singapore solicitors, which purported to make a series of unsubstantiated allegations about Mr Zecha's previous conduct. Despite PHRL's request for information and documents relating to

the genesis of this document, to which it is entitled pursuant to clauses 10.3-10.4 and/or 12.2 of the JVC SHA, neither Mr Jolivet nor TIL have provided PHRL with copies and/or the information sought.

168.    On 12 August 2014, PHRL wrote to TIL stating that, among other things, if (as TIL had previously contended) Mr Zecha was not CEO of AMBV, he should be appointed to that role, pursuant to clause 6.6(a) of the SHA. PHRL informed TIL that a written proposal signed by Mr Zecha would be placed before the Board containing his proposals for that role and proposed that the matter of Mr Zecha's role be discussed by the Board after the written proposal in relation to Mr Zecha's proposed role as CEO of AMBV had been circulated.

169.    Despite PHRL's 12 August letter, Mr Doronin, Mr Djanogly and Mr Eliasch pressed ahead at a Board meeting on 18 August 2014 and *inter alia*:

169.1.    in an attempt to counter the points which PHRL had raised in correspondence, the Board purported to "*acknowledge[...] that [Mr Zecha]'s employment with the Company or any of its subsidiaries has ended*" (although it had no entitlement to do so);

169.2.    the Board purported to offer Mr Zecha the role of "*Chairman of the Resorts Business*" which involved Mr Zecha in a purely advisory role, but this was expressed to be "*subject to the result of the pending investigation into compliance issues and final approval of the Board following conclusion of the investigation*". This was proposed without any discussion with Mr Zecha, as required by clause 6.6(a) of the SHA, and without having received the written proposal being put together by PHRL and Mr Zecha as foreshadowed in correspondence. Built in to this proposal was a mechanism for TIL (though its *de facto* control of the Board and the fact that the appointment was expressly dependent on the "*investigation*") to render it impossible for Mr Zecha to ever have any role in the business again.

170.    In the premises, PHRL avers that TIL and the JVC have acted, and (by virtue of their refusal to progress Mr Zecha's appointment to any or any meaningful role, as envisaged by clause 6.6(a)) continue to act, in breach of clause 6.6(a) of the JVC SHA.

**(f)    Conclusions and relief sought**

171.    The above pleaded facts and matters were carried out by the JVC, but were effected and/or procured by TIL (through its nominated directors) and/or Mr Eliasch (or with Mr Eliasch's assistance), both on his own behalf and on behalf of Sherway. In the premises, Mr Zecha had, until the Zecha Injunction, been unlawfully forced out of the JVC, and has since 31 July 2014 been deprived of and/or excluded from any role as Chairman of the "*Resorts Business*"

or CEO of AMBV, against his wishes and the wishes of PHRL, and in breach of clause 6.6(a) of the JVC SHA.

172.    Accordingly, PHRL seeks:

172.1.    a declaration that Mr Zecha is entitled to be Chairman of the "*Resorts Business*"—or CEO of AMBV;

172.2.    an injunction restraining the JVC and/or the Board from:

172.2.1. taking any and all steps to remove and/or exclude Mr Zecha from his position as Chairman of the "*Resorts Business*" or CEO of AMBV;

172.2.2. the removal and/or exclusion of Mr Zecha from his residence in Singapore, namely 13-14 Adam Park Road, Singapore 289932;

172.2.3. making any internal and/or public announcements to the effect that Mr Zecha has resigned and/or been removed from his position as CEO of the JVC (or alternatively as Chairman of the "*Resorts Business*" or CEO of AMBV),

and/or an order compelling TIL (so far as it is able) to procure that its nominated directors do not do any of the aforementioned acts;

172.3.    an injunction requiring the JVC and/or TIL to procure (so far as they are able) that Mr Zecha be appointed as Chairman of the "*Resorts Business*" or CEO of AMBV;

172.4.    a declaration that the purported appointment of Mr Doronin as CEO of the JVC at the 22 April Meeting was, as found by Deputy Judge Newman, invalid and of no effect;

172.5.    an injunction restraining the JVC from holding Mr Doronin out as CEO of the JVC (including by making any public announcement) unless Mr Doronin is validly appointed as CEO effective after 31 July 2014;

172.6.    a declaration that the resolutions purportedly passed at the 23 July Meeting are invalid and of no effect; and

172.7.    an injunction restraining the JVC and/or the Board from purporting to give effect to the resolutions (save the resolution purporting to remove Mr Zecha as CEO of the JVC) purportedly passed at the 23 July Meeting,

and/or an order compelling TIL to procure that its nominated directors do not do any of the aforementioned acts.

173.  For the avoidance of doubt, the fact that PHRL does not seek an injunction in respect of the resolution purportedly removing Mr Zecha as CEO of the JVC (as allegedly passed at the 23 July Meeting) does not arise as a result of any admission by PHRL that this purported resolution was valid (which it was not) but rather as a result of the fact that PHRL agreed to the appointment of Mr Jolivet as Interim CEO of the JVC, on the basis that Mr Zecha would be Chairman of the "*Resorts Business*" or CEO of AMBV, as required by clause 6.6(a) of the JVC SHA.

**XI.**   **Refinancing of the Pontwelly Loan**

174.  Clause 5.6 of the JVC SHA provides as follows:

> "*5.6 Refinancing*
>
> *The Shareholders will (and will procure that the Directors appointed by them will) use reasonable endeavours to (1) assist the A Directors and management of the JVC to attract the lowest cost of debt capital, including providing non-recourse carve out guarantees (consistent with market norms and with reasonably satisfactory terms), approving diligence materials and lender underwriting costs and modifying or drafting new agreements to comply with lender requirements, and (2) will not unreasonably withhold or delay their respective consents to any such refinancing provided that it results in a repayment of 100% of the outstanding amount under the Facility Agreement and is at lower rate of interest.*"

175.  By an email dated 20 April 2014, in advance of the 22 April Meeting, Mr Tavakoli sent an email requesting the addition of "*[r]efinancing of Pontwelly loan*" to the agenda for the 22 April Meeting. This was belatedly added to the Agenda, and the matter was discussed at the 22 April Meeting.

176.  Mr Tavakoli approached this issue on two bases: (i) that additional capital raised by way of capital call could be used to pay down the Pontwelly loan. (This recommendation, however, was dismissed by Mr Doronin.) ; and (ii) that pursuant to a presentation prepared by Imperial Capital LLC (**"Imperial"**), a New York investment bank, and circulated by Mr Tavakoli prior to the 22 April Meeting, the JVC enter into a bond offering under which interest would accrue at 8% per annum.   The counterparty to the proposed offering was Prospect Capital (**"Prospect"**), an entity introduced by Imperial, who remain interested in a refinancing deal.

177.  Both versions of the minutes for the 22 April Meeting record the following having been decided by the Board:

> "*[the JVC] will commence the discussions with various lenders in order to refinance Pontwelly loan at the most advantageous terms for the [JVC]*".

178.    By an email dated 5 June 2014, Mr Todd Fasanella (**"Mr Fasanella"**), the Managing Director of Imperial, wrote to Mr Sirois (Aman Resorts), asking for various pieces of information necessary to enable Mr Fasanella to progress the refinancing.

179.    Mr Sirois did not reply to Mr Fasanella's email. Accordingly, Mr Fasanella sent a second email chasing a reply on 12 June 2014. Mr Sirois eventually replied on 16 June 2014, stating among other things that "*[t]he Board has not indicated anything to management regarding this transaction. Until specifically so authorised we cannot provide any financial information*".

180.    This was untrue. The Board had specifically authorised the management of the JVC to progress these negotiations at the 22 April Meeting. In any event, given the clear terms of clause 5.6 of the SHA, Board approval was not necessary. Significantly, Mr Sirois did not add that he was unable to disclose information to Mr Fasanella on the grounds that it was confidential, or commercially sensitive.

181.    It is legitimately to be inferred that Mr Sirois was acting obstructively with regard to progressing refinancing on the instructions, or at the behest of, Mr Doronin, who was then acting (unlawfully) as CEO of the JVC. This was a material breach of clause 5.6 of the JVC SHA.

182.    By a letter dated 27 June 2014, PHRL asked TIL to remedy its material breaches of clause 5.6 of the SHA within 10 business days, by using reasonable endeavours to assist the JVC in refinancing the Pontwelly loan including, but not limited to, by taking steps to ensure that relevant information was released to Imperial.

183.    TIL failed to take any such steps, and Mr Sirois (it is to be inferred, on TIL's/Mr Doronin's instructions) failed to provide the information requested.

184.    Eventually, PHRL received a letter from TIL dated 14 July 2014, in which it asserted that Mr Sirois "*quite rightly*" did not disclose any information to Imperial because (i) no confidentiality agreement was in place; and (ii) he "*had not been authorised to do so by the Board*". TIL concluded that PHRL should have raised this issue with the Board "*so that a coordinated approach to refinancing could be agreed*". This was wrong. Board approval was not required but it had in any event been provided, as pleaded above. The objection based on confidentiality is baseless in circumstances where (i) Imperial is an investment professional, well-used to being supplied with, and retaining in confidence, confidential financial information about its clients; (ii) had there been any genuine concern, Mr Sirois could quite easily have asked Imperial to enter into a confidentiality agreement; (iii) Mr Sirois did not in fact object to providing the information for this reason at the time; (iv) in a subsequent email from the Chief

Financial Officer of Aman Resorts to Imperial on 12 September 2014, he suggested a non-disclosure agreement with Imperial.

185.    Furthermore, TIL's 14 July letter went on to allege that Mr Jolivet had been working on "*a presentation that can be made to potential providers of finance with a view to refinancing the existing debt. It is proposed that, once the presentation is complete, it will be presented to the Board and discussed in due course ...*". This was highly misleading.

186.    On or around 15 July 2014, Mr Amanat spoke to Mr Jolivet, and asked him whether he was preparing a presentation of the sort referred to at paragraph 185 above. Mr Jolivet informed Mr Amanat that he was not preparing a presentation to the board on the subject of refinancing, but rather he was preparing a "*3 year budget*" presentation to Pontwelly. This suggested that, far from intending to refinance the Pontwelly loan, it was envisaged that this loan would run for at least a further three years. This was wholly at odds with the resolution passed by the Board at the 22 April Meeting and, the assertion made in TIL's 14 July letter.

187.    Mr Fasanella has repeatedly sought financial information from Mr Jolivet in order to progress proposals made by Prospect. Mr Jolivet has consistently failed to respond (PHRL assumes on the instructions of Mr Doronin/TIL) with the result that refinancing has stalled.

