**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: Aman Resorts Group Limited | Chapter 11 |
| | Case No. 16-10517-scc |
| Aman Resorts Group Limited, | Adv. Pro. No. _____ |
| Plaintiff, | |
| v. | |
| Pontwelly Holding Company Limited and A.H. Overseas Limited, | |
| Defendants. | |

**COMPLAINT**

Debtor Aman Resorts Group Limited ("ARGL" or the "Debtor"), through its undersigned counsel, as and for its complaint brought on behalf of the Debtor's estate, alleges as follows:

**NATURE OF THE ACTION**

1.  This action arises from the illegal foreclosure on property worth hundreds of millions of dollars. As a result of this foreclosure, the Debtor has been left with no less than $70 million in obligations to creditors and no ability to pay them. Pursuant to the foreclosure, defendant Pontwelly Holding Company Limited ("Pontwelly") succeeded in obtaining, for its own exclusive benefit and to the detriment of all of the other creditors of the Debtor, the Debtor's sole material asset, namely its 100% ownership interest in Silverlink Resorts Limited ("Silverlink"). Upon information and belief, Pontwelly then transferred its purported interest in Silverlink to an entity known as A.H. Overseas Limited ("Overseas Ltd") in order to further hinder the creditors of the Debtor in their efforts to have their claims paid.

2. Silverlink is a holding company organized under the law of the British Virgin Islands (the "BVI").  Silverlink and its subsidiaries own and operate luxury resorts and hotels at locations around the world as well as related intellectual property.

3. As explained herein, the purported foreclosure by Pontwelly on all of the shares of Silverlink (the "Silverlink Shares"), was engineered by Vladislav Doronin ("Doronin"), a real estate developer that operates Pontwelly as his alter ego.  Doronin, in addition to having been, through Pontwelly, a lender to the Debtor, is also, as the alter ego of Tarek Investments Ltd. ("Tarek"), the indirect owner of a majority of the equity of the Debtor.

4. Tarek's interests in the Debtor are held though Peak Hotels and Resorts Group Limited, a BVI entity ("Peak Group").   Peak Group is a joint venture.  Tarek owns approximately two-thirds of the equity in Peak Group.  The balance of the equity is owned by Peak Group and Resorts Limited, also a BVI entity ("PHRL").

5.  By means of wrongful foreclosure proceedings and a purported sale of Silverlink in satisfaction of a loan from  Pontwelly, brought deliberately without proper notice being provided to the Debtor, Doronin, through Pontwelly, obtained legal title to all of the Silverlink Shares and thus to substantially all of the assets of the Debtor.

6. Through the wrongful foreclosure, Pontwelly obtained the Silverlink Shares from ARGL without having exchanged reasonably equivalent value.  In causing the transfer of Silverlink Shares to Pontwelly, Pontwelly acted with the intent to hinder, delay and defraud other creditors of the Debtor as well as enrich itself to the detriment of the other indirect equity owners of the Debtor.  Pontwelly's subsequent transfer of the Silverlink Shares to Overseas Ltd was in furtherance of this same scheme. Upon information and belief, Overseas Ltd is controlled by Doronin and did not provide reasonably equivalent value for the Silverlink Shares.

7.     Pursuant to this proceeding, the Debtor seeks to rescind the purported sale of the Silverlink Shares to Pontwelly/Doronin.  In addition, pursuant to Section 548 and 544(b) of the Bankruptcy Code, the Debtor seeks (i) to avoid, for the benefit of ARGL and its creditors, the transfer of the Silverlink Shares to Pontwelly/Doronin; (ii) to recover the Silverlink Shares or the proceeds thereof from Overseas Ltd or any other subsequent transferees; and (iii) to restore to the Debtor any earnings or other assets generated by Silverlink during the period following the purported sale to Pontwelly.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1409(a). This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(H).

## PARTIES

9.     The Debtor is a BVI corporation.  Its registered office is located at Nemours Chambers in Road Town, Tortola, British Virgin Islands.  The Debtor was created as a vehicle for acquiring Silverlink which is the holding company for luxury resort properties doing business throughout the world as "Aman Resorts."  The Debtor has consented to an Amended Involuntary Petition of its Creditors under Chapter 11 (the "Amended Petition").  The Amended Petition was filed on March 7, 2016.

