Andrew K. Glenn
Paul M. O'Connor III
Matthew B. Stein
KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800

*Counsel for Aman Resorts Group Limited*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------x
In re                                                    :
                                                         :        Chapter 11
Aman Resorts Group Limited,                              :
                                                         :        Case No. 16-10517 (SCC)
                                    Debtor.              :
-----------------------------------------------------x


**AMAN RESORTS GROUP LIMITED'S MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION TO (A) STRIKE THE *ANSWER TO***
***INVOLUNTARY PETITION AND CONSENT TO ENTRY OF ORDER***
***FOR RELIEF*, (B) DISMISS THE CHAPTER 11 CASE, AND**
**(C) IMPOSE ATTORNEYS' FEES, COSTS, AND SANCTIONS**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ...................................................................................................... 3

    A.    Aman Resorts Group Limited ............................................................ 3

    B.    History of Litigation By And Among PHRGL's Shareholders and Related Parties ......................................................................................... 4

    C.    The Chapter 11 Case ....................................................................... 4

    D.    Carpentaria Had No Authority To Act On Behalf Of ARGL ................. 6

    E.    Kasowitz, Not Brown Rudnick, Is ARGL's Only Authorized Counsel ................. 8

    F.    The Wrongfully Filed Bankruptcy Case Is Harming Aman Resorts ..................... 8

    G.    Mr. Amanat Is A Serial Fraudster ..................................................... 9

        i.    Amanat's Misleading Claims Re Tradescape/MarketXT ..................... 9

        ii.    MarketXT's And Amanat's Bankruptcy Proceedings ............................ 10

        iii.    Amanat Has Been Banned From The Securities Business ....................... 13

        iv.    Amanat's Fraud On Investors ......................................................... 14

            a)    Waltzer Litigation .................................................................. 14

            b)    Bridges Litigation .................................................................. 15

            c)    Ignalls Litigation ................................................................... 15

            d)    Shedding Dog Litigation ......................................................... 15

JURISDICTION ...................................................................................................... 16

ARGUMENT ........................................................................................................ 16

I.    THE COURT SHOULD STRIKE THE ANSWER BECAUSE CARPENTARIA LACKED THE REQUISITE CORPORATE AUTHORITY ........................................... 16

II.    THE COURT SHOULD DISMISS THE CHAPTER 11 CASE BECAUSE THE PETITIONS FAILED TO SATISFY SECTION 303 OF THE BANKRUPTCY CODE ................................................................................................... 17

A.      The Court Should Dismiss The Chapter 11 Case Because ARGL Was
        Ineligible To Be A Chapter 11 Debtor.................................................................. 18

B.      Petitioners Failed to Satisfy Their Burden Under Section 303(b)(1)
        Because the Purported Claims are the Subject of Bona Fide Dispute ................. 18

C.      Petitioners Fail to Satisfy Their Burden That ARGL Is Not Generally
        Paying Its Debts as They Become Due................................................................. 20

III.    THE COURT SHOULD DISMISS THE CHAPTER 11 CASE PURSUANT TO
        SECTION 305(a) OF THE BANKRUPTCY CODE ...................................................... 21

A.      Applicable Standards .......................................................................................... 21

B.      The Totality of the Circumstances Warrants Dismissal ....................................... 22

IV.     THE COURT SHOULD DISMISS THE CHAPTER 11 CASE BECAUSE THE
        INVOLUNTARY PETITIONS AND ANSWER WERE FILED IN BAD FAITH........ 23

V.      ARGL SHOULD BE AWARDED FEES, COSTS AND DAMAGES UNDER §
        303(i) AND BANKRUPTCY RULE 9011....................................................................... 25

A.      ARGL Should Be Awarded Fees And Costs Under § 303(i)(1)........................... 25

B.      ARGL Should Be Awarded Fees And Costs Under Bankruptcy Rule 9011 ........ 26

C.      ARGL Should be Awarded Damages Under § 303(i)(2)...................................... 28

CONCLUSION................................................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re A&J Quality Diamonds, Inc.*,
377 B.R. 460 (Bankr. S.D.N.Y. 2007) ............................................................17, 20

*In re Aminian*,
No. 07-12957, 2008 Bankr. LEXIS 903 (Bankr. S.D.N.Y. Mar. 25, 2008) ...........................19

*C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*,
113 F.3d 1304 (2d Cir. 1997)..................................................................23, 24

*Crest One Spa v. TPG Troy, LLC (In re TPG Troy, LLC)*,
793 F.3d 228 (2d Cir. 2015)................................................................19, 25, 26

*In re Daniels*,
362 B.R. 428 (Bankr. S.D. Iowa 2007) ............................................................24

*Furness v. Lilienfield*,
35 B.R. 1006 (D. Md. 1983) .....................................................................24

*In re G.T.L. Corp.*,
211 B.R. 241 (Bankr. N.D. Ohio 1997) .............................................................16

*In re Grossinger*,
268 B.R. 386 (Bankr. S.D.N.Y. 2001) ..............................................................29

*In re HBA East, Inc.*,
87 B.R. 248 (Bankr. E.D.N.Y. 1988)................................................................24

*In re Jr. Food Mart of Ark., Inc.*,
241 B.R. 423 (Bankr. E.D. Ark. 1999) .............................................................22

*Key Mech. Inc. v. BDC 56 LLC (In re BDC 56 LLC)*,
330 F.3d 111 (2d Cir. 2003)......................................................................19

*Lubow Mach. Co. v. Bayshore Wire Prods. Corp. (In re Bayshore Wire Prods. Corp.)*,
209 F.3d 100 (2d Cir. 2000)................................................................26, 28, 29

*In re MacInnis*,
235 B.R. 255 (S.D.N.Y. 1998).....................................................................24

*In re mpX Tech., Inc.*,
310 B.R. 453 (Bankr. M.D. Fla. 2004) .............................................................27

*In re Mt. Dairies, Inc.*,
    372 B.R. 623 (Bankr. S.D.N.Y. 2007) .......................................................................22, 25, 26

*Nisselson v. Amanat (In re Amanat)*,
    Adv. Proc. No. 08-01333 (Bankr. S.D.N.Y.) .........................................................................25

*Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*,
    336 B.R. 39 (Bankr. S.D.N.Y. 2006) ..............................................................................10, 11

*Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*,
    376 B.R. 390 (Bankr. S.D.N.Y. 2007) ............................................................................12, 13

*In re NNN 123 N. Wacker, LLC*,
    510 B.R. 854 (Bankr. N.D. Ill. 2014) .....................................................................................16

*In re Pasta Bar by Scotto II, LLC*,
    No. 15-12766, 2015 Bankr. LEXIS 3941 (Bankr. S.D.N.Y. Nov. 19, 2015) .........................16

*Remex Elecs., Ltd. v. Axl Indus., Inc. (In re Axl Indus., Inc.)*,
    127 B.R. 482 (S.D. Fla. 1991) .................................................................................................22

*In re Runaway II, Inc.*,
    168 B.R. 193 (Bankr. W.D. Mo. 1994).....................................................................................22

*In re S&R Grandview LLC*,
    No. 13-03098, 2013 Bankr. LEXIS 4182 (Bankr. E.D.N.C. Oct. 4, 2013) .............................17

*In re Silverman*,
    230 B.R. 46 (Bankr. D.N.J. 1998) ..........................................................................................26

*In re Skyworks Ventures, Inc.*,
    431 B.R. 573 (Bankr. D.N.J. 2010) ........................................................................................26

*In re TLC Med. Grp., Inc.*,
    No. 04-15739, 2005 Bankr. LEXIS 2959 (Bankr. E.D. La. Mar. 4, 2005).............................19

*In re TPG Troy, LLC*,
    492 B.R. 150 (Bankr. S.D.N.Y. 2013) ...................................................................17, 21, 23

*In re WLB-RSK Venture*,
    296 B.R. 509 (Bankr. C.D. Cal. 2003)....................................................................................23