188.    Further correspondence passed between TIL and PHRL on this issue in letters dated 21 July 2014 (as pleaded to at paragraph 203.2 below), TIL's letter dated 15 August 2014 and PHRL's letter dated 2 September 2014 (which, without prejudice to the default declared in its 21 July letter, sought TIL's cooperation in the refinancing of the Pontwelly loan). PHRL also wrote to Mr Jolivet on 2 September 2014 seeking, among other things, his cooperation in seeking to progress refinancing. Mr Jolivet's letter dated 5 September 2014, while acknowledging that the cost of the Pontwelly loan was "*high*" and promising that the JVC would work with Imperial to progress refinancing, alleged that "*other priorities mentioned in this letter are more pressing and ... the biggest stumbling block to getting a better financing deal is the ongoing shareholder dispute*". As at the date of filing these Particulars of Claim, no significant progress has been made to progress the refinancing.

189.    In the premises, in breach of clause 5.6 of the JVC SHA, TIL refused, and is continuing to refuse, to assist PHRL's nominated directors and the JVC secure the lowest cost of debt capital. The consequences of this are pleaded to at paragraphs 201-203 below. Without prejudice to the default notice already served, PHRL avers that TIL is continuing to breach clause 5.6 of the JVC SHA and PHRL is entitled to present a further default notice.

190.    Given that Mr Eliasch has been made aware of PHRL's position on refinancing, it is legitimately to be inferred that he has at the very least acquiesced in TIL's and the JVC's

breaches of clause 5.6 of the JVC SHA as pleaded above. His actions in this regard (on his own behalf and on behalf of Sherway) also gave rise to breaches of the Agreement and the Sherway Agreements (in particular, the Holdings SHA and the express and implied obligations within it pleaded at paragraphs 55-57 above).

XIA.   **Purported seizure of ARGL's shares in Silverlink**

190A.

(a)   At some point prior to 31 January 2015 (and in any event before 21 July 2015), Mr Doronin, TIL (including through Mr Doronin), Pontwelly (including through Mr Doronin), Mr Eliasch, Sherway (including through Mr Eliasch), Mr Djanogly and Mr Jolivet reached an express or implied agreement and/or understanding pursuant to which they would collectively (or each of them would individually) dishonestly procure that ARGL failed to make payment of any interest payment due to Pontwelly under the Financing Agreement, the intended consequence of which (or alternatively the real and predominant purpose of which) was to ensure that Pontwelly would purportedly be in a position to exercise its rights under the Pontwelly Pledge Agreement to seize and/or sell ARGL's shares in Silverlink (**"Silverlink Shares"**), to the detriment of, and/or with the intention of causing loss to, *inter alia* PHRL (**"the Pontwelly Conspiracy"**). The Pontwelly Conspiracy was put into effect as pleaded hereinafter. For the avoidance of doubt, PHRL reserves all of its rights as against those of the conspirators in the Pontwelly Conspiracy who are not presently joined to this action, including in particular Mr Djanogly and Mr Jolivet.

(b)   For the avoidance of doubt, nothing in the part of this pleading dealing with the Pontwelly Conspiracy is intended to (or does): (i) imply that Pontwelly would ever actually be entitled to exercise any security rights it might have under the Financing Agreement and/or the Pontwelly Pledge Agreement on completion of the various steps taken in furtherance of the Pontwelly Conspiracy; or (ii) to prejudice ARGL's right to challenge Pontwelly's purported Demand, Sale Notice and/or Foreclosure Notice (defined at paragraphs 190L-190M and 190P below), in any relevant jurisdiction.

(c)   Further or alternatively, and in any event, Mr Doronin, Mr Djanogly and Mr Eliasch, as *de jure* or *de facto* directors of ARGL, dishonestly permitted and procured in breach of their fiduciary duties to ARGL that ARGL would fail to make interest payments to Pontwelly.

(a)   **Factual Background**

190B.    Pontwelly made two loans to ARGL pursuant to the Financing Agreement (as amended by the First Amendment dated 31 January 2014): (i) a Term Loan for US$ 168 million; and (ii) a Bridge Loan for US$ 40 million. The interest rate on the Term Loan is 12.68%, and the interest rate on the Bridge Loan is 18%. Interest on the two loans together accrues monthly, and is capitalised on a quarterly basis, until the total amount of the interest reaches an aggregate of US$ 24 million. Once the interest, as capitalised, reaches this cap, interest is due in cash on a monthly basis at the applicable rate for each loan.

190C.    On 28 August 2014, Mr Jolivet wrote to the JVC's Board. This letter enclosed a spreadsheet consisting of several pages, one which was entitled "*Group Cashflow*". This spreadsheet appeared to demonstrate the provisioning of sums from the group's cashflow in order to enable it to make payment of "*Pontwelly Interest*" from January 2015 onwards. Another page of this spreadsheet, entitled "*Pontwelly Debt (2)*", indicated that Mr Jolivet had calculated that the US$ 24 million cap would be exceeded by 31 January 2015, thereby triggering an obligation on ARGL to begin paying interest on a monthly basis.

190D.    Accordingly, it is clear that, by 28 August 2014 at the latest, Mr Jolivet (and the other conspirators in the Pontwelly Conspiracy) believed and/or represented to the other members of the JVC's Board (including Carpentaria) that interest would be payable on the Pontwelly loan from February 2015 onwards. Furthermore, Mr Jolivet was provisioning sums from the group's cashflow to meet that anticipated liability.

190E.    Thereafter, PHRL engaged in correspondence with Mr Jolivet (both directly and through Macfarlanes) in respect of the refinancing of the Pontwelly loan. Mr Jolivet said that Aman Resorts management agreed with PHRL that it would be in the best interests of the group for the Pontwelly loan to be refinanced. At no stage during this correspondence did Mr Jolivet mention or even suggest that the group would have insufficient funds to make payment of the interest payments on the Pontwelly loan when they began in February 2015. As pleaded above, it is PHRL's case that Mr Jolivet has (on the instructions or encouragement of Mr Doronon) deliberately blocked PHRL's attempts to refinance the Pontwelly loan. It is averred that one of the purposes of this blocking (as well as continuing to benefit Mr Doronin via the usurious interest rate charged by the Pontwelly loan) was to enable Pontwelly to purportedly take the steps pleaded hereinafter.

190F.    Months passed, including the alleged due date for the first of the interest payments on the Pontwelly loan on 1 February 2015. Although PHRL was unaware of this until 21 July 2015, it appears that (by virtue of the deliberate acts or omissions of the conspirators) neither this, nor any subsequent interest payments were made by ARGL when allegedly due. Indeed, at no stage did Mr Jolivet (or any of the Defendants, who were parties to the Pontwelly Conspiracy,

and hence were aware that interest was not going to be paid) raise with PHRL and/or Carpentaria (or their representatives or stakeholders) and/or the Board of ARGL that ARGL was about to default (or had defaulted) on such obligation(s), or call a Board meeting of ARGL to discuss what steps (including, if necessary, borrowing further funds, which ARGL would well be able to do given the substantial real property assets which it controlled through its shareholding in Silverlink) ARGL would take to discharge these liabilities. By way of just one example, PHRL is aware that, at all material times, there was a sum (understood to be US$ 3,022,496.79) standing to the credit of ARGL with Standard Chartered Bank in London, which could have been made available for this purpose.

190G.    Had PHRL and/or Carpentaria (and/or their representatives or stakeholders) been informed that ARGL was about to default (or had defaulted) on its obligation(s) to make payment to Pontwelly, they would have procured that ARGL was able to: (i) meet any liability when due; and/or (ii) pay off any overdue liabilities prior to the issuance by Pontwelly of any form of default notice.

190H.    Mr Doronin, Mr Djanogly and Mr Eliasch were all *de jure* directors of ARGL (or, in the alternative, they all exercised the functions of a director of ARGL and, accordingly, were *de facto* directors of ARGL). As directors (whether *de jure* or *de facto*), these individuals owed to ARGL fiduciary and other duties. By having acted as hereinbefore and hereinafter pleaded, Mr Doronin, Mr Djanogly and Mr Eliasch acted dishonestly and in breach of their duties as directors of the JVC and ARGL. In particular, permitting or failing to procure that ARGL made interest payments that it was able to make threatened the loss of ARGL's business and the main substance of its undertaking and core assets, through the enforcement of the Pontwelly security, and constituted a breach of duty. Even if ARGL was not readily in a position to make such payments, failing adequately to inform its stakeholders so that arrangements could be made to ensure that the interest payments were met posed a like threat to ARGL's business and undertaking and amounted to a like breach of duty.

190I.    Far from alerting PHRL about any imminent default, the communications which Carpentaria received from Mr Jolivet during the months that followed proposed an increase in expenditure by the Aman Resorts group of companies on marketing and property acquisitions. By way of just one example, in an email dated 10 April 2015, Mr Jolivet informed the Board that the JVC had committed to (or budgeted for) a substantial marketing campaign, which involved the company spending some US$ 800,000 on various branding initiatives and a new website. This communication was not only silent about the (by now allegedly multiple) breaches by ARGL of the Financing Agreement, but it proposed to commit further expenditure (which would have covered almost half of a monthly interest payment) to non-essential projects. Any expenditure on marketing would have been pointless if, pursuant to the Pontwelly Conspiracy, ARGL was at risk of having its only asset, and hence the hotel business, seized by Pontwelly.

190J.    On 17 April 2015, ARGL's default(s) being unknown to PHRL, PHRL's solicitors wrote to TIL and the JVC and *inter alia* demanded an explanation as to why no progress appeared to have been made on refinancing the Pontwelly loan. This letter also stated that PHRL's nominated directors had been shut out of the business of the JVC and complained about the fact that a re-branding exercise appeared to have been undertaken without consulting with the Board (or at least all members of it).

190K.    In neither Macfarlanes' reply to this letter, nor any subsequent correspondence, did Mr Jolivet (or TIL or Sherway, who were copied in to all correspondence) mention the true position regarding ARGL and Pontwelly.