10.     Defendant Pontwelly is a BVI corporation.  Its registered office is located at 3076 Sir Francis Drake's Highway, PO Box 3463, Road Town, Tortola, British Virgin Islands.  Upon information and belief, Pontwelly is owned and controlled by Doronin, a real estate developer who, upon information and belief, maintains residences in Russia, Sweden, New York, New York and Miami, Florida.

11. Upon information and belief Defendant A.H. Overseas is a BVI Entity. Upon information and belief, A.H. Overseas is owned and controlled by Doronin.

## FACTUAL BACKGROUND

### I. Aman Resorts: Luxury Resort Properties

12. Aman Resorts was founded in 1988 by Adrian Zecha ("Zecha"), a well-known Indonesian hotelier. Zecha built Aman Resorts by identifying remote and exotic locations and turning them into boutique resorts, frequently accompanied by privately-sold villas. At present, Aman Resorts owns and/or operates 27 small-scale luxury hotels located in Asia, Europe, North Africa, and the United States.

### II. Amanat and Doronin Form a Joint Venture Company to Acquire Aman Resorts

13. In 2013, Omar Amanat, a private investor and entrepreneur, learned that DLF Group Hospitality Limited ("DLF"), a commercial real estate developer based in India was interested in a sale of Aman Resorts. Following discussions, Amanat and DLF entered into a non-binding letter of intent concerning a sale of Silverlink to ARGL, which had been formed to serve as a vehicle for the potential acquisition.

14. In connection with financing ARGL's acquisition of Silverlink, Amanat was introduced to Doronin. In December 2013, Amanat and Doronin met at Doronin's residence in New York where they negotiated and agreed to the terms for an agreement to form a joint venture that would hold the shares in ARGL. Once financed, ARGL would, in turn, acquire Silverlink. The agreement contemplated that Doronin would provide both debt and equity financing to the joint venture company and ARGL.

15. On January 17, 2014, Peak Group was incorporated to serve as the joint venture to be operated by Amanat and Doronin. The terms of joint venture are set forth in a Shareholders'

4

Agreement dated January 31, 2014 (the "Peak Group Shareholders' Agreement"). Ownership of ARGL was transferred to Peak Group on January 31, 2014. Under the Peak Group Shareholders' Agreement, shares of ARGL were issued to two companies: (1) PHRL, which holds the interests of Amanat and Adrian Zecha; and (2) Tarek, representing the interests of Doronin. PHRL was issued 12,339 Class "A" shares representing a 35.2% interest in Peak Group and Tarek received 22,704 Class "B" shares, or a 64.8% interest in Peak Group.

16.    On February 8, 2014, ARGL completed the acquisition of Silverlink for a total consideration of $358 million. Of the total, $190 million was in the form of an equity investment provided by the shareholders of Peak Group. The remainder of the acquisition price was funded by a loan (the "Pontwelly Loan") provided by Pontwelly to ARGL pursuant to a financing agreement dated as of January 31, 2014 ("Financing Agreement").[1] A portion of the Pontwelly Loan that was not used to fund the acquisition was allocated to meet the working capital needs of ARGL, Silverlink and their subsidiaries. Pursuant to a pledge agreement dated February 13, 2014 (the "Pledge Agreement"),[2] the Pontwelly Loan was secured by the Silverlink Shares.

17.    The organizational structure of the Doronin-Zecha-Amanat joint venture immediately following its acquisition of Silverlink is shown in the chart below:

---

[1] Although, subject to certain conditions, Pontwelly was authorized to syndicate the loans under Section 12.07 of the Financing Agreement, Pontwelly and ARGL executed a letter agreement dated as of January 31, 2014 (the "No-Syndication Letter") pursuant to which Pontwelly's ability to assign or transfer a direct or indirect interest in the loans was restricted.

[2] The Financing Agreement and the Pledge Agreement are governed by New York law and have standard forum-selection clauses. Section 12.10 of the Financing Agreement provides that "[a]ny legal action or proceeding with respect to this agreement or any other loan document may be brought in the Courts of the State of New York in the County of New York or of the United States District Court for the Southern District of New York[.]" Section 24.1 of the Pledge Agreement contains an identical forum-selection clause.