*In re Zaragosa Props., Inc.*,
    156 B.R. 310 (Bankr. M.D. Fla. 1993) ...................................................................................27

**Statutes**

11 U.S.C. § 109 ...................................................................................................................18

11 U.S.C. § 303 .......................................................................................................... *passim*

11 U.S.C. § 305 ..................................................................................................21, 22, 23

11 U.S.C. § 1112 ..............................................................................................16, 23, 24

28 U.S.C. § 157(b) ............................................................................................................16

28 U.S.C. § 1334 ...............................................................................................................16

28 U.S.C. §§ 1408 and 1409 ..........................................................................................16

**Other Authorities**

Fed. R. Bankr. P. 9011 ................................................................................... *passim*

Local Bankruptcy Rule 9011-1(b) .............................................................................28

Aman Resorts Group Limited ("ARGL"), the purported and disputed debtor in the above-captioned chapter 11 case (the "Chapter 11 Case"), through its undersigned counsel, hereby files this motion (the "Motion") to (i) strike the *Answer to Involuntary Petition and Consent to Entry of Order for Relief* (the "Answer"), (ii) dismiss the Chapter 11 Case pursuant to Sections 109, 303, 305(a) and 1112(b) of title 11 of the United States Code (the "Bankruptcy Code"), and (iii) impose attorneys' fees, costs, and sanctions under Section 303(i) of the Bankruptcy Code and Rule 9011 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), respectfully represents as follows:

### PRELIMINARY STATEMENT[1]

The circumstances in this Chapter 11 Case are extraordinary. It is a blatant and outrageous attempt by Omar Amanat ("Amanat") – together with his friend, associate and business partner of at least seven years, Sean Sullivan – to relitigate, in yet another forum, a long-standing dispute that he has now lost in litigation he caused to be commenced in England two years ago through an affiliate (Peak Hotels and Resorts Limited ("Peak Hotels")) he formerly controlled.

The English proceedings concerned the control and ownership of Silverlink Resorts Limited, a luxury hotel group operating under the Aman Resorts brand in approximately twenty countries ("Aman Resorts"). The claims brought by Peak Hotels were settled last week on terms that resulted in all Peak Hotels' claims being dismissed. Mr. Amanat therefore effectively lost the litigation. Following this he orchestrated the filing last Friday of a meritless involuntary petition against ARGL, caused an Answer to be filed this Monday – the next business day – fraudulently consenting to the Amended Petition, then immediately caused the filing the

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the body of this Motion.

following day of new litigation against A.H. Overseas Limited and Pontwelly Holding Company Limited (respectively the owner or Aman Resorts, and the immediately prior owner of Aman Resorts) based on claims already settled in London.

This is clearly a cynical, orchestrated attempt to harass the owners of Aman Resorts, harm the value and brand of Aman Resorts, and relitigate issues Mr. Amanat has lost. As set forth below, such dispute has no rightful place in bankruptcy court and sadly, is merely the latest example of Mr. Amanat's outrageous, fraudulent conduct and his abuse of American courts.

And yet, this underlying bad faith motivation is only the tip of the iceberg of the multiple and fatal flaws of the Chapter 11 Case. The case was commenced when Mr. Amanat and two of his affiliates, including Carpentaria, filed a frivolous involuntary Chapter 11 petition against ARGL, a company that has no debts or domicile in the United States, and for which a false address was given in the petition. Three days later, in a clear attempt to avoid Mr. Amanat and his affiliates being designated as petitioning creditors, a second involuntary petition was filed against ARGL by new alleged creditors. This cleared the way for Carpentaria – which, it merits repeating, *was one of the original petitioners* – to file an answer fraudulently consenting to the involuntary petition on behalf of ARGL. Remarkably, at the time of filing of the Answer, Carpentaria was also a director of ARGL (although it has since been removed). Compounding the fraud, Carpentaria represented to the Court that it was acting pursuant to authority granted to it in connection with an agreed order precluding such action (pending the hearing of an application to set aside the order), and which had on March 4, 2016 been set aside! Having hoodwinked the Court into granting an order for relief under title 11, Carpentaria then filed a complaint – the only substantive document filed to date – to relitigate issues that Mr. Amanat and his affiliates already lost.

There are numerous grounds that justify dismissal of this Chapter 11 Case.  Carpentaria had no authority to consent to the involuntary petition on behalf of ARGL – on its own, a justification to strike the Answer and Complaint.  ARGL is not a proper debtor as it has no debts – all of the claims asserted by the petitioning creditors are meritless – and it has no domicile or business in the United States.  The case was filed as a ruse to continue a two-entity dispute that had already reached its conclusion in other jurisdictions (and related publicity).  In total, the entire case is an exemplar of a bad faith filing that should be referred to the Department of Justice for criminal prosecution.

Accordingly, for all the reasons set forth herein, the Court should grant the Motion, strike the Answer, dismiss the Chapter 11 Case and award ARGL fees, costs and damages commensurate with the bad faith filing and harm suffered.

## BACKGROUND[2]

### A.    Aman Resorts Group Limited.

1.    ARGL is a special purpose company incorporated and registered in the British Virgin Islands.  Keillor Decl. ¶ 3.  ARGL's sole purpose was to hold the shares in another BVI company, Silverlink Resorts Limited (the operating company for the Aman Resorts business) ("Silverlink").  *Id.* ¶ 4.  In August 2015, the shares in Silverlink were transferred to Pontwelly Holding Company Limited. ARGL has no debt and has no domicile or assets in the U.S.  *Id.* ¶ 5. ARGL is the wholly owned subsidiary of Peak Hotels and Resorts Group Limited ("PHRGL"). *Id.* ¶ 3.

---

[2]    All facts referenced herein are supported by the accompanying Declaration of Gareth James Keillor (the "Keillor Declaration") and the Declaration of Olivier Jolivet (the "Jolivet Declaration").

**B.    History of Litigation By And Among PHRGL's
<u>Shareholders and Related Parties.</u>**

2.      In June 2014, Peak Hotels commenced proceedings in the High Court in London

against Tarek Investments Limited ("<u>Tarek</u>"), the majority (indirect) shareholder of ARGL and

other parties (the "<u>London Proceedings</u>").  Keillor Decl. ¶ 6.  In those proceedings Peak Hotels

alleged, *inter alia*, that Tarek had breached PHRGL's Shareholder Agreement and also alleged

that Tarek and other parties had engaged in a conspiracy to "steal" ARGL's only asset, its shares

in Silverlink.  *Id.*  Tarek denied the claims and brought its own counterclaim alleging that Peak

Hotels (and Amanat, the individual who stood behind Peak Hotels) had been engaged in a

"greenmailing" strategy designed to put pressure on Tarek to buy out Peak Hotels' stake in

PHRGL at a premium, or to sell Tarek's stake to Peak Hotels at a discount.  *Id.*

3.      The London Proceedings were due to go to trial in April 2016.  *Id.* ¶ 7.  However,

on  March 2, 2016, the London Proceedings as between Tarek (and its associates) and Peak

Hotels were settled on terms that Peak Hotels' claims were all dismissed and the allegations of

breach of fiduciary duty and fraudulent conduct made by Peak Hotels were withdrawn.  *Id.*  Peak

Hotels also agreed to pay Tarek's legal costs.  *Id.*

**C.    <u>The Chapter 11 Case.</u>**

4.      On March 4, 2016, Amanat, Peak Venture Partners ("<u>Peak Venture</u>") and

Carpentaria Management Services Limited ("<u>Carpentaria</u>," and collectively with Amanat and

Peak Venture, the "<u>Original Petitioners</u>") filed an involuntary Chapter 11 petition against ARGL

[Docket No. 1] (the "<u>Original Petition</u>") with this Court.  Carpenteria and Peak Venture are

owned and controlled by Amanat, Keillor Decl. ¶ 6, and none of the actions described herein

could have occurred without Amanat's approval and consent.  Peak Hotels is a distinct legal

entity in which Amanat has no controlling interest.