**(b)    Purported Demand and Sale Notice**

190L.    On 21 July 2015, PHRL's solicitors received from Bryan Cave LLP (PHRL's former solicitors) a copy of a purported notice from Pontwelly addressed to ARGL and Silverlink, which provided *inter alia* as follows:

"*Pursuant to Section 2.04(c) of the Financing Agreement, interest on each Loan, other than the PIK Amount, is payable in cash monthly, in arrears, on the first day of each month, and interest at the Post-Default Rate is payable on demand.*

*On February 2, 2105, aggregate accrued interest on the Loans of $2,076,322.35 for the month of January, 2015 came due and payable, of which $107,504.18 exceeded the PIK Cap and was not paid when due or within two (2) Business Days thereafter. As a result thereof, and pursuant to Section 9.01(a) of the Financing Agreement, and Event of Default occurred on February 4, 2015. In addition thereto, interest of $2,149,415.17 for the month of February, 2015 (inclusive of interest at the Post-Default Rate from February 4, 2015) came due and payable on March 2, 2015, interest of $ 2,430,005.86 for the month of March, 2015 (at the Post-Default Rate) came due and payable on April 1, 2015, interest of $2,351,618.59 for the month of April, 2015 (at the Post-Default Rate) came due on May 1, 2015, interest of $2,430,005.86 for the month of May, 2015 (at the Post-Default Rate) came due on June 1, 2015, and interest of $2,351,618.59 for the month of June, 2015 (at the Post-Default Rate) came due on July 1, 2015, none of which was paid when due or at any time thereafter.*

*By virtue of the foregoing interest payment defaults, and in accordance with Section 9.01 of the Financing Agreement, we hereby declare all of the Loans currently outstanding (and further evidenced by the Term Note and the Bridge Note) to be immediately due and payable, including the aggregate principal of the Loans, all accrued and unpaid interest thereon, all fees and all other amounts payable under the Financing Agreement and the other Loan Documents and demand payment in full thereof. We expressly reserve the right to exercise any all other rights and remedies under applicable law and under the Loan Documents (including, but not limited to, the Pledge Agreement)*".

(Without prejudice to PHRL's case that this purported demand is and was invalid, it will hereafter be referred to as "the Demand".)

190M.  On the same date, PHRL's solicitors also received from Bryan Cave LLP a document entitled "*NOTIFICATION OF DISPOSAL OF COLLATERAL*". This document provided, as far as is material, as follows:

> "*We will sell the following described collateral:*
> *100% of the issued and outstanding shares of Silverlink Resorts Limited, a company organized under the laws of the British Virgin Islands ("Silverlink"), believed to be evidenced by Certificate No. 67 for 157,363,951 shares (par value US $1.00 per share) currently registered in the name of Aman Resorts Group Limited,*
> *to the highest qualified bidder in public as follows:*
>
> *Day and Date:  Tuesday, August 25, 2015*
> *Time:            10:00 a.m. Eastern Daylight Time (New York)*
> *Place:           Paul Hastings LLP*
> *                 75 East 55th Street*
> *                 New York, NY 10022-3205*"

(Without prejudice to PHRL's case that this purported notice is and was invalid, it will hereafter be referred to as "**the Sale Notice**".)

190N.  In this context, in the days that followed (until service of a notice seeking to cancel the sale was sent on 11 August 2015, and pleaded to in further detail below) neither Pontwelly nor the other Defendants appear to have taken any steps whatsoever to publicise the intended auction so as to ensure that the best possible market price achievable in the circumstances is achieved. In so doing, Pontwelly was acting in breach of the obligations cast upon it *qua* mortgagee under New York law, which are considerably more onerous under New York law than they are under English law. In the circumstances, it is to be inferred that the parties to the Pontwelly Conspiracy had intended that Silverlink's shares would be purchased by some entity connected with them and/or Mr Doronin (if the latter, on the basis that Sherway and/or Mr Eliasch will have some interest in that entity) or alternatively that the sale was simply a sham. That inference is the only explanation of Mr Eliasch's and/or Sherway's failure to take any steps to prevent the Pontwelly loan going into default, because such a default would extinguish Sherway's putative interest in the JVC (through PHRL Holdings) on the basis of its claim that PHRL is not entitled to rescission of the Sherway Agreements. As regards the sale being a sham, PHRL has discovered that, on 23 July 2015, someone (it is to be inferred Mr Doronin, Mr Djanogly and/or Pontwelly) purportedly resolved that changes to Silverlink's members were no longer to be registered at BVI Companies House. It is legitimately to be inferred that this step was taken in order to conceal the identity of the entity to which Pontwelly dishonestly purported to transfer the Silverlink Shares.

190O.  While PHRL was considering how to respond to the Demand and the Sale Notice, including by seeking urgent injunctive relief to prevent the purported sale scheduled for 25 August 2015, on 13 August 2015, PHRL became aware of a press release which had been issued by Mr Jolivet to all Aman Resorts staff on the same day ("**the August Press Release**"). The August Press Release provided, as far as is material, as follows:

*"I am writing to inform you that as of Tuesday 11th August 2015, following a corporate restructure, Aman is now under the full and stable ownership of Mr Vladislav Doronin.*

*Mr Doronin will continue as Chairman of Aman supported by Mr Alan Djanogly as the only other Director. Whilst this is a corporate restructure, from a day to day business perspective for all owners and staff, it remains very much a case of 'business as usual'.*

*You will all be aware that Mr Doronin is a long standing supporter of Aman and so under his continued Chairmanship the brand will go from strength to strength. Mr Doronin's financial support and personal commitment allowed us to secure Aman Tokyo and make it the success it is.*

*This is very positive news for Aman and will provide us with much needed boardroom stability. This, together with Mr Doronin's support, will help take the business forward.*

*I am sure you will have the opportunity to meet with Mr Doronin in due course, if you have not already done so. If you have any questions, please do not hesitate to get in touch with myself or our CFO, Michel Checoury.*

*Yours sincerely*

*Olivier Jolivet".*

190P.    On 13 August 2015, PHRL also received from Bryan Cave LLP a copy of a letter from Pontwelly dated 11 August 2015, which stated, as far as is material, as follows:

*"Please be advised that the sale in public of 100% of the issued and outstanding shares (the "Shares") of Silverlink Resorts Limited ("Silverlink") ... scheduled for Tuesday, August 25, 2015 at 10.00 a.m. Eastern Daylight Time (New York), has been cancelled. As of the date hereof, Pontwelly has become the legal and equitable owner of the Shares, having enforced its rights and remedies under the Uniform Commercial Code and effectively accepting the shares in full satisfaction of the Debts".*

(Without prejudice to PHRL's case that this purported notice is and was invalid, it will hereafter be referred to as **"the Foreclosure Notice".**)

190Q.    PHRL also became aware of the following announcement on Mr Doronin's personal website (http://vladislavdoronin.com), which reads *inter alia* as follows:

*"As of 11th of August 2015 Pontwelly Holding Company Ltd (Pontwelly), which was previously the largest lender to Aman, has taken full ownership of the Aman hotel business (Silverlink Resorts Ltd).*

*Following this restructuring the current Chairman of Aman, Mr Vladislav Doronin and Board Director, Mr Alan Djanogly, remain as the only two directors.*

*Olivier Jolivet, CEO of Aman said, "This is very positive news for Aman and will add much needed boardroom stability. This together with Vladislav's vision will help take the business forward."*

*Vladislav Doronin, Chairman of Aman said, "I am delighted by this re-structuring. The streamlined management and access to further investment this gives will allow us to capitalise*

*on all and every opportunity ensuring Aman remains as the world's leading luxury hotel brand."*

*Owners and staff at Aman have been informed that whilst this is corporate restructure, from a day to day business prospective it remains very much a case of 'business as usual' for the luxury hotel Group.*

*Mr Doronin will continue to pursue his legal claims against Mr Amanat separately. Mr Amanat has no further involvement with Aman."*

190R.    It would therefore appear that Mr Doronin changed his mind about the proposed auction of ARGL's shares in Silverlink (which, for the reasons pleaded above, would in any event have been a sham, had it taken place) and decided instead (no doubt mindful of the impending disclosure deadline and trial in these proceedings) to have Pontwelly purportedly foreclose on ARGL's shares in Silverlink in *"full satisfaction of the Debts"*. PHRL has since been told that Pontwelly subsequently purported to dishonestly transfer the Silverlink Shares to another BVI-registered entity, the Seventh Defendant, AH Overseas Limited (**"AHOL"**). It is averred that AHOL is another entity which is owned and/or controlled by Mr Doronin, and it is to be inferred that the transfer of the Silverlink Shares to AHOL was for no (or no adequate) consideration. Further, and in any event, by virtue of it being a vehicle of Mr Doronin, AHOL will be imputed with all knowledge which Mr Doronin had, as pleaded herein. In no circumstances can it be said that AHOL is a bona fide purchaser for value of the Silverlink Shares.

190S.    It is PHRL's case that this purported action is:

(a)    As Pontwelly (and subsequently AHOL) knew, invalid under New York law. In particular PHRL avers that, as a matter of New York law:

i.    Generally, collateral may only be acquired by a secured lender by way of foreclosure following a public sale. This public sale process must conform to statutory requirements relating to notice, publication and, independently and in addition to these specific requirements, the overarching requirement of good faith and commercial reasonableness.

ii.    The only circumstances in which a secured party may acquire the collateral without compliance with the public sale requirements of the UCC is where the debtor, after default, provides "consent". PHRL is not aware of any such consent having been given by ARGL. If any such "consent" was purportedly given, it cannot have been given with the authority of ARGL's Board (no board meeting having been convened) and/or cannot have been given by any of the directors in good faith in the interests of ARGL (but rather would have been in furtherance of the Pontwelly Conspiracy).

iii.   Consent may be deemed to have been given where the lender sends to the debtor a written proposal to accept collateral in full satisfaction of the obligation it secures, and the debtor does not object within 20 days. As far as PHRL is aware, no such written notice of acceptance was sent by Pontwelly to ARGL (or to Mr Amanat, who received a copy of the Sale Notice). If (which is denied) any such written notice of acceptance was purportedly sent, it was sent in such a fashion so as not to come to the notice of all of ARGL's directors and/or was only sent to those of ARGL's directors or purported representatives who are parties to the Pontwelly Conspiracy, and who ensured that it did not come to the attention of Carpentaria. Insofar as those of ARGL's board (i) were aware of any such purported notice of acceptance; and (ii) procured that ARGL did not write to reject such purported acceptance, they were acting in flagrant and dishonest breach of duty and further to the Pontwelly Conspiracy.

iv.   Finally, as above, the UCC provides that lenders seeking to exercise their rights as such must act in good faith. Given its knowledge of, and participation in, the Pontwelly Conspiracy, Pontwelly cannot have been acting in good faith as a lender (and, insofar as any of the Pontwelly Conspirators purported to give consent on behalf of ARGL and/or conceal any written notice of acceptance issued by Pontwelly, neither can those of the Pontwelly Conspirators who are directors or purported representatives of ARGL have been so acting). Moreover, given that the value of Pontwelly's outstanding debt is around US$ 168 million, but the Aman Resorts business was acquired just over a year ago for US$ 358 million, it is quite clear that Pontwelly is seeking by this action to dishonestly gain a significant windfall.