### III. The Peak Group Shareholders' Agreement

18. The Peak Group Shareholders' Agreement contained provisions that were designed to ensure that PHRL and Tarek shared control over the management and affairs of the Peak Group. Among its terms was a provision allowing each of PHRL and Tarek to nominate two directors to Peak Group's four-member board of directors and further providing that ARGL's board of directors "shall mirror the composition" of Peak Group's board. At all relevant times, PHRL's director-nominees were Carpentaria Management Services Limited

("Carpentaria") and Carl Johan Eliasch.[3]  Tarek's nominees were Doronin and Mr. Alan Djanogly.  In permitting both shareholders to appoint one director, the Peak Group Shareholders' Agreement was intended to create an ongoing deadlock with no single shareholder (through control of the board) being able to push through proposals without consent from the other shareholder.

19.    With respect to day-to-day management, the Peak Group Shareholders' Agreement provided that Zecha would be Chief Executive Officer until July 31, 2014 and that he would thereafter be the Chairman or CEO of one of ARGL's subsidiaries.

20.    Notwithstanding the provisions in the Peak Group Shareholders' Agreement designed to ensure equal control over the board of directors, at some time after April 9, 2014, Doronin obtained *de facto* control of the board.  Upon information and belief, when PHRL appointed Eliasch as a director on April 9, 2014, he was, unbeknownst to Amanat, closely acquainted with Doronin.  Moreover, upon information and belief, at some time after his appointment to Peak Group's board, Eliasch formed an alliance with Doronin and Djanogly pursuant to which the three agreed to cast their votes as directors in the same way and to otherwise act for the benefit of Tarek and without regard for PHRL's interests.  As such, upon information and belief, at all relevant times, Doronin effectively controlled three out of the four seats on Peak Group's board of directors.

### IV.    The April 22, 2014 Board Meeting: Doronin's Initial Attempts to Eliminate or Reduce PHRL's Interest in Peak Group

21.    Almost immediately upon completion of the acquisition of ARGL, the relationship of the joint venture participant deteriorated as Tarek sought the elimination or

---

[3] Amanat was introduced to Eliasch, an investor, through a mutual acquaintance. Eliasch, who immediately became interested in investing in Aman Resorts, agreed to provide PHRL with a $50 million loan.  As a condition of his investment, Eliasch required that PHRL appoint him to serve on Peak Group's board as one of PHRL's designees.

7

reduction of PHRL's interest in Peak Group. Tarek initially attempted to achieve this goal by two principal means: (1) blocking any attempted potential refinancing of the Pontwelly Loan on more favorable terms; and (2) demanding calls for capital with the knowledge that they could not be met by PHRL.

22. The Pontwelly Loan bore a high rate of interest making it a burden to the Debtor. One tranche of the Pontwelly Loan, consisting of a $168 million in principal amount term loan (the "Term Loan") bore interest at the rate of 12.68% per annum. Another tranche, consisting of a $40 million bridge loan, bore interest at the rate of 18% per annum. At an April 22, 2014 board meeting, Peak Group's board was presented with a proposal by Imperial Capital LLC ("Imperial"), a New York-based investment bank, to arrange a refinancing pursuant to which ARGL would issue bonds on terms far more favorable to PHRL than the Pontwelly Loan. When, however, Imperial sought to progress the transaction by obtaining due diligence about the Debtor, ARGL/Silverlink management was unable to cooperate, stating that management had not been authorized to provide the requested information. Although PHRL wrote a letter to Tarek on June 27, 2014 requesting that Tarek take steps to ensure that the relevant information be released to Imperial, Tarek refused on various pretexts. Tarek's conduct contravened the Peak Group Shareholders' Agreement, which obligated Tarek to facilitate efforts to refinance the Pontwelly Loan by, among other things, refraining from unreasonably withholding or delaying any necessary consent.

23. Without being provided with material necessary to perform due diligence on the refinancing, Imperial was unwilling to proceed. By hindering ARGL's efforts to refinance, Doronin ensured that Pontwelly would retain its stream of income from its above-market loans and its security interest in the Silverlink Shares.