4

5.      Kent Gross was the attorney representing the Original Petitioners.  The Original

Petition was handwritten and purported to have original signatures of the Original Petitioners,

but not that of Mr. Gross.  None of the claims asserted by the Original Petitioners had ever been

asserted against ARGL prior to the filing of the Original Petition and ARGL disputes all of the

claims as without merit.

6.      On March 7, 2016, an amended involuntary petition (the "Amended Petition" and

together with the Original Petition, the "Petitions") was filed with this Court against ARGL by

Carolyn Turnbull, George Robinson, Fonde Investment Capital SA, and Adrian Zecha (the "New

Petitioners," and together with the Original Petitioners, the "Petitioners").  [Docket No. 3].  The

Amended Petition did not include any original signatures of the New Petitioners.  ARGL has

requested copies of the signatures of the New Petitioners, but, to date, none have been provided.

7.      None of the claims asserted by the New Petitioners had ever been asserted against

ARGL prior to the filing of the Amended Petition, and ARGL disputes all of the claims as

without merit.  Indeed, representatives of ARGL understand that Mr. Zecha has denied his

involvement in the Chapter 11 Case.  Keillor Decl. ¶ 17.

8.      On March 7, 2016, at the direction of Carpentaria, Mr. William R. Baldiga of

Brown Rudnick LLP ("Brown Rudnick") purported to act for ARGL by filing the Answer,

consenting to the Original Petition that Carpentaria itself had filed on March 4, 2016.  [Docket

No. 4]

9.      On March 9, 2016, this Court, finding that "the Debtor [has] consented to the

entry of an Order for Relief," entered an *Order for Relief* under Chapter 11 of the Bankruptcy

Code.  [Docket No. 6].

10.    Also on March 9, 2016, Brown Rudnick filed a complaint (the "Complaint") with this Court purportedly on behalf of ARGL, seeking to avoid the transfer of certain assets by ARGL to certain third parties which had taken place following a foreclosure process.  [Docket No. 5].

**D.    Carpentaria Had No Authority To Act On Behalf Of ARGL.**

11.    The Answer filed by Carpentaria on behalf of ARGL purported to act upon the "authorization" granted by the Direction and Authorization of Carpentaria Management Services Limited to Aman Resorts Group Limited to File Answer and Consent to Involuntary Petition (the "Direction and Authorization").  Keillor Decl. ¶ 9.  The Direction and Authorization was signed by Carpentaria on behalf of ARGL – in effect, granting itself the very authority it now attempts to rely on.

12.    The Direction and Authorization, in turn, is premised only on (i) an Order, dated October 15, 2015 (the "October Order") of the Eastern Caribbean Supreme Court in the High Court of Justice, Virgin Islands, Commercial Division (the "V.I. Court") granting Peak Hotels the right to institute and prosecute a Chapter 11 bankruptcy case on behalf of ARGL in this Court, and (ii) an alleged Irrevocable Appointment and Assignment of Interest, dated October 16, 2015, assigning such right to Carpentaria.  Keillor Decl. ¶ 10.

13.    On December 1, 2015, however, Peak Hotels agreed to a Consent Order (the "Consent Order") pursuant to which Peak Hotels gave an undertaking that it would not "take any steps to commence or prosecute derivative Chapter 11 proceedings in New York . . ." pending the hearing of an application to set aside the October Order, which had been listed for hearing in July 2016.  Keillor Decl. ¶ 11.  Thus, to the extent it had the right to institute or consent to any bankruptcy proceedings against ARGL under the October Order (which ARGL disputes), Carpentaria lost that right to act when Peak Hotels agreed to the Consent Order.  On March 4,

2016 (before the filing of the Answer), an order was filed with the V.I. Court agreeing that the

October Order be set aside (the "March Order").  Keillor Decl. ¶ 12.

14.    Additionally, the alleged Irrevocable Appointment and Assignment of Interest

was signed by a person, Sean L. Sullivan – the same individual who signed the Direction and

Authorization and the Original Petition on behalf of Carpentaria – who was not authorized to

sign such document on behalf of Peak Hotels.  Keillor Decl. ¶ 14.  Mr. Sullivan was not a

director of Peak Hotels:  the director at the relevant time was an individual named Ms. Turnbull.

*Id.*  Moreover (a) in the London Proceedings, Peak Hotels itself stated in December 2015 that

"*from October 2014, the person with day-to-day conduct of PHRL's and Carpentaria's affairs

was Ms Turnbull*" and (b) the liquidators of Peak Hotels have said that Sean Sullivan was not an

authorised signatory of Peak Hotels at the date of the alleged Irrevocable Appointment and

Assignment of Interest.  *Id.*

15.    Carpentaria's purported consent to the Original Petition on behalf of ARGL is

also proscribed by the terms of PHRGL's Shareholder Agreement, dated January 31, 2014,

between Peak Hotels and Tarek Investments Ltd.  Keillor Decl. ¶ 16.  Under this agreement, any

proposal to wind up ARGL or any other proceeding seeking liquidation, administration,

reorganization, readjustment or other relief under any bankruptcy, insolvency or similar law is a

"Shareholder Reserved" matter, therefore requiring approval of both shareholders.  *Id.*  There has

been no approval of the Original Petition, the Amended Petition, the Answer, or the Complaint

by the shareholders.  *Id.*  Nor was there any board meeting called to address these matters.  *Id.*

16.    Similarly, ARGL's Memorandum of Association and Articles of Association

contemplate that a "winding up" of ARGL can only be accomplished by a "Resolution of

Members" or "Resolution of Directors." No such resolution approving the Original Petition, the Amended Petition, the Answer, or the Complaint exists.

17.     Thus, neither Carpentaria nor Brown Rudnick had any authority to act on behalf of ARGL in filing the Answer and Complaint.

18.     Based on the foregoing, the undersigned sent a letter on March 9, 2016 to Brown Rudnick, stating that if the Answer is not withdrawn by March 10, 2016, ARGL would seek sanctions, attorneys' fees and costs against Carpentaria and Brown Rudnick pursuant to Bankruptcy Rule 9011. Keillor Decl. ¶ 20. Counsel also sent a similar letter to Mr. Gross on the same date. *Id.* ¶ 21. As of the filing of this Motion, neither Brown Rudnick nor Carpentaria nor Mr. Gross have withdrawn any pleading or otherwise responded to ARGL's demand. *Id.* ¶ 23.

**E.     Kasowitz, Not Brown Rudnick, Is ARGL's Only Authorized Counsel.**

19.     Pursuant to the Minutes of a Telephonic Meeting of the Board of Directors of Peak Hotels and Resorts Group Limited held on March 8, 2016 ("PHRGL Minutes"), Kasowitz, Benson, Torres & Friedman LLP ("Kasowitz") was appointed to represent ARGL in the Chapter 11 Case and any related actions. Keillor Decl. ¶ 18.

20.     Further, the PHRGL Minutes confirmed that Brown Rudnick has not been and is not appointed as counsel to ARGL, including in connection with the Chapter 11 Case. *Id.* ¶ 19.

21.     On March 10, 2016, the board of ARGL resolved to confirm the appointment of Kasowitz, and to instruct Kasowitz to file a motion to dismiss these proceedings on the basis, inter alia, that the proceedings are improper and without merit. *Id.* ¶ 22.

**F.     The Wrongfully Filed Bankruptcy Case Is Harming Aman Resorts.**

22.     ARGL shares a common name with Aman Resorts for historic reasons, although the entities are not affiliated and ARGL has no financial interest or control over Aman Resorts. Jolivet Decl. ¶ 3. Despite these facts, due to this name overlap, the Chapter 11 Case has, and will

8

continue to, confuse future and potential guests, franchisees and vendors of Aman Resorts hotels that it is subject to bankruptcy proceedings when, in fact, it is not. *Id.* If permitted to continue, this confusion risks significantly damaging Aman Resorts' business through reduced guest bookings and complications with franchisees, partners, financial institutions and vendors, diluting the power and strength of the Aman Resorts brand. *Id.* Indeed, the Wall Street Journal has already published an article improperly conflating ARGL's bankruptcy with Aman Resorts and its hotels. *Id.* The longer ARGL remains in this involuntary bankruptcy, the greater the risk that ARGL could face third party liability from Aman Resorts and its affiliates due to this confusion. *Id.* Mr. Amanat has a history of using the media to seek to assert pressure on other parties, a point that was well ventilated in the English proceedings.