(PHRL reserves the right to add to or modify the above grounds to the extent necessary and will seek permission to adduce the evidence of an expert witness at trial.)

(b)   Further, and in any event, and irrespective of the validity of the purported foreclosure as a matter of New York law, this situation has been unlawfully and dishonestly engineered and is simply a further purported step in the Pontwelly Conspiracy, which is designed to purportedly enable (as pleaded at paragraph 190S(a)(v) above) Pontwelly to acquire the Silverlink Shares at significantly below their true market value.

190SA. PHRL and ARGL are unable to bring proceedings against the Pontwelly Conspirators and AHOL in respect of the matters complained of in paragraphs 190A-190S above because TIL,

Sherway and/or Mr Doronin and/or Mr Eliasch (who, between them, control the Boards of the JVC and ARGL) will not authorise such proceedings because they are among the intended targets of such proceedings.

(c)    **Consequences and relief sought**

190T.    None of the acts carried out pursuant to the Pontwelly Conspiracy can have been carried out in good faith and in the best interests of the JVC, ARGL, and/or any of the JVC's shareholders or stakeholders. In particular, the Pontwelly Conspiracy involved dishonestly attempting to engineer a situation in which ARGL (the JVC's wholly owned subsidiary) lost its only asset.

190U.    In the premises, Mr Doronin, Mr Djanogly and Mr Eliasch have acted dishonestly in breach of:

(a)    their statutory duties as directors of the JVC and ARGL (and in this regard, the facts and matter pleaded at paragraph 190H above are repeated *mutatis mutandis*);

(b)    their obligations under paragraph 12.1 of the JVC's Memorandum of Association; and

(c)    their obligations under Articles 9.1 and 9.5 of the JVC's Articles of Association.

190V.    The Pontwelly Conspiracy amounts to a conspiracy by unlawful means (those unlawful means being the dishonest breaches by directors of ARGL of their duties to ARGL, and the breaches of the JVC SHA and/or the Holdings SHA pleaded herein). The intended effect of the Pontwelly Conspiracy (and the desire of the Conspirators) was for ARGL's assets and undertaking to be removed from it through the purported enforcement of the Pontwelly loan, and thereby to damage PHRL and ARGL in the manner pleaded at paragraph 190Y below. Pontwelly (through Mr Doronin, at least) was at all material times party to, and aware of, the Pontwelly Conspiracy, and aware of the dishonest breaches of duty by the directors of ARGL which were involved.

190W.    In the premises, PHRL seeks a declaration (both in its own capacity and in a double derivative capacity on behalf of ARGL) that Pontwelly, by virtue of its knowledge (acquired through the Pontwelly Conspiracy) of the individual Defendants' dishonest breaches of duty as directors of the JVC and/or ARGL and/or its knowledge or their breaches of contract as hereinbefore and hereinafter pleaded:

(a)    is and was not entitled to rely on the defaults alleged in the Demand and declare the Pontwelly loan immediately due and payable;

(b)     is and was not entitled to exercise any of its rights in the case of an alleged default, including in particular as asserted under the Sale Notice and/or the Foreclosure Notice, and/or any right of sale and/or foreclosure; and

(c)     is liable, in having purportedly transferred the Silverlink Shares to AHOL, for dishonestly assisting the directors' dishonest breaches of fiduciary duty and/or trust.

190X.   In the further premises, PHRL (both in its own capacity and in a double derivative capacity on behalf of ARGL) seeks a declaration that AHOL, by virtue of its knowledge (acquired through Mr Doronin) of the Pontwelly Conspiracy and/or the individual Defendants' dishonest breaches of duty as directors of the JVC and/or ARGL and/or its knowledge or their breaches of contract as hereinbefore and hereinafter pleaded:

(a)     is not a bona fide purchaser for value, and accordingly holds the Silverlink Shares on constructive trust for ARGL; and

(b)     further, or alternatively, is liable for knowing receipt of trust property, it being unconscionable for AHOL to retain the benefit of the receipt.

190Y.   In the premises, the acts done in execution of the Pontwelly Conspiracy have caused PHRL loss and damage and/or (if not restrained by the Court) will cause PHRL (further) loss and damage. In particular, in the event that Pontwelly is permitted to sell or foreclose on ARGL's shares in Silverlink:

(a)     PHRL will lose those rights which it has under the SHA to participate in the management of Aman Resorts;

(b)     The value of PHRL's shares will be reduced to nil (or very little). PHRL is unable to plead with any further particularity at this stage but it appears that Pontwelly is at present purporting to have foreclosed on the shares in allegedly full satisfaction of its debts, despite the fact that, as pleaded at paragraph 190S(a)(iii) above, the value of the shares significantly exceeds the outstanding balance on the Pontwelly loan.

PHRL reserves the right to plead further to this loss or damage and will seek to rely at trial on the report of an expert accountant.

190Y.   In the further premises:

(a)     the acts done in execution of the Pontwelly Conspiracy have caused ARGL loss and damage and/or (if not restrained by the Court) will cause it further loss and damage.

in particular, it has lost the value of the Silverlink Shares and its right to manage the Aman Resorts business and derive profits therefrom; and

(b)      AHOL holds on constructive trust for ARGL: (i) the Silverlink Shares; and (ii) any corporate opportunity which belonged to ARGL (through its ownership of the Silverlink Shares, and thus the ultimate ownership of Aman Resorts business) which AHOL (through its ownership of the Silverlink Shares, and thus the ultimate ownership of Aman Resorts business) has taken from ARGL by virtue of the Pontwelly Conspiracy.

190Z.    In the premises, and in the further premises pleaded in paragraph 190AA below, PHRL is entitled (both in its own capacity and in a double derivative capacity on behalf of ARGL) to, and seeks, an injunction:

(a)      restraining AHOL from in any way purporting to transfer, dispose of, deal with, create any rights or encumbrance (whether by way of security or otherwise) over, or diminish the value of the Silverlink Shares (further, or in the alternative, requiring Mr Doronin to procure, insofar as is within his power, that AHOL does not do these things);

(b)      restraining AHOL from purporting to exercise any alleged rights to change the composition of the Board of Silverlink and/or seeking to exclude or prevent Carpentaria from acting as an actual or *de facto* director of Silverlink and/or act in any manner inconsistent with the JVC SHA and the rights of PHRL thereunder, save with PHRL's consent or leave of the Court (further, or in the alternative, requiring Mr Doronin to procure, insofar as is within his power, that AHOL does not do these things); and

(c)      restraining Pontwelly, Mr Doronin and AHOL from howsoever holding out that (i) Mr Doronin is the sole owner and/or is in sole control of Aman Resorts; and (ii) Carpentaria is no longer a director of Silverlink including by the August Press Release and on his website (http://vladislavdoronin.com).

190AA.   In the further premises, Mr Doronin, Mr Eliasch, Sherway, and Pontwelly are liable to PHRL in damages for having induced or procured or assisted TIL's and the JVC's breaches of the JVC SHA. In particular, these individuals knew of the existence of PHRL's rights under the JVC SHA, and intentionally interfered with those rights to the detriment of PHRL, causing it loss and damage. PHRL is accordingly entitled to:

(a)      damages for the loss suffered as a result of Mr Doronin's, Mr Eliasch's, Sherway's and/or Pontwelly's tort; and

(b)    an injunction to prevent the continuation or repetition of the tortious conduct or the loss and damage flowing (or likely to flow) therefrom, in substantially the form set out in paragraph 190Z above.

190AB. It is not possible at this stage to quantify precisely PHRL's loss but such loss would at least include any diminution in value of its shareholding in the JVC as a result of TIL's and the JVC's breaches of the JVC SHA and the loss of its opportunity to develop the Aman Resorts group of hotels as a successful and profitable venture in the manner that had been envisaged at the time when it entered into the JVC SHA. PHRL reserves the right to plead further to this loss or damage and will seek to rely at trial on the report of an expert accountant.

190AC. Further, or alternatively, by having acted as aforesaid, Mr Doronin, Mr Eliasch, Sherway, and Pontwelly are liable for causing PHRL loss by unlawful means, specifically: (i) by acting in breach of the JVC SHA with the intention that this should harm PHRL's interests, including its economic expectations, in the JVC; and (ii) by means of the breach by directors of ARGL of their duties to ARGL, with like intention. Paragraphs 190R-190AB above are repeated *mutatis mutandis*.

190AD. In the further premises, TIL (including through Mr Doronin and Mr Djanogly pursuant to the Pontwelly Conspiracy) has committed a material breach of clauses 4.5(a)-(c) and 23.1 of the JVC SHA, the consequences of which are pleaded to at paragraph 202A-206 below.

190AE. In the further premises, (and if, contrary to PHRL's case, the Sherway Agreements were not terminated by PHRL's 17 July 2014 letter) Mr Eliasch and Sherway (including through Mr Eliasch) have acted in breach of the Agreement and/or Sherway (including through Mr Eliasch) has acted in breach of the Sherway Agreements (particularly clauses 4.1(a), 4.2 and 20.1 of the Holdings SHA). By reason of these breaches, PHRL has suffered loss and damage (as to which paragraph 232 below is repeated).

190AF. Further, PHRL is entitled to and claims interest pursuant to section 35A of the Senior Courts Act 1981 on the damages pleaded above.

190AG. Alternatively, PHRL claims interest on the damages pleaded above at such rate and for such period as the Court thinks fit.

**XII.**    **Withholding of information and/or documents from Carpentaria**

191.    It is abundantly clear that TIL and Mr Eliasch (acting on his own behalf and on behalf of Sherway) have engineered a situation in which Carpentaria, PHRL's only loyal nominated

director, is kept in the dark regarding documents which are circulated among Mr Doronin, Mr Djanogly and Mr Eliasch. This conduct is not in good faith in the interests of the JVC and/or constitutes a material breach by TIL of clauses 4.5, 10.3-10.4 and/or 12.2 of the JVC SHA. Pending disclosure, the best particulars which PHRL is able to offer in respect of documents which have been (or it is legitimate to infer have been) circulated to all of the Board members except Carpentaria are as follows:

191.1.  The Brand Presentation, the Development Presentation and the 3 Years Plan (as pleaded above) were only circulated to Carpentaria at the very last minute, during the board meeting in which they were being discussed.

191.2.  Paragraphs 78 and 149-151 above are repeated.

191.3.  PHRL had no input into, or knowledge of, the Proposed Guidelines (or any of the other documentation circulated with the Additional Items) before Carpentaria was ambushed with them the evening before the relevant meeting. Given that Mr Eliasch had signed a purported consent to short notice, it is legitimately to be inferred that he saw the Proposed Guidelines and the other documents before purporting to give that consent. All of the other directors knew that Carpentaria had not seen these documents before.