8

24. At the same April 22, 2014board meeting, a PowerPoint presentation regarding various plans to expand Aman Resorts was circulated. The proposed expansion purportedly required an "an immediate capital call from shareholders" of $200 million to commence a number of proposed initiatives "at short notice." Amanat, acting for Carpentaria, objected to the proposed capital call, arguing that ARGL had no need for such substantial equity capital and that, in any event, the capital call exceeded a limit set forth in the Peak Group Shareholders' Agreement. Over the opposition of Carpentaria, and contrary to the Peak Group Shareholders' Agreement, the other directors voted in favor of the capital call. Upon information and belief, when the capital call was proposed it was known that PHRL would be unable to meet the call and that its interests would thus be impaired. [4]

25. At the same April 22, 2014 board meeting, Zecha was handed a letter purporting to terminate his employment.

### V. The London Proceedings

26. Responding to these developments, PHRL brought suit in the High Court of Justice in the United Kingdom against Tarek, Eliasch, and Sherway Group Limited, the entity through which Eliasch extended the $50 million loan to PHRL. PHRL's complaint asserted, *inter alia*, breach of the Peak Group Shareholders' Agreement based on the improper capital call and the wrongful termination of Zecha.

27. On July 14, 2014, the defendants agreed, in effect, to a stand-still of efforts to oust Zecha or to enforce the capital call pending final resolution of PHRL's claims of breach.

### VI. Doronin's Final Attempt to Obtain Sole Ownership of Aman Resorts

---

[4] During the April 22nd meeting Mr. Eliasch proposed that a portion of the proceeds could be used to pay down the Pontwelly Loan. However, Mr. Doronin objected on the basis that he did not want to use "[his] own money to cover [his] own loan."

28. Not content with abiding by the stand-still, Doronin hatched a scheme to foreclose on Silverlink, thereby, supposedly, handing PHRL a fait accompli. As the first step in this scheme, Doronin exercised his control over the finances of ARGL to cause it to fail to make payments under the Pontwelly Loan. Pontwelly then retained Paul Hastings LLP to document enforcement proceedings against ARGL. Led by attorneys based out of the New York office of Paul Hastings, two alternative processes were ostensibly pursued: (1) a public auction of the Silverlink Shares, which was supposedly to take place at Paul Hastings in New York on August 25, 2015; and (2) the purported solicitation of ARGL's consent to the sale of the Silverlink Shares to Pontwelly in full satisfaction of the outstanding Pontwelly Loan.

29. In fact, however, Pontwelly had no intention of proceeding with a public sale of the Silverlink Shares. Rather, it was the intent of Pontwelly all along to cause ARGL to appear to have authorized a so-called "strict foreclosure", *i.e.*, a legal mechanism by which a lender accepts ownership of collateral in full or partial satisfaction of the underlying debt obligation secured by such collateral.

30. Under Section 9-620 of New York's Uniform Commercial Code, a debtor may strictly foreclose on collateral only if it sends a proposal setting forth the terms and conditions of the strict foreclosure to the debtor, and the debtor consents to such proposal. Consent may be affirmative, in that the debtor may execute an "authenticated record" manifesting its consent. A debtor may also be deemed to have provided its constructive consent by its failure to object to a properly noticed proposal within 20 days.

31. To effect a purported strict foreclosure against ARGL, Pontwelly resorted to a crude and primitive strategy: deliberately and in bad faith adopting a mode of notice that assured that neither Carpentaria nor PHRL (nor, for that matter, any of Peak Group's other shareholders

10

and directors) would receive, on a timely basis, the strict foreclosure proposal required by Section 9-620 of the Uniform Commercial Code. Under this scheme, since no party adverse to Pontwelly/Doronin would timely receive statutory notice of the proposed strict foreclosure, no such party would have a chance to object thereto on behalf of ARGL. As a result, Pontwelly/Doronin would be able to argue that ARGL had constructively consented to the strict foreclosure proposal and the loss of substantially all of its assets for far less than their value.

32.  Among the flaws in this scheme is that under UCC 9-620, notice to the debtor must be <u>reasonable</u> in order for the debtor's subsequent failure to object to be treated as constructive assent. Because notice given by Pontwelly/Doronin was not reasonable and was, in fact, designed not to reach those directors of ARGL that might object, such notice did not give rise to constructive consent. Instead it was a legal nullity.

33.  The method for properly sending a notice to ARGL under the Financing Agreement and the Pledge Agreement is set forth in section 12.01 of the Financing Agreement (which provision is expressly incorporated by the Pledge Agreement). It provides that any notice to ARGL must be delivered by hand or by mail to ARGL's registered agent in the British Virgin Islands, with a copy sent to the following parties: (a) Bryan Cave's London office (attention: Daniel Larkin); (b) Tarek in Zurich (c/o Dr. Harold Grüninger), and (c) Greenberg Traurig LLP in New York (attention: Robert J. Ivanhoe, Esq.). When the Financing Agreement was entered into, Bryan Cave represented both ARGL and PHRL, Greenberg Traurig served as counsel for Tarek, and Tarek was the entity through which Doronin held his indirect ownership interest in ARGL.