### G. Mr. Amanat Is A Serial Fraudster.

23.     Mr. Amanat's history of fraud and abuse of the American legal system is astonishing. He will say or do anything to accomplish his litigation goals and obfuscate in the face of challenges to his conduct. He has also been recognized by the English court to have a judicially established record of dishonesty.

#### i. Amanat's Misleading Claims Re Tradescape/MarketXT.

24.     Amanat also represented that he was the founder, CEO and majority shareholder of Tradescape Corporation ("Tradescape"), which he sold to E*Trade for $280 million in 2002.

25.     Upon information and belief, Amanat did found Tradescape which ultimately was renamed MarketXT Holdings Corp. ("MarketXT"), but that Amanat owned only 17% of the equity of MarketXT at the time it sold its operating subsidiaries to E*Trade in 2002.

26.     Moreover, the sale by MarketXT was not for $280 million as Amanat represented, but rather was for $100 million in E*Trade stock (although there was a potential, never reached, of MarketXT earning another $180 million in E*Trade stock based upon the performance of the

former MarketXT subsidiaries sold to E*Trade). *See Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*, 336 B.R. 39, 45 (Bankr. S.D.N.Y. 2006).

27.     Amanat himself did not receive (at least properly, *see infra*) any of the E*Trade stock.  Rather, approximately 20% of the stock was escrowed to pay creditors of the subsidiaries that were sold, and the remaining shares were subject to extensive restrictions, which a bankruptcy court found "[a]s a practical matter, this made it difficult if not impossible for [MarketXT] to liquidate the shares." *Id.*  In fact, two years after the sale, in 2004, Amanat executed an affidavit swearing that "MarketXT has not yet received any consideration for the Merger." *See* Stein Decl. at Ex. A, B.

28.     Further evidencing that Amanat did not receive any value from the sale, he admitted under oath in other litigation, and on his federal income tax returns, that in 2002 – the year of the sale to E*Trade – Amanat earned less than $50,000.

29.     In connection with the sale to E*Trade, Amanat also was to be employed by E*Trade after the transaction.  However, E*Trade almost immediately fired Amanat based upon accusations of fraud.  *See* Stein Decl. at Ex. D.

### ii.     MarketXT's And Amanat's Bankruptcy Proceedings.

30.     Further evidencing that Amanat was a financial failure, and that the sale of MarketXT's operating subsidiaries to E*Trade was not a financial success, particularly for Amanat, Amanat has admitted that after January 27, 2003 – less than one year after the sale to E*Trade – MarketXT "had no cash, bills could not be paid, [and] a multitude of lawsuits against [MarketXT] were proceeding and rapidly resulting in default judgments." *See* Stein Decl. at Ex. E.

31.     Consistent with the complete financial failure of the business, in 2004, MarketXT was involuntarily placed into bankruptcy protection. *Nisselson v. Empyrean Inv. Fund, L.P.*, 336 B.R. at 47.

32.     Soon thereafter, Amanat individually was placed into involuntary bankruptcy. While Amanat at one point in his bankruptcy proceeding claimed more than $500 million in assets, Amanat ultimately was determined by the Bankruptcy Court to have $658,000 in assets to pay almost $38 million in allowed pre-bankruptcy claims – 1.74% of the amount owed. *See* Stein Decl. at Ex. F.

33.     While Amanat did not legitimately receive any significant amount of funds from the E*Trade transaction, he admittedly used the E*Trade shares to improperly transfer tens of millions of dollars out of MarketXT in an effort to frustrate MarketXT's creditors, and the MarketXT creditors accused him of using those funds for his personal benefit.

34.     In 2008, the MarketXT Plan Committee and former bankruptcy trustee filed an adversary proceeding against Amanat in his bankruptcy proceeding. *See* Stein Decl. at Ex. G. The complaint against Amanat alleged that from early 2003, "when MarketXT had virtually no liquid assets," Amanat "devised a secret scheme" to deprive MarketXT of its assets – most particularly, the E*Trade shares – and keep the proceeds for himself. *Id.*

35.     The complaint accused Amanat of using the cash proceeds of his scheme for his personal expenses and investments, including spending millions of dollars in transfers for the benefit of him and his family, hundreds of thousands of dollars in political and charitable donations, payments for personal legal fees, investments in film companies, private jets and other expenses. *Id.*

36.     Similar allegations were made in the MarketXT bankruptcy proceedings.  As the bankruptcy court in the MarketXT proceedings found in one of the many decisions relating to this fraud, Amanat enlisted the participation of Rauf Ashraf in a scheme to transfer the value of the E*Trade shares that belonged to MarketXT, to entities controlled by Amanat and Ashraf. *Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*, 376 B.R. 390, 397 (Bankr. S.D.N.Y. 2007).

37.     In fact, the bankruptcy court relied on discovery in that proceeding to support a finding of fraud, including an e-mail in which Ashraf told Amanat, "WHAT ABOUT THE other 2.5 million shares … send them over so I can clean them ALL!!  HAHA." *Id.* at 406.

38.     The bankruptcy court also found that the "crime-fraud exception" to the attorney-client privilege applied to many communications between Amanat, Ashraf and attorneys, particularly in their effort to retain attorneys to prepare documents for fictitious transactions, which Amanat and Ashraf intended to "backdate" after the lawyers completed them to try to justify prior transfers. *Id.* at 399-400.

39.     Indeed, the bankruptcy court found that "Amanat and Ashraf backdated" and obtained false notarizations of documents in an effort to supposedly justify the transfers of assets out of MarketXT for use by Amanat and Ashraf. *Id.* at 418.

40.     The scheme was extensive, and as the bankruptcy court determined in the MarketXT proceedings, even after agreeing in open court to maintain the assets that had been improperly transferred from MarketXT, Ashraf "willfully and contemptuously" transferred $6.7 million to a cousin of Amanat who, the bankruptcy court determined, fled to Dubai after warrants were issued for his arrest, and was living in the home of Amanat's brother, refusing to return any of the funds. *Id.* at 400.

41.      After extensive submissions and hearings, the bankruptcy court held that it had been "established by clear and convincing evidence that the transfer of $15.5 million … was intentionally designed to hinder and delay" MarketXT's creditors, and granted summary judgment finding that an additional $13.2 million transfer by Amanat and Ashraf was an intentional fraudulent conveyance.  *Id*. at 411-412, 417.

42.      In fact, faced with the evidence, Amanat admitted in an affidavit that he "in concert with Rauf Ashraf [and others] caused the transfer of [MarketXT's] E*Trade stock … with the intent to delay … creditors."  *See* Stein Decl. at Ex. H

43.      As a result of all of the proceedings, which took eight years, Amanat was ordered to pay $24 million in restitution.  Moreover, given Amanat's fraud, the bankruptcy court ordered that those liabilities were not dischargeable in bankruptcy.  *See* Stein Decl. at Ex. I.

### iii.      Amanat Has Been Banned From The Securities Business.

44.      Not only has Amanat been financially bankrupted and found liable in fraud, he also has been banned from participating in any securities businesses as a result of his repeated violations of federal securities laws.

45.      For example, in Amanat's personal bankruptcy, the NASD successfully moved to lift the bankruptcy stay so that it could pursue its investigation against Amanat relating to his securities law violations in connection with Momentum Securities, LLC, one of the MarketXT operating subsidiaries that was sold to E*Trade.  *See* Stein Decl. at Ex. J.