191.4.  In its letter dated 14 July 2014, TIL alleged that there existed a refinancing presentation, yet PHRL was not aware of its existence and has not to date seen a copy.

191.5.  Despite it obviously having been under preparation for some time prior to 20 July 2014, PHRL only received the Code of Conduct by email at 10.06 p.m. on 20 July 2014, which it had not seen or been asked to contribute to, just hours before the meeting at which it was proposed to be discussed.

191.6.  In his letter to the Board of the JVC dated 23 July 2014, Mr Eliasch enclosed "*the latest weekly Occupancy -v- Budget report*". PHRL had not seen, and/or was not provided with a copy of this document before it was sent with Mr Eliasch's letter.

191.6A. Carpentaria was kept in the dark about the circumstances surrounding ARGL's failure to pay Pontwelly any sums which allegedly fell due under the Financing Agreement and the Pontwelly Conspiracy.

192.    It is legitimately to be inferred that there are many more documents which were circulated among Mr Doronin, Mr Djanogly and Mr Eliasch, which were deliberately withheld from Carpentaria. PHRL reserves the right to amend its pleadings further upon disclosure.

193.    For the avoidance of doubt, not only did Mr Eliasch's actions as pleaded above constitute the assistance or acquiescence in TIL's and the JVC's breaches of the JVC SHA, but his actions (on his own behalf and on behalf of Sherway) gave rise to breaches of the Agreement and the Sherway Agreements (in particular, the Holdings SHA and the express and implied obligations within it pleaded at paragraphs 55-57 above).

**XIII.    Deadlock / Obligatory Transfer Event**

**(a)    Deadlock**

194.    Clause 14.1 of the JVC SHA provides, as far as is material, as follows:

> "*14. DEADLOCK*
>
> *14.1 Occurrence of deadlock*
>
> *(a) There is a deadlock if:*
> *...*
> *(ii) the Board fails to approve the Initial Resorts Business Plan or any annual Resorts Business Plan under clause 4.2, the Initial Development Business Plan or any annual Development Business Plan under clause 4.3, or the appointment or removal of a CEO (other than the appointment or removal of Adriaan Zecha); or*
> *...*
> *(b) Subject to clause 14.1(c), either Shareholder may give notice in writing to the other Shareholder within 20 Business Days of the occurrence of an event set out in clause 14.1(a) ("Deadlock Notice") that in its opinion there is a deadlock and identifying the matter over which the parties are deadlocked.*
>
> *(c) No Deadlock Notice can be issued in respect of any Shareholder Reserved Matter pursuant to clause 14.1(a)(i) or any Board Reserved Matter under clause 14.1(a)(iii) during the Lock-up Period, provided that if the deadlock continues at the end of the Lock-up Period a Deadlock Notice may be given within 20 Business Days of the end of the Lock-up Period.*"

195.    The "*Lock-up Period*" is defined as "*a period expiring on the third anniversary of the Completion Date*" (i.e. 7 February 2017).

196.    In the above-pleaded premises, PHRL avers that there is a deadlock within the meaning of clause 14.1(a)(ii) in that:

196.1.    the Board has failed to validly approve the "*Initial Resorts Business Plan*" under clause 4.2 and/or the "*Initial Development Business Plan*" under clause 4.3; and/or

196.2.   the Board has failed to validly approve the appointment of Mr Doronin as CEO of the JVC.

197.   PHRL's 22 May letter constituted a *"Deadlock Notice"* within the meaning of clause 14.1(b) and required TIL, pursuant to clause 14.2, to use all reasonable endeavours in good faith to resolve the deadlock within 10 business days. TIL has failed and/or refused to do so.

198.   In the premises, PHRL seeks a declaration that its 22 May 2014 letter constituted a *"Deadlock Notice"* within the meaning of clause 14.1(b) of the JVC SHA, thereby triggering the resolution provisions in clause 14.2 of the JVC SHA.

**(b)   Obligatory Transfer Event**

199.   Further or alternatively, clause 16 of the JVC SHA provides, as far as is material, as follows:

*"16. OBLIGATORY TRANSFER EVENT*

16.1     *If any of the events set out in clause 16.2 ("**Obligatory Transfer Event**") shall occur, the Shareholder which is not in default or otherwise affected by the relevant Obligatory Transfer Event ("**Non-Defaulting Shareholder**") shall be entitled to serve notice (a "**Default Notice**") on the other Shareholder ("**Defaulting Shareholder**"). Upon service of a Default Notice, the Defaulting Shareholder shall be deemed to have served a notice in writing ("**Transfer Notice**") on the Non-Defaulting Shareholder offering to transfer all the Equity Interest of the Defaulting Shareholder to the Non-Defaulting Shareholder at a price agreed or determined in accordance with clause 17.1.*

16.2     *An Obligatory Transfer Event shall occur where:*

*(a) the Defaulting Shareholder commits a material breach of any of clauses 2 (Period to Completion), 4.5 (Business and Financial Plan – Shareholder obligations), 5.6 (Refinancing), 7.1 (Reserved Matters), 8 (Restrictions on Parties), 9 (Development Opportunities), 11 (Anti-Corruption), 15 (Transfer of Equity Interests), 24 (Confidentiality) 22.2 (Return of Payments to Shareholders in event of SPA termination) and 26 (Warranties) of this agreement and, where capable of remedy, fails to remedy such breach within 10 Business Days of being specifically required in writing so to do by the Non-Defaulting Shareholder. ..."*

200.   Clause 4.5 of the JVC SHA provides, as far as is material, as follows:

*"4.5 Shareholder obligations*

*(a) Each Shareholder shall use reasonable endeavours:*
*(i) to ensure that the Resorts Business is carried on in accordance with the then current Resorts Business Plan;*
*(ii) to ensure that the Development Business is carried on in accordance with the then current Development Business Plan; and*
*(iii) to promote and develop the Business to the best advantage in accordance with good business practice and the highest ethical standards.*

*(b) Each Shareholder agrees to exercise its respective rights under this agreement so as to ensure that the business of the JVC Group consists exclusively of the Business and that the Business shall be conducted on commercial principles with a view to optimising overall returns in accordance with the Resorts Business Plan, the Development Business Plan and the terms of this agreement.*

*(c) Each Shareholder shall procure that the Directors appointed by it shall act in good faith in discharging their duties as directors of the JVC (and ARGL and ARDL, as applicable). ..."*

201.    In the premises, the above pleaded facts and matters constitute material breaches by TIL of the following clauses:

201.1.    clause 4.5, for the reasons pleaded above and in section XV below, including:

201.1.1. TIL's apparent disregard for the procedural protections set out in the JVC SHA;

201.1.2. the purported issuance of "capital calls" outside the provisions of clause 5.4, for the improper purpose of diluting PHRL (including purporting to resolve valuations far below market value, with the aim of leveraging the dilutive effect of such calls on PHRL), and far in excess of the JVC's present needs;

201.1.3. the unilateral and wrongful termination of the Incentive Arrangements;

201.1.4. the removal and/or exclusion of Mr Zecha as CEO of the JVC or alternatively Chairman of the *"Resorts Business"* and/or as CEO of AMBV and the attempt(s) to circumvent the Zecha Injunction requiring his reinstatement;

201.1.5. the purported appointment of Mr Doronin as CEO;

201.1.6. TIL's breaches of clauses 10.3-10.4 and/or 12.2 of the JVC SHA by refusing and/or withholding information and documents from PHRL relating to the JVC to which it is entitled whether as a shareholder or through Carpentaria on the Board; and

201.1.7. having colluded and/or conspired with Sherway/Mr Eliasch to breach the provisions of the JVC SHA as pleaded in section XV below);

Furthermore, shortly after the TIL Claim was filed, Mr Eliasch forwarded to Mr Amanat an email which he (Mr Eliasch) had received from Mr Doronin, which stated that Mr Doronin was going to deal with things *"[his] way"* which apparently involved putting Mr Amanat *"in a place where he deserves"*. This is the very antithesis to the good faith envisaged by clause 4.5.

201.2.  clause 5.6, for the reasons pleaded in section XI above; and/or

201.3.  clause 7.1(b) ("*[t]he Shareholders shall procure that neither the JVC nor the Subsidiaries shall undertake any of the Shareholder Reserved Matters without the prior written approval of each of the Shareholders*") insofar as the Board proceeds with the purported termination of the Incentive Arrangements;

202.  By letters dated 22 May 2014 and 27 June 2014, PHRL requested that TIL remedy the breaches pleaded at paragraphs 201.1 and 201.3, and paragraph 201.2 respectively within 10 business days. TIL failed and/or refused to do so, within 10 business days or at all.

202A.  Furthermore, it is averred that TIL's breaches pleaded at paragraph 190AD above constituted material breaches of clauses 4.5 (Business and Financial Plan – Shareholders obligations) and 5.6 (Refinancing) and are incapable of remedy. (If contrary to this, these breaches (or any of them) are capable of remedy, TIL has failed and/or refused to remedy any such breaches within 10 Business Days of the date of this pleading (which should in such circumstances be taken to be a direct request so to do).)

203.  In the premises, PHRL seeks a declaration that:

203.1.  an "*Obligatory Transfer Event*" has occurred;

203.2.  PHRL is and was accordingly entitled to serve a "*Default Notice*" (within the meaning of clause 16 of the JVC SHA) and has validly done so by its letters dated 27 June 2014 and/or 21 July 2014 and/or 14 August 2015; and

203.3.  in the premises, PHRL is entitled to acquire TIL's shares at a price of 80% of "*Fair Value*" (within the meaning of the JVC SHA).

204.  In the further premises, PHRL seeks all necessary ancillary relief to enable it to acquire TIL's shareholding and to enable it to be transferred to PHRL upon determination of their value.

## XIV.  Damages

205.  By reason of the breaches of the JVC SHA and/or the Facility Agreement by (i) TIL and the JVC and (ii) Sherway respectively, as pleaded above, PHRL has suffered loss and damage. It is not possible in these Particulars of Claim to quantify precisely PHRL's loss but such loss would at least include: (i) any diminution in value of its shareholding in the JVC as a result of TIL's and the JVC's breaches of the JVC SHA; and (ii) (to the extent that PHRL has not

rescinded the Sherway Agreements) any financial loss consequent upon Sherway's breach of the Facility Agreement. PHRL reserves the right to plead further to this loss or damage and will seek to rely at trial on the report of an expert accountant.