34.  The putative notice of a never-contemplated future public sale at auction was sent to, among others, Bryan Cave (who forwarded such notice to representatives of PHRL on the

11

same day).  In contrast, the request for consent to strict foreclosure pursuant to UCC 9-620 (the "9-620 Proposal") was sent only to ARGL's registered office in the British Virgin Islands.

35.    Upon information and belief, Doronin and Pontwelly knew that notices to ARGL's British Virgin Islands address would not be promptly forwarded to PHRL or Carpentaria.  Indeed, the 9-620 Proposal was not forwarded to Carpentaria until August 14, 2015, more than three weeks after it had been delivered.

36.    As Pontwelly had foreseen and planned, by the time the 9-620 Proposal reached PHRL and Carpentaria, the time for a debtor that has received valid notice to object to the strict foreclosure had already expired.

37.    In fulfillment of its bad faith scheme to foreclose without a public auction and without the statutorily required notice being given, on August 11, 2015, Pontwelly, through its counsel, issued a "Notification of Cancelation of Sale" which purported to advise of the "cancellation" of the public auction of the Silverlink Shares.  This notice asserted that Pontwelly had become the owner of the Silverlink Shares by virtue of a purported strict foreclosure as a result of the "consent" of the Debtor.

### VII.    The Purported Strict Foreclosure Results in ARGL's Insolvency

38.    The Silverlink Shares were ARGL's only major asset.  Upon consummation of the purported strict foreclosure, ARGL's remaining assets were worth approximately $3,160,000 and consisted primarily of cash on its hand, located in accounts in New York and London.  By contrast, its total liabilities exceeded $70,887,500.  Thus, it is clear that transfer of the Silverlink Shares to Pontwelly rendered ARGL insolvent from a balance sheet perspective.

39.    Subsequent to the purported strict foreclosure, Doronin or Pontwelly caused title to the Silverlink Shares to be transferred to Overseas Ltd.

40. Upon information and belief, Overseas Ltd. is controlled by Doronin and did not pay reasonably equivalent value for the Silverlink Shares.

## COUNT I
## DECLARATORY JUDGMENT
## (28 U.S.C. § 2201)

41. The Debtor repeats and realleges the allegations set forth in paragraphs 1 through 40, which are incorporated as if set forth fully herein.

42. Pontwelly claims to own the Silverlink Shares by virtue of having strictly foreclosed on such shares pursuant to § 9-620 of the New York Uniform Commercial Code.

43. The Debtor disputes the validity of the purported foreclosure and of Pontwelly's claimed ownership of the Silverlink Shares.

44. An actual controversy exists between the Debtor and Pontwelly concerning the ownership interests in the Silverlink Shares.

45. The Debtor has no adequate remedy at law.

46. The Debtor is entitled to a declaration pursuant to 28 U.S.C. § 2201 that: (i) ARGL did not consent to Pontwelly's 9-620 Proposal and the purported strict foreclosure was thus a legal nullity and was void *ab initio*; and (ii) ARGL is the sole owner of the Silverlink Shares; and (iii) neither Pontwelly nor any purported transferee of Pontwelly holds any ownership interest in the Silverlink Shares.

## COUNT II
## INTENTIONAL FRAUDULENT TRANSFER
### (11 U.S.C. §§ 544, 548(a), 550, and applicable state law)

47. ARGL repeats and realleges the allegations set forth in paragraphs 1 through 40, which are incorporated as if set forth fully herein.

48. On or about January 31, 2014, Pontwelly and ARGL entered into the Pontwelly Loans.

49. On or about February 14, 2014, ARGL granted a lien on its Silverlink Shares to Pontwelly as security for the Pontwelly Loans.

50. On or about August 11, 2015, Pontwelly purported to foreclose on the Silverlink Shares, causing ARGL to transfer such shares to Pontwelly in full satisfaction of the amount outstanding under the Pontwelly Loans (the "Silverlink Transfer").