46.      Similarly, FINRA filed a motion in Amanat's personal bankruptcy proceedings to lift the automatic stay in order to pursue its investigation of Amanat and his securities law violations while he was chief executive officer and owner of Sort Securities, LLC ("Sort").  *See* Stein Decl. at Ex. K.

47.     On May 25, 2006, FINRA cancelled Sort's membership in FINRA, and in 2008, Amanat was barred from associating with any FINRA member firm in any capacity due to his repeated and willful violations of the federal securities laws.  *See* Stein Decl. at Ex. E.

### iv.     Amanat's Fraud On Investors.

48.     In addition to the fraud involved with the transfer of MarketXT's assets, Amanat also has been sued in numerous cases throughout this state arising from his alleged efforts to steal money from supposed business partners, colleagues and friends.  Amanat uniformly has been held liable in these actions, and repeatedly has been sanctioned for his misconduct in the litigation – usually while running through lawyer after lawyer.

### a)     Waltzer Litigation.

49.     In 2001, Kevin Waltzer, one of the early investors in Tradescape (subsequently, MarketXT), sued Amanat in New York (Index No. 603415/2001), alleging fraud and breach of fiduciary duty.  *See* Stein Decl. at Ex. L.

50.     Amanat refused to comply with numerous orders of the Supreme Court, ultimately resulting in a default liability judgment against him, which following an inquest, resulted in a judgment against Amanat for more than $6.6 million.  *See* Stein Decl. at Exs. M, N.

51.     After obtaining the judgment, upon a showing that Amanat was attempting to dispose of, encumber or secrete property, or remove it from the state, for the purpose of defrauding Waltzer, Waltzer also obtained an order of attachment.  *See* Stein Decl. at Ex. O. Upon information and belief, Amanat attempted to violate the order of attachment and to transfer property to his brother.

b)      <u>**Bridges Litigation.**</u>

52.     Amanat also was sued in New York Supreme Court, Erie County, alleging

misappropriation of monies from a company, Bridges Network, Inc., in which Amanat

purportedly invested.

53.     As with most of the litigation by partners against him, Amanat simply refused to

appear and defend himself, and ultimately was ordered by the State Supreme Court to pay

$500,000 to Bridges Network.  *See* Stein Decl. at Ex. P.

c)      <u>**Ignalls Litigation.**</u>

54.     In 2003, Amanat was sued by Scott Ignalls.  On August 1, 2004, the Court held

that "[f]or over a year, the Amanat Defendants have engaged in a pattern of repeated attempts to

avoid their discovery obligations," "engaged in a pattern of blatant disregard of this Court's

orders which rises to the level of willful, contumacious, bad faith conduct," and thus the Court

struck the answer of Amanat.  *See* Stein Decl. at Ex. Q.

d)      <u>**Shedding Dog Litigation.**</u>

55.     In 2010, Amanat and numerous entities he controls were sued by Shedding Dog

Ltd. (a company established by a principal of the Embrey Family Foundation, which funds

projects and initiatives devoted to helping women who have been victims of abuse) arising out of

Amanat's failure to repay a million dollar loan.  *See* Stein Decl. at Ex. R.

56.     As in his other litigations, Amanat refused to respond to any discovery requests

and refused to attend his deposition, running through five different law firms in connection with

the dispute.  *See* Stein Decl. at Ex. S.

57.     Ultimately, Amanat executed a confession of judgment, agreeing to a payment

plan.  *See* Stein Decl. at Ex. T.  Notwithstanding his confession of judgment, Amanat failed even

to meet his obligations under the payment plan, forcing the plaintiff to file an Order to Show

Cause seeking discovery as a judgment creditor, before agreeing to yet another payment plan.

*See* Stein Decl. at Ex. U.

## JURISDICTION

58.     This Court has subject matter jurisdiction to consider and determine this Motion

pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue

is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## ARGUMENT

### I.      THE COURT SHOULD STRIKE THE ANSWER BECAUSE CARPENTARIA LACKED THE REQUISITE CORPORATE AUTHORITY.

59.     The Court should dismiss the Chapter 11 Case pursuant to Section 1112(b) of the

Bankruptcy Code ("Section 1112(b)") because Carpentaria had no authority to file the Answer

and consent to the Petitions on behalf of ARGL.  The only source of authority Carpentaria cited

was the October Order, which (a) had been rendered nugatory in December 2015 by the

undertaking given by Peak Hotels in the Consent Order and (b) has been revoked through the

March Order.

60.     Courts have ruled that Section 1112(b) – which allows the court to dismiss a

Chapter 11 case "for cause" – requires dismissal of a Chapter 11 case where, as here, the Chapter

11 petition was filed or consented to by an entity that had no authority to do so.  *See In re G.T.L.*

*Corp.*, 211 B.R. 241, 245 (Bankr. N.D. Ohio 1997) (the court must ignore a party's consent to an

involuntary petition where such party had no authority to act on behalf of the debtor); *see also In*

*re Pasta Bar by Scotto II, LLC*, No. 15-12766 , 2015 Bankr. LEXIS 3941, at *2 (Bankr.

S.D.N.Y. Nov. 19, 2015) ("[T]he filing of the chapter 11 petition in this case was not properly

authorized.  Therefore, the Dismissal Motion is granted."); *In re NNN 123 N. Wacker, LLC*, 510

B.R. 854, 858 (Bankr. N.D. Ill. 2014) ("In addition to 'cause' under § 1112(b), lack of corporate

16

authority to file is an independent ground for dismissal of a bankruptcy case filed by a

corporation."); *In re S&R Grandview LLC*, No. 13-03098, 2013 Bankr. LEXIS 4182, at *10

(Bankr. E.D.N.C. Oct. 4, 2013) (dismissing a Chapter 11 case where the petitioner did "not have

authority to file a bankruptcy petition on behalf of the Debtor").

61.    Although Carpentaria consented to the Petitions in its Answer, it had no authority

to do so.  It failed to obtain either shareholder or director approval for any such filing.

Furthermore, it is clear that the Order for Relief would not have been entered had the Court not

been led falsely to believe by Carpentaria and Brown Rudnick that "the Debtor [has] consented

to the entry of an Order for Relief."

62.    Accordingly, the Answer should be vacated, and the Court should examine the

merits of the underlying Amended Petition.

## II.    THE COURT SHOULD DISMISS THE CHAPTER 11 CASE BECAUSE THE PETITIONS FAILED TO SATISFY SECTION 303 OF THE BANKRUPTCY CODE.

63.    The Court should also dismiss the Chapter 11 Case because the Petitions failed to

satisfy the criteria enumerated in Section 303 of the Bankruptcy Code.  Specifically, the Debtor

was ineligible for relief under the Bankruptcy Code, any purported "claims" upon which they

were based are the subject of a bona fide dispute, and ARGL is not failing to pay its debts as they

become due.  If the Petitioners fail to prove that they satisfy any of the requirements of Section

303, the Petitions must be dismissed.  *See In re A&J Quality Diamonds, Inc.*, 377 B.R. 460, 463

(Bankr. S.D.N.Y. 2007) ("The petitioning creditors have the burden of proving all statutory

requirements of Bankruptcy Code § 303") (citing *In re Palace Oriental Rugs, Inc.*, 193 B.R. 126,

129 (Bankr. D. Conn. 1996)); *see also In re TPG Troy, LLC*, 492 B.R. 150, 161 (Bankr.

S.D.N.Y. 2013) (where a debtor fails to meet any of the requirements enumerated in Section 303,

it is not necessary for the court to "delve into fact-intensive inquiries" pertaining to other

possible grounds for dismissal).

> **A.      The Court Should Dismiss The Chapter 11 Case
> Because ARGL Was Ineligible To Be A Chapter 11 Debtor.**

64.      Section 109(a) of the Bankruptcy Code provides that "only a person that resides

or has a domicile, a place of business, or property in the United States . . . may be a debtor under

this title."