206. Further, PHRL is entitled to and claims interest pursuant to section 35A of the Senior Courts Act 1981 on the damages pleaded above. Alternatively, PHRL claims interest on the damages pleaded above at such rate and for such period as the Court thinks fit.

## XV.   PHRL Holdings, Sherway and Mr Eliasch

**(a)     Pincer movement: the Sherway Notice**

207. As pleaded at paragraph 49 above, the consent of Pontwelly and the Board of the JVC is was necessary to enable PHRL's shares in the JVC to be transferred to Holdings.

208. Clause 13 of the Facility Agreement provides, as far as is material, as follows:

*"13. UNDERTAKINGS*

*13.1 Undertakings made by the Borrower*

*The Borrower undertakes to the Lender, until all monies due under this Agreement have been fully and finally repaid to the Lender, that:*
*...*
*13.1.3 share transfers: it shall:*

*(a) within one Business Day following the Drawdown Date, sign and deliver to Pontwelly Holding Company Ltd the Share Transfer Request; and*

*(b) as soon as reasonably practicable, but in any event no later than three Business Days from the date the Share Transfer Consent has been obtained:*

> *(i) transfer all of the shares which it owns in [the JVC] to [Holdings];*

> *(ii) procure the satisfaction of the conditions subsequent listed in Schedule 4 ([the JVC] Conditions Subsequent); and*

> *(iii) transfer to the Lender 38.71% of the issued shares of [Holdings]..."*

209. *"Share Transfer Request"* means *"a letter to [Pontwelly] substantially in the form attached hereto as of Schedule 5 (Form of Share Transfer Request)"*.

210. *"Share Transfer Consent"* means:

*"... all necessary consents of:*
*(a) [Pontwelly], which are required under the Pontwelly Facility Agreement; and*
*(b) corporate approvals of [the JVC] and other consents of the directors of [the JVC] (including, without limitation, approving the resolutions referred to at paragraph 4 of Schedule 4...*

*in connection with the proposed transfer of the shares which [PHRL] owns in [the JVC] to [Holdings]".*

211.    On 2 April 2014, in accordance with clause 13.1.3(a) of the Facility Agreement, PHRL sent to Pontwelly a *"Share Transfer Request"* in the form set out at Schedule 5 of the Facility Agreement. This request invited Pontwelly to approve the proposed transfer of shares from PHRL to Holdings by endorsing that consent on the letter and returning it to PHRL's solicitors.

212.    Pontwelly did not respond to PHRL's *"Share Transfer Request"* until 27 May 2014. Rather than simply signing and returning the *"Share Transfer Request"*, in a letter of the same date, Pontwelly stated:

> *"This is to confirm that the undersigned, in its capacity as Administrative Agent and Lender, hereby consents to the transfer by [PHRL] of PHRL's Equity Interests in the [JVC] to [Holdings], as proposed by your letter dated April 2, 2014, subject to the understanding that, from and after the occurrence of such transfer, both references in clause (a) of the definition of "Change of Control" in the Financing Agreement shall be deemed to be references to [Holdings]"* (**"the Purported Consent"**).

213.    The Purported Consent did not constitute a *"Share Transfer Consent"* within the meaning of the Facility Agreement, for the following reasons:

213.1.    The Purported Consent was not in the form requested pursuant to PHRL's 2 April 2014 request i.e. a simple endorsement of the request.

213.2.    The Purported Consent was conditional upon an amendment to the *"Change of Control"* provisions in the Financing Agreement. As to this:

213.2.1. PHRL was not in a position to procure amendments to the Financing Agreement (between Pontwelly as Administrative Agent and Lender and ARGL as borrower), to which it is not a party. Accordingly, the condition to which the consent was subject could not by PHRL have been fulfilled.

213.2.2. Further, even if PHRL had been in a position to consent to and/or secure an amendment to the Financing Agreement in this manner (which it is not) it could not realistically do so. The definition of *"Change of Control"* in the Financing Agreement provides, as far as is material, as follows:

> *""Change of Control" means each occurrence of any of the following:*
> *(a) (i) [Mr Amanat] (or his Family Members or Family Entities) shall cease beneficially and of record to own and control in the aggregate, directly or indirectly, at least 51% on a fully diluted basis of the aggregate outstanding voting or economic power of the Equity Interests of [PHRL] ... or (iii) [PHRL] or [TIL] shall cease beneficially and of record to be the only two shareholders in the [JVC]".*

In the event that Holdings was substituted for the first mention of PHRL in the above definition, there would be a *"Change of Control"* within the meaning of the Financing Agreement because Mr Amanat would not own, either directly or indirectly, at least 51% of Holdings. This would trigger an immediate *"Event of Default"* under the Financing Agreement.

214.   On a true construction of the Holdings SHA (i.e. prior to its rescission or termination by PHRL, as pleaded below), Pontwelly's 27 May 2014 letter, setting out its conditional consent, did not constitute a *"Share Transfer Consent"* within the meaning of the Facility Agreement.

215.   PHRL wrote to Pontwelly on 29 May 2014 and 2 June 2014, requesting that an unconditional consent be provided. Pontwelly, by its letter dated 4 June 2014, refused to do so.

216.   By a letter dated 2 June 2014, Sherway issued a purported *"Notice of enforcement"* (**"the Sherway Notice"**). The Sherway Notice wrongly alleged that a *"Share Transfer Consent"* had been received on 27 May 2014, and wrongly asserted that PHRL was in breach of clause 13.1.3 of the Facility Agreement (i.e. prior to its rescission or termination by PHRL, as pleaded below). The Sherway Notice went on to wrongly allege that there had been an *"Event of Default"* under clause 14.1.2 of the Facility Agreement, which, the Sherway notice wrongly alleged, entitled Sherway to acquire all of PHRL's shares in the JVC at 80% of *"Fair Value"* (clause 14.2.2 of the Facility Agreement).

217.   For the reasons pleaded at paragraph 213 above, it is averred that no *"Share Transfer Consent"* has been received, the premise of the Sherway Notice is ill-founded and Sherway is not entitled to allege an *"Event of Default"*. By a letter dated 3 June 2014 to Sherway, PHRL invited Sherway to withdraw the Sherway Notice and its allegation of breach of clause 13.1.3 of the Facility Agreement. Sherway has failed and/or refused to do so.

**(b)**   **Breaches by Mr Eliasch and/or Sherway in breach of the JVC SHA, the Agreement and/or the Sherway Agreements**

218.   PHRL avers that Mr Eliasch (acting on his own behalf and on behalf of Sherway) and, by reason of his conduct, Sherway have acted in breach of the JVC SHA and/or have assisted or procured TIL and the JVC in breaching the SHA as pleaded above (in particular at paragraphs 15, 65-105, 108-112, 113-126, 128-171, 174-189, 190AD and 191-193 above). PHRL avers that Mr Eliasch and, by reason of his conduct, Sherway have (together with TIL) acted in breach of the JVC SHA, the Agreement and/or the Sherway Agreements (particularly the Holdings SHA).

219.    In carrying out the above pleaded actions, PHRL avers that Mr Eliasch acted at the behest of (and/or or in the interests of) Mr Doronin and/or TIL, with the common intention of acting against PHRL's interests (or alternatively PHRL's and Sherway's joint interests) and the best interests of the JVC.

220.    In the premises, it is averred that Mr Eliasch and Sherway have acted (and, until PHRL terminated the Sherway Agreements on 17 July 2014, continued to act) in breach of the Agreement and/or the Sherway Agreements (in particular the Holdings SHA) in that:

220.1.    the Representations were and are untrue, and Mr Eliasch has failed to act in accordance with them in carrying out his duties as an "A" director of the JVC;

220.2.    Mr Eliasch has failed and/or refused to act in accordance with the JVC SHA, the JVC Memorandum and the JVC Articles;

220.3.    Mr Eliasch has failed and/or refused to act in accordance with PHRL's instructions, or even consulted with PHRL prior to casting his vote at any meeting of the JVC's Board and/or signing any document in his capacity as an "A" director of the JVC – despite having been requested to do so in writing on 7 July 2014 and 9 July 2014, Mr Eliasch has refused to consult with PHRL in any respect with regard to the JVC's affairs, having wrongly alleged in correspondence (including by letters dated 8, 9 and 10 July 2014) and in his witness statements that he has no obligation to do so;

220.4.    Mr Eliasch has failed and/or refused to pass on to PHRL, and/or consult with PHRL in connection with, all documentation and information obtained by him in his capacity as an "A" director of the JVC;

220.5.    Mr Eliasch has failed and/or refused to act at all material times to safeguard PHRL's investment (or, pursuant to the Holdings SHA, PHRL's and Sherway's joint investment) in the Aman Resorts group of companies, particularly the JVC;

220.6.    Mr Eliasch filed witness statements as pleaded at paragraphs 148 and 220.3 above, the tenor and content of which made it plain that there was absolutely no prospect of resurrecting the sort of working relationship between PHRL and Mr Eliasch which would be a necessary pre-requisite for the continuation of any joint venture between them; and/or

220.7.    Mr Eliasch and/or (through Mr Eliasch) Sherway have conspired together with Mr Doronin and/or (through Mr Doronin) TIL to injure PHRL (and/or Mr Amanat) by effecting the "pincer movement" by Sherway pleaded at sub-section (a) above and by

procuring the various breaches of the Agreement, the Sherway Agreements and the JVC SHA hereinbefore pleaded.

220.8.  Mr Eliasch and Sherway have committed repudiatory breaches of the Sherway Agreements (in particular the Holdings SHA) as pleaded at paragraphs 15, 88.2, 98, 101-106, 112, 126-127, 141, 146, 149, 152, 160-161, 170, 190, 190AE 191-193, 201 and 218-219 above.

221.  In relation to paragraphs 220.3 and 220.4 above, PHRL relies on the facts and matters pleaded at paragraphs 191-193 above, together with the following further particulars, which are the best which PHRL is presently able to give pending disclosure:

221.1.  Mr Eliasch failed to disclose his presence, or the content of the matters discussed: (i) at a dinner at Mr Doronin's Miami residence on 21 April 2014 at which Mr Doronin and Mr Zecha were present; and (ii) with Mr Doronin and Mr Zecha on the way to the 22 April Meeting, where Mr Zecha's position as CEO of the JVC was discussed; and

221.2.  Mr Eliasch has failed to disclose his involvement with the matters relating to the JVC Board pleaded above, including in particular discussions with Mr Doronin and/or Mr Djanogly in relation to the calling of Board meetings at very short notice, and the purported signing of written consents to short notice, without any prior warning to PHRL whatsoever.