51. As a result of the Silverlink Transfer, the assets of ARGL have been put beyond the reach of the creditors of ARGL.

52. Doronin, through Pontwelly and Tarek exercised control and dominion over ARGL, causing ARGL to transfer the Silverlink Shares with knowledge, *inter alia*, that such transfer would hinder, delay or defraud its creditors.

53. At all times relevant hereto, there were actual creditors of the Debtor holding unsecured claims allowable within the meaning of 11 U.S.C. §§ 502 and 544(b).

54. The Silverlink Transfer should be avoided and recovered from Pontwelly, Overseas Ltd., and any other subsequent transferee pursuant to 11 U.S.C. §§ 548(a)(1)(A), 544(b), 550(a), and under applicable state fraudulent transfer law.

# COUNT III
## CONSTRUCTIVE FRAUDULENT TRANSFER
### (11 U.S.C. §§ 544, 548(a), 550, and applicable state law)

55. The Debtor repeats and realleges the allegations set forth in paragraphs 1 through 40, which are incorporated as if set forth fully herein.

56. On or about January 31, 2014, Pontwelly and the Debtor entered into the Financing Agreement pursuant to which Pontwelly loaned the Debtor the Pontwelly Loans.

57. On or about February 14, 2014, the Debtor granted a lien on its Silverlink Shares to Pontwelly as security for the Pontwelly Loans.

58. On or about August 11, 2015, Pontwelly purported to strictly foreclose on the Silverlink Shares, causing the Debtor to transfer such shares to Pontwelly in satisfaction of the amount outstanding under the Pontwelly Loans, which, Pontwelly has claimed was $203,892,771.25.

59. At all times relevant hereto, the value of the Silverlink Shares was no less than $355 million.

60. The Debtor did not receive reasonably equivalent value or fair consideration in exchange for the Silverlink Transfer.

61. As a result of the Silverlink Transfer, the sum of the Debtor's liabilities exceeded all of its assets, at fair valuation.

62. At all times relevant hereto, there were actual creditors of the Debtor holding unsecured claims allowable within the meaning of 11 U.S.C. §§ 502 and 544(b).

63. The Silverlink Transfer was fraudulent as to ARGL's creditors and should be avoided and recovered from Pontwelly, Overseas Ltd. and other subsequent transferee pursuant to 11 U.S.C. §§ 544(b), 548(a), and 550(a), and under applicable state fraudulent transfer law.

## PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, ARGL requests that judgment be entered in its favor and against Pontwelly, Overseas Ltd and any subsequent transferee as follows:

(1) On Count I:

   a. entering a judgment against Pontwelly pursuant to 28 U.S.C. § 2201, declaring that: (i) ARGL did not consent, neither affirmatively nor by deemed constructive consent, to the 9-620 Proposal; (ii) the purported strict foreclosure by Pontwelly was a legal nullity and was void ab *initio*; and (iii) that ARGL retains legal and equitable title to the Silverlink Shares; and

   b. providing for such other and further relief as justice and equity may require.

(2) On Count II:

   a. entering a judgment against Pontwelly, avoiding the Silverlink Transfer as having been made with actual intent to hinder, delay, or defraud the creditors of the Debtor under 11 U.S.C. §§ 548(a)(1)(A), 544(b), and applicable state law;

   b. pursuant to 11 U.S.C. § 550, entering judgment against Pontwelly, Overseas Ltd. and any other subsequent transferee and ordering the return of the Silverlink Shares to the Debtor; and

   c. providing for such other relief as justice and equity may require.

(3) On Count III:

   a. entering a judgment against Pontwelly, avoiding the Silverlink Transfer as a constructively fraudulent transfer pursuant to 11 U.S.C. §§ 548(a)(1)(B), 544(b), and applicable state law;

   b. pursuant to 11 U.S.C. § 550, entering judgment against Pontwelly, Overseas Ltd. and any other subsequent transferee and ordering the return of the Silverlink Shares to the Debtor; and

   c. providing for such other relief as justice and equity may require.

Dated:  March 9, 2016
        New York, New York

                Respectfully submitted,

                BROWN RUDNICK LLP

                /s/ May Orenstein
                    William R. Baldiga, Esq.
                    May Orenstein, Esq.
                    7 Times Square
                    New York, NY 10036
                    (212) 209-4800

                *Counsel for Aman Resorts Group*
                *Limited, by Carpentaria Management*
                *Services Limited*