65.      ARGL, however, has no domicile or assets in the U.S.  Indeed, ARGL's address

listed in the Original Petition and Amended Petition is false.  This is clear from paragraph 19 of

the Amended Particulars of Claim (appended to the Answer), which states that "*ARGL, a*

*company incorporated and registered in the British Virgin Islands under company number*

*1799232. ARGL's registered office is Nemours Chambers, Road Town, Tortola, British Virgin*

*Islands*").  [Docket No. 4]  Even the Complaint filed by Brown Rudnick on behalf of Carpentaria

provides that "[t]he Debtor is a BVI corporation.  Its registered office is located at Nemours

Chambers in Road Town, Tortola, British Virgin Islands."  [Docket No. 5 at ¶ 9.]  ARGL's sole

purpose was to act as a holding vehicle for the shares in Silverlink.  ARGL has never conducted

any other business with the United States and has no employees.

66.      Because ARGL was ineligible for relief under Section 109(a) of the Bankruptcy

Code, the Chapter 11 Case should be dismissed.

> **B.      Petitioners Failed to Satisfy Their Burden Under Section 303(b)(1)
> Because the Purported Claims are the Subject of Bona Fide Dispute.**

67.      Section 303(b)(1) of the Bankruptcy Code provides, in pertinent part:

> An involuntary case . . . is commenced . . . . (1) by three or more
> entities, each of which is either a *holder of a claim* against such
> person *that is not* contingent as to liability or *the subject of a bona*
> *fide dispute as to liability or amount* . . . .

11 U.S.C. § 303(b)(1) (emphasis added). "A creditor must satisfy both prongs of this test; the claim must not be subject to a bona fide dispute as to *either* liability *or* a dispute as to amount." *In re Aminian*, No. 07-12957, 2008 Bankr. LEXIS 903, at *5 (Bankr. S.D.N.Y. Mar. 25, 2008) (emphasis in original).

68.       In determining what constitutes a "bona fide dispute" under Section 303(b)(1), the Second Circuit adopted a standard used by various other circuit courts: "The bankruptcy court must determine whether there is an objective basis for either a factual or a legal dispute as to the validity of the debt." *Key Mech. Inc. v. BDC 56 LLC (In re BDC 56 LLC)*, 330 F.3d 111, 117 (2d Cir. 2003) (quoting *In re Busick*, 831 F.2d 745, 750 (7th Cir. 1987)) (brackets omitted). "The reasoning behind the objective standard is that . . . Congress intended to disqualify a creditor whenever there is *any legitimate basis for the debtor not paying the debt, whether that basis is factual or legal*." *Key Mech.*, 330 F.3d at 117-18 (quotation marks omitted) (emphasis added); *Crest One Spa v. TPG Troy, LLC (In re TPG Troy, LLC)*, 793 F.3d 228, 234 (2d Cir. 2015) (quoting and applying *Key Mech.*).

69.       Further, Petitioners have the burden to demonstrate that there is no bona fide dispute – a burden that Petitioners' skeletal filings plainly do not meet, nor could they ever meet. The Second Circuit, like other circuits, "requires, first, that the petitioning creditor establish a prima facie case that no bona fide dispute exists. Once a prima facie case has been established, the burden shifts to the debtor to demonstrate the existence of a bona fide dispute." *Key Mech.*, 330 F.3d at 118 (citing *Subway Equip. Leasing Corp. v. Sims (In re Sims)*, 994 F.2d 210, 221 (5th Cir. 1993); *TPG Troy*, 793 F.3d at 234 (quoting and applying *Key Mech.*); *see also In re TLC Med. Grp., Inc.*, No. 04-15739, 2005 Bankr. LEXIS 2959, at *8 (Bankr. E.D. La. Mar. 4, 2005) ("[I]n view of the unresolved state court lawsuit . . . the Petitioning Creditor has not

19

convinced the Court that there is insufficient basis to render her claim subject to a bona fide

dispute.").

71.    Here, the Petitioners submitted only skeletal petitions with no supporting

documentation or information about the claims they rely upon other than their alleged amount.

Thus, the Petitioners failed completely to make a prima facie showing that the claims listed on

either the Original Petition or Amended Petition are not the subject of a bona fide dispute.

ARGL has no records of any of the claims allegedly asserted against it by the Petitioners.

71.    Because Petitioners' claims are disputed (in reality, nonexistent), the Chapter 11

Case should be dismissed for this reason alone.

### C.    Petitioners Fail to Satisfy Their Burden That ARGL Is Not Generally Paying Its Debts as They Become Due.

72.    Section 303(h)(1) of the Bankruptcy Code provides, in relevant part, that "the

court shall order relief against the debtor in an involuntary case . . . only if – the debtor is

generally not paying such debtor's debts as such debts become due unless such debts are the

subject of a bona fide dispute as to liability or amount."  11 U.S.C. § 303(h)(1).  "The petitioning

creditors have the burden of proving . . . that the debtor is generally not paying its bills on time."

*A&J Quality Diamonds, Inc.*, 377 B.R. at 463 (citing *In re Palace Oriental Rugs, Inc.*, 193 B.R.

126, 129 (Bankr. D. Conn. 1996)) (case dismissal is warranted where petitioners failed to

produce "evidence addressing any of the factors courts regularly examine in determining whether

the debtor is generally not paying its debts as they become due.").  Once this burden is met, only

then does the burden shift to the debtor to show that there is a dispute as to a material fact, such

as the existence of the liability or its amount.  *See A&J Quality Diamonds, Inc.*, 377 B.R. at 463.

73.    Here, as noted above, the Petitioners submitted skeletal involuntary petitions –

without any supporting information or documentation – asserting a right to be paid and nothing

more.  Therefore, because Petitioners have not satisfied their burden under Section 303(h)(1) of

the Bankruptcy Code, the Chapter 11 Case should be dismissed.

**III.     THE COURT SHOULD DISMISS THE CHAPTER 11 CASE
PURSUANT TO SECTION 305(a) OF THE BANKRUPTCY CODE.**

74.     As a third and independent basis, the Court should dismiss the Chapter 11 Case

pursuant to Section 305(a)(1) of the Bankruptcy Code because the interests of justice require it.

**A.     Applicable Standards.**

75.     Section 305(a)(1) of the Bankruptcy Code permits a bankruptcy court to dismiss

any bankruptcy case where "the interests of creditors and the debtor would be better served by

such dismissal . . ."  11 U.S.C. § 305(a)(1).  This Court has considered the following factors in

rendering an abstention decision under Section 305(a):

(1)     the economy and efficiency of administration;

(2)     whether another forum is available to protect the interests of both parties
or there is already a pending proceeding in a state court;

(3)     whether federal proceedings are necessary to reach a just and equitable
solution;

(4)     whether there is an alternative means of achieving an equitable
distribution of assets;

(5)     whether the debtor and the creditors are able to work out a less expensive
out-of-court arrangement which better serves all interests in the case;

(6)     whether a non-federal insolvency has proceeded so far in those
proceedings that it would be costly and time consuming to start afresh with the
federal bankruptcy process; and

(7)     the purpose for which bankruptcy jurisdiction has been sought.

*In re TPG Troy, LLC*, 492 B.R. at 160 (citing cases).  "While all factors are considered, not all

are given equal weight in every case."  *Id*. (quoting *In re Monitor Single Lift I, Ltd.*, 381 B.R.

455 (Bankr. S.D.N.Y. 2008)).  "The decision to abstain under § 305(a)(1) should be made on a

case-by-case basis."  *Id*. (quoting *In re Monitor Single Lift I, Ltd.*).