222.  For the reasons pleaded at paragraphs 207-217 above, PHRL avers that the service of the Sherway Notice was part of Mr Doronin's and Mr Eliasch's agreement to force PHRL out of the JVC and was a repudiatory breach of the Sherway Agreements.

223.  Moreover, as pleaded above, Sherway has breached (and, until PHRL terminated the Sherway Agreements on 17 July 2014, acted in continuing breach of) the Holdings SHA by:

223.1.  failing to act in accordance with the Agreement, which is an implied term of the Holdings SHA;

223.2.  failing to procure that Mr Eliasch act in good faith in discharging his duties as a director of the JVC and/or failing to comply with its obligations under clause 4.2 of the Holdings SHA and/or deliberately ignoring and flouting Sherway's obligations to seek to reach agreement with its joint venture partner on matters relating to their joint venture;

223.3.  failing to procure that Mr Eliasch acted in accordance with the JVC SHA and the JVC's Memorandum and Articles;

223.4.  failing to procure that Mr Eliasch pass on to Carpentaria and/or share with PHRL information and documents relating to the business of the JVC and/or PHRL Holdings and/or to consult with PHRL as regards the JVC's business and affairs (as to which paragraph 57 above in particular is repeated); and/or

223.5.  breaching its warranty that it was acting on its own behalf and not for the benefit of any other person (in this case, Mr Doronin/TIL).

**(c)     Consequences and relief sought**

*Misrepresentation*

224.   The Representations, either individually or collectively, were material and were made with the intention that PHRL would enter into the Sherway Agreements, which should be viewed as essentially one over-arching agreement. But for the Representations (either individually or collectively) PHRL would not have entered into the Sherway Agreements.

225.   Further, Mr Eliasch (and/or Sherway) knew that the Representations were false (insofar as they suggested Mr Eliasch was not a good friend of Mr Doronin) at the time that they were made (or alternatively knew that the Representations had become false prior to PHRL's entry into the Sherway Agreements at the latest and failed to correct them because, by that stage, Mr Eliasch (and/or Sherway) knew that Mr Eliasch had no intention of complying with or acting consistently with the Representations insofar as they related to his declared intention to support PHRL's position in any dispute with TIL and/or Mr Doronin).

226.   By a letter dated 17 July 2014, PHRL gave notice of rescission of the Sherway Agreements.

227.   In the premises, PHRL:

227.1.  seeks a declaration that it is entitled to and has rescinded the Sherway Agreements as a result of the fraudulent (or alternatively negligent) misrepresentations pleaded above;

227.2.  claims damages from the Defendants at common law and/or under §2 of the Misrepresentation Act 1967; and

227.3.  an injunction in the form pleaded at paragraph 231.2 below.

228.    Subject to setting off any such damages to which PHRL is entitled, PHRL will return the US$ 50 million borrowed pursuant to the Facility Agreement.

*Repudiatory breach*

229.    In the alternative, and in the premises, PHRL avers that Mr Eliasch and/or Sherway have acted in repudiatory breach of the Agreement and/or the Sherway Agreements (as the case may be). PHRL relies on each of the breaches and/or continuing breaches pleaded above either individually or cumulatively. By a letter dated 17 July 2014, PHRL exercised its right to accept Sherway's repudiatory breaches and terminated the Sherway Agreements. PHRL is additionally entitled to, and does rely, on the additional repudiatory breaches now pleaded in these Consolidated Particulars of Claim as justifying its termination by reason of Sherway's repudiatory conduct. If, contrary to the foregoing, PHRL was not entitled to terminate the Sherway Agreements in its 17 July 2014 letter (which is denied), on any view, in the light of the facts and matters pleaded at paragraphs 190A-190AB above, Sherway has acted in repudiatory breach of the Sherway Agreements (and/or each of them). In particular, it is impossible to see how Sherway/Mr Eliasch can have acted in this manner consistently with a desire to act in good faith and/or for the benefit of PHRL, Sherway and/or PHRL Holdings. Accordingly, if (contrary to PHRL's primary case) the Sherway Agreements (or any of them) are still on foot, PHRL hereby exercises its right to terminate the Sherway Agreements (and each of them) for Sherway's repudiatory breach(es).

230.    By a letter dated 17 July 2014 to the JVC and to TIL, PHRL exercised its right pursuant to clause 6.1(c) of the JVC SHA and requested that TIL procured the passing of such resolutions as may be necessary to remove Mr Eliasch. If, contrary to the foregoing, PHRL was not entitled to exercise this right in its 17 July 2014 letter to the JVC and TIL (which is denied), in the light of PHRL's subsequent termination of the Sherway Agreements (and each of them) as pleaded at paragraph 229 above, PHRL is entitled to exercise its rights pleaded in the first sentence of this paragraph, which is repeated *mutatis mutandis*.

231.    Accordingly, PHRL:

231.1.    claims a declaration that it was entitled to and has accepted Sherway's repudiatory breaches of the Sherway Agreements and has thereby terminated these agreements, together with damages flowing from such repudiatory breach(es):

231.2.    seeks an injunction restraining Mr Eliasch from:

231.2.1. consenting (whether in writing or otherwise) (i) to a period of notice for the convening of a Board meeting of the JVC shorter than the 5 Business Days notice required by clause 6.2(c) of the SHA; and (ii) to matters (or business in relation to such matters) being raised at any meeting of the Board of the JVC where such matters are not on the agenda for the relevant Board meeting; and

231.2.2. attending any meeting of the Board of the JVC; and

231.3. seeks an injunction restraining Sherway from purporting to rely on the Sherway Notice and/or any of its alleged rights under the Sherway Agreements alleged to be triggered by it.

232. As to paragraph 231.1 above, PHRL's loss includes at least: (i) any diminution in value of its shareholding in the JVC as a result of TIL's and the JVC's breaches of the JVC SHA; and (ii) any financial loss consequent upon Sherway's breaches of the Sherway Agreements. PHRL reserves the right to plead further to this loss or damage and will seek to rely at trial on the report of an expert accountant.

*Inducing or procuring a breach of contract and/or causing loss by unlawful means*

233. Further, or alternatively, having acted in the manner pleaded in sub-section (b) above, Mr Eliasch and (through Mr Eliasch) Sherway are liable for having induced or procured or assisted TIL's and the JVC's breaches of the JVC SHA.

234. Mr Eliasch and (through Mr Eliasch) Sherway knew of the existence of PHRL's rights under the JVC SHA and intentionally interfered with that right to the detriment of PHRL, causing it loss and damage. PHRL is accordingly entitled to:

234.1. damages for the loss suffered as a result of Mr Eliasch's and/or Sherway's tort; and

234.2. an injunction to prevent the continuation or repetition of the tortious conduct.

235. It is not possible at this stage to quantify precisely PHRL's loss but such loss would at least include any diminution in value of its shareholding in the JVC as a result of TIL's and the JVC's breaches of the JVC SHA. PHRL reserves the right to plead further to this loss or damage and will seek to rely at trial on the report of an expert accountant.

236. Further, or alternatively, having acted in the manner pleaded in sub-section (b) above, Mr Eliasch and (through Mr Eliasch) Sherway are liable for causing PHRL loss by unlawful

means, specifically, by acting in breach of the JVC SHA with the intention that this should harm PHRL's interests, including its economic expectations, in the JVC. As a result of having acted in this manner, PHRL has suffered loss and damage and is accordingly entitled to the same kind of relief pleaded at paragraphs 234.1-234.2 above.

*Conspiracy*

237.   In the premises, PHRL avers that Mr Eliasch and/or (through Mr Eliasch) Sherway, have conspired together with Mr Doronin and/or (through Mr Doronin) TIL (together **"the Conspirators"**) to cause loss to PHRL.

238.   In particular:

238.1.   it is legitimately to be inferred from the conduct of the Conspirators as pleaded above that they formed an agreement, prior to the acts complained of herein, an intended consequence of which (or alternatively the real and predominant purpose of which) was to injure PHRL;

238.2.   the Conspirators have sought to put this agreement into effect by, among other things, committing (or procuring the commission of) breaches of the Agreement, the JVC SHA and/or (in the case of Sherway) the Sherway Agreements, as hereinbefore pleaded;

238.3.   furthermore, more recently, Mr Eliasch (on his own behalf and on behalf of Sherway) has sought (it is to be inferred on the instructions of, or with the encouragement of, Mr Doronin/TIL) to interfere with PHRL's contractual relations with Jinpeng, including by (i) meeting with Jinpeng, including on 4 August 2014; (ii) providing Jinpeng with documents, including documents filed in these proceedings; and (iii) encouraging or instigating the taking of steps by Jinpeng to put PHRL into liquidation, including by an application to appoint Provisional Liquidators in the British Virgin Islands – indeed, TIL has, in an effort to ensure that PHRL is wound up, indicated in a letter to Jinpeng dated 25 September 2014 that it will not seek to rely on the appointment of liquidators over PHRL as constituting a event of default under the JVC SHA;

238.4.   the acts done in the execution of that agreement have resulted in loss and damage to PHRL (and will, if not restrained, continue to cause loss and damage to PHRL).

239.   As a result of this conspiracy, PHRL has suffered loss and damage. Again, it is not possible at this stage to quantify precisely PHRL's loss but such loss would at least include any diminution in value of its shareholding in the JVC as a result of TIL's and the JVC's breaches

of the JVC SHA. PHRL reserves the right to plead further to this loss or damage and will seek to rely at trial on the report of an expert accountant. In relation to interference with Jinpeng, in the event that PHRL is forced to abandon its case that Jinpeng's loan has been converted into equity and to repay Jinpeng c. US$ 35 million in order to avoid liquidation, PHRL will seek to reclaim any loss and damage thereby sustained from the Conspirators.

240.    PHRL is accordingly entitled to:

    240.1.  damages for the loss suffered as a result of the Conspirators' conspiracy;

    240.2.  an injunction to prevent the continuation or repetition of the tortious conduct.

241.    Further, PHRL is entitled to and claims interest pursuant to section 35A of the Senior Courts Act 1981 on the damages pleaded above.

242.    Alternatively, PHRL claims interest on the damages pleaded above at such rate and for such period as the Court thinks fit.