21

76.      Where, as here, a bankruptcy case is predicated solely on a two-party dispute for
which relief is available in a non-bankruptcy forum, courts almost universally hold the case
should be dismissed.  *See, e.g.*, *In re Mt. Dairies, Inc.*, 372 B.R. 623, 634 (Bankr. S.D.N.Y.
2007) ("Even if Schneider-Valley were an eligible petitioner under 11 U.S.C. § 303, this Court
would be compelled to abstain pursuant to 11 U.S.C. § 305 because this is essentially a two-party
dispute for which the parties have adequate remedies in state court."); *In re Jr. Food Mart of
Ark., Inc.*, 241 B.R. 423, 426 (Bankr. E.D. Ark. 1999) ("an involuntary case which is essentially
a two party dispute may be dismissed"); *In re Runaway II, Inc.*, 168 B.R. 193, 198 (Bankr. W.D.
Mo. 1994) (involuntary petition dismissed where state court litigation would resolve disputed
issues and resolution in state court would not harm creditors); *Remex Elecs., Ltd. v. Axl Indus.,
Inc. (In re Axl Indus., Inc.)*, 127 B.R. 482, 484 (S.D. Fla. 1991) ("The bankruptcy courts
generally grant motions to abstain in two-party disputes where the petitioner can obtain adequate
relief in a non-bankruptcy forum").

**B.      The Totality of the Circumstances Warrants Dismissal.**

77.      Here, an analysis of these applicable factors strongly favors granting the Motion
and dismissing the Chapter 11 Case.

78.      The Chapter 11 Case is nothing more than a loosely disguised attempt to continue
a dispute between the shareholders of PHRGL which had recently been settled by those
shareholders and which Amanat has therefore already lost.  The Bankruptcy Court is the wrong
forum to continue a fight that has already played out in the courts of England, British Virgin
Islands and New York State and has all but concluded.

79.      Indeed, the fact that Brown Rudnick filed the purported Complaint – the only
substantive document filed in the Chapter 11 Case to date – on behalf of ARGL on the same day
the Court entered the Order for Relief, reveals Amanat and his affiliates' intent to use this

22

Chapter 11 Case solely for the illegitimate purpose of harassing Amanat's adversaries and using

this Court as a tool for furthering Amanat's goals in a dispute that is the antithesis of a bona fide

attempt to restructure ARGL.  *See TPG Troy, LLC*, 492 B.R. at 160-61 (dismissing a case under

Section 305(a) where "multiple forums . . . are available to protect the interests of both parties"

and "it is questionable whether the bankruptcy proceeding was filed for a proper purpose;

Petitioners are pursuing the same exact claims in many other venues that they are pursuing in this

Court").

80.     Accordingly, for yet another reason, the Court should dismiss the Chapter 11

Case.

## IV.   THE COURT SHOULD DISMISS THE CHAPTER 11 CASE BECAUSE THE INVOLUNTARY PETITIONS AND ANSWER WERE FILED IN BAD FAITH.

81.     Dismissal is also prudent here where the overwhelming evidence indicates that

the filing was in bad faith.  Although Sections 303(b) and 1112(b) of the Bankruptcy Code do

not explicitly require that an involuntary bankruptcy petition be filed in good faith, courts have

espoused such a requirement.  *C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*,

113 F.3d 1304, 1310 (2d Cir. 1997) ("A bankruptcy court may dismiss a bad faith filing on an

interested party's motion or *sua sponte"*); 2 COLLIER ON BANKRUPTCY ¶ 303.16 (16th ed. 2016);

7 COLLIER ON BANKRUPTCY ¶ 1112.07.

82.     Among the tests applied by courts for determining bad faith in the context of

Section 303(b) is the "improper purpose" test, which assesses why the creditor sought to file the

Chapter 11 Case and whether the filing was undertaken to achieve improper goals such as

harassment, delay or to increase costs.  *In re WLB-RSK Venture*, 296 B.R. 509, 513-14 (Bankr.

C.D. Cal. 2003) (dismissing an involuntary Chapter 11 case where "the petition was filed for an

improper purpose.").

23

83.    In the context of Section 1112(b), application of the standard generally turns on the totality of circumstances of each case. *C-TC 9th Ave. P'ship*, 113 F.3d at 1312 ("[A] determination of bad faith requires a full examination of all the circumstances of the case."). Courts have found bad faith in situations involving (i) use of bankruptcy as a vehicle to resolve two-party disputes, *In re HBA East, Inc.*, 87 B.R. 248, 260 (Bankr. E.D.N.Y. 1988); (ii) the absence of legitimate debt, *Furness v. Lilienfield*, 35 B.R. 1006, 1012 (D. Md. 1983) ("There must be real debt and real creditors, otherwise the basic purposes of Chapter 11 would be thwarted"); and (iii) filing of false or misleading information, *In re MacInnis*, 235 B.R. 255, 261 (S.D.N.Y. 1998) ("Misrepresentations in a bankruptcy petition clearly evidence bad faith."); *In re Daniels*, 362 B.R. 428, 436 (Bankr. S.D. Iowa 2007) ("because of the misleading nature of [the debtor's] schedules, the case was filed with lack of good faith").

84.    Dismissal of the Chapter 11 Case is warranted under both Section 303(b) and Section 1112(b). Petitioners' bad faith in filing the Petitions, the Answer, and the Complaint is blatant. First, on March 4, 2016, Amanat, Carpentaria and Peak Venture filed the Original Petition against ARGL. Subsequently, in an attempt to avoid Amanat and his affiliates being designated as petitioning creditors and avoid Carpentaria acting both as a petitioning creditor and as an agent of the debtor, the Amended Petition was filed by the New Petitioners. Next, Carpentaria purported to consent on behalf of ARGL *even though Carpentaria had no authority to do so*, submitting to the Court that its authority was based upon the October Order – an order that it knew had been vacated by the Consent Order.

85.    This ploy was orchestrated by Amanat, through his affiliates, to utilize the Chapter 11 Case as a tool to harass Mr. Amanat's adversaries, not a bona fide attempt to restructure ARGL. Indeed, the Petitions were filed against an entity that has *no debt*.

24

86.    Mr. Amanat has abused the bankruptcy process.  In a recent case, Judge Allan

Gropper stated that Amanat:

> induced his chauffeur to file an involuntary petition against him on
> the theory that, well, in an involuntary [bankruptcy] he could get
> an automatic stay against a number of creditors who are going
> against him, but it wouldn't stop him from engaging in whatever
> transactions he wanted to…. I made no finding there that he had
> perjured himself…on the first occasion that he appeared before this
> court. So I'm not saying I make any such finding now, but you can
> draw your own conclusions.

*Nisselson v. Amanat (In re Amanat)*, Adv. Proc. No. 08-01333 (Bankr. S.D.N.Y.), 2/14/12 Hr'g

Tr. at 11:25-12:11.

87.    Similarly, here, the Court should not tolerate Mr. Amanat's conduct by allowing

him to place ARGL wrongfully and deceitfully in a sham Chapter 11 case.

## V.    ARGL SHOULD BE AWARDED FEES, COSTS AND DAMAGES UNDER § 303(i) AND BANKRUPTCY RULE 9011.

88.    Because the Chapter 11 Case is demonstrably frivolous and was filed in bad faith,

the Court should award ARGL (i) costs and counsel fees under Section 303(i)(1) of the

Bankruptcy Code and Bankruptcy Rule 9011, and (ii) proximate and punitive damages under

Section 303(i)(2).[3]

### A.    ARGL Should Be Awarded Fees And Costs Under § 303(i)(1).

89.    "When an involuntary petition is dismissed,  there is a presumption that costs and

attorney's fees will be awarded to the alleged debtor."  *TPG Troy, LLC*, 793 F.3d at 235 (internal

quotation marks and citations omitted).  Once an involuntary petition is dismissed, "the burden

of proof is on the petitioner to justify a denial of costs and fees."  *Mountain Dairies*, 372 B.R. at

---

[3]    Section 303(i) of the Bankruptcy Code provides: If the court dismisses a petition under this section other
than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this
subsection, the court may grant judgment - (1) against the petitioners and in favor of the debtor for- (A) costs; or (B)
a reasonable attorney's fee; or (2) against any petitioner that filed the petition in bad faith, for-- (A) any damages
proximately caused by such filing; or (B) punitive damages.