*Alternative relief: the Sherway Notice*

243.    If, contrary to PHRL's case, it has not validly rescinded and/or terminated the Sherway Agreements (or any of them), PHRL seeks:

    243.1.  a declaration that:

        243.1.1. no "*Share Transfer Consent*" has been received by PHRL within the meaning of the Facility Agreement;

        243.1.2. PHRL is not in breach of clause 13.1.3 of the Facility Agreement;

        243.1.3. there has been no "*Event of Default*" under clause 14.1.2 of the Facility Agreement; and/or

        243.1.4. the Sherway Notice is of no effect;

    243.2.  an injunction restraining Sherway from taking any steps purporting to enforce its rights pursuant clause 14.2.2 of the Facility Agreement including, without limitation, purporting to acquire PHRL's shares in the JVC and/or purportedly enforce any rights under the Pledge Agreement dated 2 April 2014, pursuant to which PHRL pledged its shares in the JVC to secure its obligations under the Facility Agreement.

XVI.    **Removal of Mr Eliasch as a director of the JVC**

244.    As pleaded above, by a letter dated 17 July 2014, PHRL gave notice of rescission, or alternatively accepted Mr Eliasch's and Sherway's repudiatory breaches of the Sherway Agreements.

245.    By a letter dated 17 July 2014 to the JVC and to TIL, PHRL exercised its right pursuant to clause 6.1(c) of the JVC SHA and requested that TIL procured the passing of such resolutions as may be necessary to remove Mr Eliasch. This letter enclosed, pursuant to Article 7.21 of the Articles, a written resolution, which it required TIL to sign.

246.    In breach of clause 6.1(c) of the JVC SHA, TIL failed and/or refused to effect Mr Eliasch's removal. PHRL accordingly seeks:

246.1.   an injunction requiring TIL to effect Mr Eliasch's removal as a director of the JVC; and

246.2.   damages flowing from TIL's breach of clause 6.1(c) of the JVC SHA.

247.    It should be noted that PHRL is currently enjoined from relying upon the 17 July notice pleaded above in order to seek to remove Mr Eliasch from his position as a director of the JVC. These matters will have to be resolved at the trial of this claim. PHRL claims this relief in these Particulars of Claim in the event that, as PHRL expects, Mr Eliasch's injunction will be discharged.

AND the Claimant claims:

As against TIL and the JVC:

(1)    Declarations as pleaded at paragraphs 107, 112, 127, 172, 198 and/or 203 above.

(2)    An injunction in the terms pleaded at paragraphs 107, 127, 172 and 246 above.

(3)    Damages as pleaded at paragraphs 206 and 246 above.

(4)    Further or other relief, including as pleaded at paragraph 204 above.

(5)    Interest pursuant to section 35A of the Senior Courts Act 1981, or at such other rate as the Court sees fit.

As against Sherway and Mr Eliasch:

(6)     Declarations as pleaded at paragraphs 227, 231 and 243.1 above.

(7)     An injunction in the terms pleaded at paragraphs 227, 231, 234, 236 and 243.2 above.

(8)     Damages as pleaded at paragraphs 190AE, 227, 231, 234, 236 above.

(9)     Further or other relief, including all necessary accounts and enquiries for the purposes of quantifying the above claimed damages.

(10)    Interest pursuant to section 35A of the Senior Courts Act 1981, or at such other rate as the Court sees fit.

As against Sherway, Mr Eliasch and TIL:

(11)    An injunction as pleaded at paragraph 240 above.

(12)    Damages for conspiracy, as pleaded at paragraph 240 above.

(13)    Further or other relief, including all necessary accounts and enquiries for the purposes of quantifying the above claimed damages.

(14)    Interest pursuant to section 35A of the Senior Courts Act 1981, or at such other rate as the Court sees fit.

As against Pontwelly:

(14A)   A declaration as pleaded at paragraph 190W above.

(14B)   Equitable compensation for dishonest assistance.

As against AHOL:

(14C)   A declaration as pleaded at paragraph 190X above.

(14D)   An injunction as pleaded at paragraph 190Z above.

(14E)   Equitable compensation for knowing receipt.

(14F)   Such further or other order as is necessary to procure the return of the Silverlink Shares to ARGL.

As against Mr Doronin, TIL, Pontwelly, Mr Eliasch and/or Sherway:

(14G)   Damages, and other relief, as pleaded at paragraphs 190V and 190Y above.

As against Mr Doronin, Pontwelly, Mr Eliasch and/or Sherway:

(14H)   Damages as pleaded at paragraphs 190AA and 190AC above.

(14I)   An injunction as pleaded at paragraphs 190AA and 190AC above.

As against Mr Doronin, Pontwelly and AHOL:

(14J)   An injunction as pleaded at paragraph 190Z above.

As against all of the Defendants:

(15)   Damages for breach of the JVC SHA and/or the Facility Agreement (as the case may be).

(16)   Further or other relief, including all necessary accounts and enquiries for the purposes of quantifying the above claimed damages.

(17)   Interest pursuant to section 35A of the Senior Courts Act 1981, or at such other rate as the Court sees fit.

(18)   Costs.

2 October 2014
21 August 2015
[date] 2015

JOHN BRISBY QC
RICHARD HILL QC
ALEXANDER COOK

**Statement of Truth**

* (I believe) (The Claimant believes) that the facts stated in these Re- Amended Consolidated Particulars of Claim are true.

* I am duly authorised by the Claimant to sign this statement.

Full name: **ANDREW RICHARD DUNN**

Name of Defendant's solicitor's firm: **CANDEY LIMITED LLP**

Signed ………………………………………….    Position or office held **PARTNER**

* (Claimant)(Claimant's solicitor) (if signing on behalf of firm or company)

Dated ……………………………………….

Claim No. HC-2014-000497

IN THE HIGH COURT OF JUSTICE
CHANCERY DIVISION

B E T W E E N :

PEAK HOTELS AND RESORTS LIMITED

Claimant

-and-

(1) TAREK INVESTMENTS LIMITED
(2) PEAK HOTELS AND RESORTS GROUP
LIMITED
(3) SHERWAY GROUP LIMITED
(4) CARL JOHAN ELIASCH
(5) PONTWELLY HOLDING COMPANY LIMITED
(6) VLADISLAV DORONIN
(7) AH OVERSEAS LIMITED
(8) AMAN RESORTS GROUP LIMITED

Defendants

-and-

(1) PHRL HOLDINGS LIMITED
First Named Third Party
(2) OMAR SHARIF AMANAT
Second Named Third Party
(3) LALIT MODI
Third Named Third Party

_____

RE- AMENDED CONSOLIDATED
PARTICULARS OF CLAIM

_____

CANDEY LIMITED LLP
8 Stone Buildings
Lincoln's Inn
London WC2A 3TA
Tel: 020 3328 7780
Ref: ADC/ARD

Solicitors for the Claimant

Page 101 of 102

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
VIRGIN ISLANDS
COMMERCIAL DIVISION
Claim No. BVIHC (Com) 0116 of 2015

IN THE MATTER OF PEAK HOTELS AND RESORTS GROUP LIMITED

AND IN THE MATTER OF AMAN RESORTS GROUP LIMITED

AND IN THE MATTER OF THE BVI BUSINESS COMPANIES ACT 2004

B E T W E E N:

PEAK HOTELS AND RESORTS LIMITED
Claimant / Applicant

-and-

(1) PEAK HOTELS AND RESORTS GROUP LIMITED

(2) AMAN RESORTS GROUP LIMITED
Defendants / Respondents

---

ORDER

---



Conyers Dill & Pearman

Legal Practitioners for the
Claimant/Applicant
Commerce House, Wickhams Cay 1
PO Box 3140, Road Town, Tortola
British Virgin Islands VG1110
Tel: +1 (284) 852 1000
Fax +1 (284) 852 1001

**<u>Annex B</u>**

## IRREVOCABLE APPOINTMENT AND ASSIGNMENT OF INTEREST

Whereas Carpentaria Management Services Limited ("Assignee") has agreed to provide PEAK HOTELS AND RESORTS LIMITED incorporated and registered in The British Virgin Islands with company number 1808196 whose registered office is at Nemours Chambers, Road Town, Tortola, British Virgin Islands (PHRL) the undersigned Assignor ("Assignor") with litigation funding in connection with the prosecution of the Aman Resorts Group Limited ("ARGL") chapter 11 bankruptcy as further described by the BVI court order referenced below;

As consideration for the funding, Assignor hereby irrevocably, appoints, authorizes, and assigns, transfers and sets over to Assignee, as its agent, with an interest, assignee, transferee and recipient, the power and authority to enforce and implement section 3 of the court order (attached as exhibit B) that was granted to Assignor by the Honorable Justice Barry Leon (Ag) made on October 15th 2015 under Section 184C of the BVI Companies Business Act (2004) specifically stating that:

PHRL has leave pursuant to the BVI Derivative Actions Provisions:

3.1. to institute, and thereafter prosecute through to a conclusion (including any appeal(s)), proceedings under Chapter 11 of the United States Bankruptcy Code in the name of, and on behalf of, ARGL in respect of that company before the United States Bankruptcy Court for the Southern District of New York; and for that purpose

3.2. to take such actions, file such papers, give such testimony, and (either by itself or by Carpentaria Management Services Limited, with full powers and authority under the Act and all other applicable law) to execute any necessary or appropriate agreements and commitments and all related corporate resolution(s) (none of which shall require any other signature to render the same fully valid) for ARGL and on ARGL's behalf, in connection with such proceedings as set out at paragraph 3.1 above

The Assignor warrants and represents that said court order is in full force and effect and is fully assignable and the power of appointment is duly authorized;

The Assignee hereby assumes and agrees to perform all obligations of the Assignor pursuant to the order and agrees to indemnify and hold the Assignor harmless from any claim or demand resulting from any action taken by the Assignee with regards to the ARGL bankruptcy.

The Assignee shall be responsible for providing litigation funding to be paid for the purpose of pursuing the aforementioned claims under the BVI court order, which rights are assigned hereunder. In return Assignee shall receive a reimbursement for all of its reasonable out of pocket costs and then shall receive 5% of all recoveries from pursuing the ARGL claims under the BVI order.

The Assignor hereby irrevocably appoints Assignee as its exclusive agent with power of attorney to take such actions, file such papers, give such testimony, by itself with full powers and authority under the Act and all other applicable law) to execute any necessary or appropriate agreements and commitments and all related corporate resolution (s) (none of which shall require any other signature than Assignee's to render the same fully valid) for ARGL and on ARGL's behalf, in connection with such proceedings as set out in the BVI court order.

This assignment shall be binding upon and inure to the benefit of the parties, their successors and assignees and assigns.

Signed this 16th day of October, 2015.


_____
Assignor's Signature


Sean L. Sullivan, Director, Peak Investments Limited

Authorized signatory for

Peak Hotels and Resorts Limited
Assignor's Printed Name


_____
Assignee's Signature


Sean L.  Sullivan, Director

Carpentaria Management Services Limited
Assignee's Printed Name