637 (quoting *In re Squillante*, 259 B.R. 548, 553-54 (Bankr. D. Conn. 2001)); *see also In re*

*Skyworks Ventures, Inc.*, 431 B.R. 573, 576 (Bankr. D.N.J. 2010) (awarding fees and costs upon

dismissal is the "majority rule"); *In re Silverman*, 230 B.R. 46, 50 (Bankr. D.N.J. 1998)

(attorney's fees and costs are "typically . . . awarded upon dismissal" of an involuntary petition).

90.    "Section 303(i)(1) is a fee-shifting provision that requires no showing of bad

faith, and aims to keep the putative estate whole." *TPG Troy, LLC*, 793 F.3d at 235. *See also*

*Lubow Mach. Co. v. Bayshore Wire Prods. Corp. (In re Bayshore Wire Prods. Corp.)*, 209 F.3d

100, 105 (2d Cir. 2000) ("Under the terms of the statute, bad faith is not a prerequisite to an

award of costs and attorney's fees under § 303(i)(1)."). Instead, "the exercise of the court's

discretion is based on the totality of the circumstances . . ." *Mountain Dairies*, 372 B.R. at 637

(quoting *Squillante*, 259 B.R. at 553-54).

91.    ARGL is thus entitled to costs and reasonable counsel fees consistent with Section

303(i)(1) of the Bankruptcy Code, because, as shown *supra*, this Chapter 11 Case should be

dismissed. Furthermore, although not a prerequisite to an award of costs and attorneys' fees,

Amanat and his affiliates' bad faith in this Chapter 11 Case provides an additional basis for such

an award. As described in detail *supra*, Amanat caused Carpentaria to consent to the frivolous

Petitions on behalf of ARGL *even though Carpentaria had no authority to do so*, attempting to

utilize the Chapter 11 Case as a tool to harass Mr. Amanat's adversaries. Amanat and his

affiliates misled the Court by filing the Answer, purporting to consent to the Petitions on behalf

of ARGL, and by providing a false address for ARGL in the Petitions.

92.    Accordingly, ARGL should be awarded costs and attorney's fees pursuant to

Section 303(i)(1).

**B.    ARGL Should Be Awarded Fees And Costs Under Bankruptcy Rule 9011.**

93.    Bankruptcy Rule 9011 provides in relevant parts:

26

Signing of Papers; Representations to the Court; Sanctions; Verification and Copies of Papers.

…

(*b*) *Representations to the court*. By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—

> (*1*) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

> (*2*) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

> (*3*) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

> (*4*) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

(*c*) *Sanctions*. If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation.

…

Fed. R. Bankr. P. 9011.

94.     Courts have ruled that Bankruptcy Rule 9011 permits imposing sanctions on a person who files a bankruptcy petition on behalf of a corporation without the requisite authority. *In re mpX Tech., Inc.*, 310 B.R. 453, 458-59 (Bankr. M.D. Fla. 2004) (corporation president, who had been informed of his removal by majority shareholders, is subject to Bankruptcy Rule 9011 sanctions for filing bankruptcy petition without the authority of the board of directors); *In re Zaragosa Props., Inc.*, 156 B.R. 310, 313-14 (Bankr. M.D. Fla. 1993) (Bankruptcy Rule 9011

sanctions are mandated where individual who filed petition "had no authority, and knew he had no authority" to file a bankruptcy petition on the debtor's behalf).

95.     Amanat and its affiliates misled the Court by filing the Answer, purporting to consent to the Petitions on behalf of ARGL, even though they had no authority to do so.  As described *supra*, Carpentaria presented the Court the Direction and Authorization to act on behalf of ARGL, even though it was premised on an order (the October Order) which had been superseded by the Consent Order and the March Order (neither of which were disclosed).  Nor did Carpentaria disclose to the Court the existence of PHRGL's Shareholder Agreement, under which neither Carpentaria nor Brown Rudnick had any authority to act on behalf of ARGL in filing the Answer and Complaint.

96.     Furthermore, it remains unclear whether the Petitioners actually authorized the filing of the Petitions.  In a letter dated March 9, 2016, counsel contacted the attorney for the Petitioners, Mr. Kent Gross, and demanded that he immediately produce the original signatures of each party that purportedly signed or authorized Mr. Gross to sign on their behalf, pursuant to Rule 9011-1(b) of the Local Bankruptcy Rules for the Southern District of New York ("An original signed copy of the filing shall be maintained in the attorney's files.").  To date, Mr. Gross has not responded to this demand.

97.     Based on all the foregoing, sanctions are warranted under Bankruptcy Rule 9011.

**C.     ARGL Should be Awarded Damages Under § 303(i)(2).**

98.     Section 303(i)(2) of the Bankruptcy Code authorizes courts to award judgment for proximate and punitive damages arising out of a bad faith filing.  "Because 'bad faith' is not defined in the [B]ankruptcy [C]ode, and because there is no legislative history addressing the intended meaning of this language, courts have used different approaches to determine whether a petition was filed in bad faith for purposes of § 303(i)(2)."  *Bayshore Wire Prods.*, 209 F.3d at

105 (brackets omitted).  The Second Circuit explained that courts employ various standards, finding bad faith:  (i) "when a petitioning creditor uses involuntary bankruptcy procedures in an attempt to obtain a disproportionate advantage for itself, rather than to protect against other creditors obtaining disproportionate advantages, *particularly when the petitioner could have advanced its own interests in a different forum*," (ii) "if the filing of the petition was motivated by ill will, malice, or a desire to embarrass or harass the alleged debtor," (iii) "based on what a reasonable person would have believed," and (iv) under Bankruptcy Rule 9011 standards.  *Id.* at 105-06 (collecting cases) (citations and quotation marks omitted) (emphasis added).[4]

99.    Petitioners' bad faith in filing the Petitions, the Answer, and Complaint is described in detail *supra*.  Amanat and his affiliates orchestrated the filings as a ploy to harass Mr. Amanat's adversaries, not a bona fide attempt to restructure ARGL, while misleading the Court and providing false information.

100.    As if that were not enough, Carpentaria has failed to withdraw its Answer upon receipt of ARGL's letter of March 9, 2016, in which ARGL's counsel reminded Carpentaria's counsel that Carpentaria had no authority to act for ARGL and that its pleadings were void *ab initio* and thus of no effect.  Additionally, the Petitioners knew, or recklessly disregarded, that ARGL has no debts or claims to be restructured.  The Court should not permit the exploitation of its resources for Amanat's improper purposes particularly where, as here, Petitioners refused to dismiss the Petitions after ARGL advised them that the Petitions are patently frivolous.  For all these reasons, the Petitions were filed in bad faith, and ARGL is entitled to damages consistent with Section 303(i)(2) of the Bankruptcy Code.

---

[4]    *See, e.g.*, *In re Grossinger*, 268 B.R. 386, 387 (Bankr. S.D.N.Y. 2001) ("'[B]ad faith will then exist any time a creditor uses an involuntary bankruptcy to obtain a disproportionate advantage to that particular creditor's position, rather than to protect against other creditors obtaining such a disproportionate advantage.  *This is especially true where the petitioning creditor could have obtained that advantage in an alternate forum*.'") (quoting *In re Better Care, Ltd.*, 97 B.R. 405, 410 (Bankr. N.D. Ill. 1990)) (emphasis in *Grossinger*).

**<u>CONCLUSION</u>**

For the reasons set forth above, ARGL requests that the Court grant the Motion and

(i) trike the Answer from the record, (ii) dismiss the Chapter 11 Case, (iii) award ARGL fees,

costs and damages pursuant to Section 303(i) of the Bankruptcy Code and Bankruptcy Rule

9011, and (iv) grant such other relief to ARGL as is deemed just and proper.

Dated: March 11, 2016
      New York, New York

By: <u>/s/ *Andrew K. Glenn*</u>
Andrew K. Glenn (aglenn@kasowitz.com)
Paul M. O'Connor III (poconnor@kasowitz.com)
Matthew B. Stein (mstein@kasowitz.com)
KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone:  (212) 506-1700
Facsimile:  (212) 506-1800

*Counsel for Aman Resorts Group Limited*